UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AT&T CORP.,

                                  Plaintiff,

              -against-

ATOS IT SOLUTIONS AND SERVICES, INC.,

                                  Defendant.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff AT&T Corp. ("AT&T"), by and through its attorneys Baker Hostetler LLP, for its complaint against Defendant Atos IT Solutions and Services, Inc. ("Atos" or "Defendant" and together with AT&T, the "Parties") respectfully alleges as follows on knowledge as to its own acts and on information and belief as to all other matters except where indicated otherwise:

## NATURE OF THE ACTION

1.      This is a Complaint for breach of contract arising from Atos' breach of a Release and Settlement Agreement (the "Settlement Agreement") and a related contractual amendment (the "2021 Amendment") to a September 30, 2015 AT&T SDN OneNet BTB Pricing Schedule[1] between AT&T and Atos (the "Pricing Schedule").

2.      Pursuant to the Pricing Schedule, AT&T agreed to provide certain voice and data connectivity services to Atos in exchange for Atos' agreement to, *inter alia*, satisfy certain Minimum Annal Revenue Commitments (each, a "MARC") to AT&T.

3.      The Pricing Schedule originally provided for a 36-month term.  However, in 2018

---

[1]     The Pricing Schedule, together with subsequent amendments and modifications, are part of an original Master Agreement, Reference No. 120206, executed by AT&T and a predecessor-in-interest to Atos, effective October 9, 2002 (the "MSA").

the Parties agreed to extend the Pricing Schedule's term to 64 months (the "2018 Amendment"). The Parties agreed to MARCs of $10.5 million for each of the first two years of the Pricing Schedule's term.

4.      Under the 2018 Amendment, Atos also guaranteed revenues of at least $18.5 million to AT&T for Months 29-64 of the Pricing Schedule's term.  This multi-year revenue commitment is referred to as the Minimum Term Revenue Commitment ("MTRC").[2]

5.      The 2018 Amendment provided Atos with an option to further extend the Pricing Schedule's term for an additional 12-months (the "Extension Term") for which Atos would be required to satisfy a $6.2 million MARC.

6.      The 2018 Amendment included a "Shortfall Charges/Penalties" provision.  Under that provision, Atos would owe AT&T a shortfall charge if it failed to meet the MARC or MTRC for the periods specified in the amended Pricing Schedule.

7.      As to the MTRC for Months 29-64 of the Pricing Schedule's term, the shortfall charge was comprised of "an amount equal to the difference between the MTRC and the total of the MTRC-Eligible Charges incurred by the end of the MTRC measurement period for Months 29-64."

8.      The Parties subsequently agreed to a similar amendment in 2019 (the "2019 Amendment") that further amends and restates the Pricing Schedule and is otherwise substantially the same as the 2018 Amendment in all relevant respects.

9.      Atos ultimately failed to satisfy the MTRC for Months 29-64 of the Pricing Schedule's term.  As a result, Atos owed AT&T a shortfall charge of approximately $455,237.00 at the end of the Pricing Schedule's 64-month term.

---

[2]    No MARC or MTRC was owed for months 25-28 of the Pricing Schedule's term.

10.     However, Atos claimed that it should not be responsible for the MTRC shortfall because it allegedly resulted from a downturn in its business purportedly caused by the COVID-19 pandemic.  AT&T disagreed.

11.     After a period of negotiations, the Parties eventually entered into the Settlement Agreement pursuant to which AT&T agreed to waive the Shortfall Charge in exchange for Atos' agreement to, *inter alia*, "execute all necessary documentation to extend the Pricing Schedule Term to 76 months, expiring February 18, 2022, with a $6,200,000.00 Minimum Annual Revenue Commitment."

12.     Atos subsequently executed the 2021 Amendment by which, consistent with its obligations under the Settlement Agreement, Atos agreed to: (1) extend the Pricing Schedule's Term for an additional year running from February 19, 2021 to February 18, 2022 (Months 65-76) (the "Extension Term"); and (2) a $6.2 million MARC for the Extension Term.

13.     Despite agreeing to the Extension Term's $6.2 million MARC—both under the Settlement Agreement *and* as part of the 2021 Amendment—Atos once again failed to satisfy its contractually-mandated revenue commitment to AT&T.  Instead, Atos missed the Extension Term's MARC by more than 50%—a shortfall of $3,367,351.00 (the "Shortfall Amount").

14.     However, when AT&T issued an invoice to Atos for the Shortfall Amount, Atos refused to pay it.  Instead, Atos attempted to hide behind an obvious drafting error contained in the earlier 2018 Amendment and later repeated in the 2019 Amendment that provides an erroneous calculation of the shortfall amount for which Atos would be responsible if it failed to satisfy the Extension Term's $6.2 million MARC.

15.     The drafting error at issue provides that the shortfall charge (the "Shortfall Charge") for Months 65-77 of the Pricing Schedule's Term is equal to the difference between the

3

Extension Term's MARC and all MARC-Eligible Charges incurred ***thru month 40*** of the Pricing Schedule's term (the "Scrivener's Error")—a period of 40 months rather than 12 months. *See* 2018 and 2019 Amendments at §3.2 (emphasis added).

16.     Atos claimed the Scrivener's Error entitled it to calculate the Shortfall Charge by measuring the Extension Term's $6.2 million MARC against all MARC-Eligible Charges incurred thru month 40 of the Pricing Schedule's Term—not just the MARC-Eligible Charges incurred by Atos during the actual Extension Term that corresponds to the MARC.

17.     Atos' view of its Shortfall Charge obligations is not only contrary to the 2021 Amendment and the Settlement Agreement, it leads to patently absurd results.

18.     Indeed, given the fact that Atos had already incurred more than $17 million in MARC-Eligible Charges by the time the Parties signed the 2018 Amendment in which the Scrivener's Error first appears, Atos' reading would render the Extension Term's $6.2 million MARC meaningless and entirely unenforceable.

19.     Under Atos' reading, the calculation of the Shortfall Charge would always result in a negative number even if Atos incurred no MARC-Eligible Charges during the Extension Term at all.  Accordingly, AT&T would never be able to enforce the $6.2 million MARC governing the Extension Term.

20.     As set forth below, Atos' attempt to avoid liability for the Shortfall Amount fails on multiple levels.

21.     *First*, the 2021 Amendment does not include the Scrivener's Error language on which Atos relies to avoid its obligations.

22.     The 2021 Amendment expressly mandates a $6.2 million MARC, which the controlling agreements define as, "the total revenue commitment set forth in [the] Pricing

Schedule that [Atos] agrees to satisfy during each year of the Pricing Schedule Term."

23.     Atos failed to satisfy the Extension Term's $6.2 million MARC within the meaning of the term "MARC" established by the Pricing Schedule, the MSA and their related documents because Atos failed to provide at least $6.2 million in revenues to AT&T during the Extension Term.

24.     *Second*, the Scrivener's Error is an obvious drafting error for which AT&T is entitled to the remedy of reformation.  Not only does the Scrivener's Error provide an erroneous calculation of the Shortfall Charge, it does not even refer to the correct period of time covered by the Extension Term—referring to "Months 65-77" (a 13-month period) instead of Months 65-76 (the correct 12-month period).

25.     Moreover, both Parties expressly acknowledged the Scrivener's Error in their communications prior to signing the 2021 Amendment and the Settlement Agreement—neither of which contains the Scrivener's Error.

26.     *Third*, even if Atos could somehow rely upon the Scrivener's Error to avoid its obligation to satisfy the Extension Term's $6.2 million MARC, Atos nonetheless breached the Settlement Agreement by refusing to execute an amendment to correct the Scrivener's Error.

27.     The Settlement Agreement specifically requires Atos to "execute all necessary documentation to extend the Pricing Schedule Term to 76 months, expiring February 18, 2022, *with a $6,200,000.00 Minimum Annual Revenue Commitment*." *See* Settlement Agreement, §1(a) (emphasis added).

28.     Following the Parties' execution of the 2021 Amendment and Settlement Agreement, AT&T repeatedly asked Atos to execute an amendment that would have corrected

the Scrivener's Error and eliminated any confusion as to the proper calculation of the Shortfall Charge. However, Atos refused to do so.

29.     Atos' material breaches of the 2021 Amendment and the Settlement Agreement have caused AT&T to suffer damages in an amount to be determined at trial but believed to be no less than the full Shortfall Amount of $3,367,351.00, plus interest, costs and attorneys' fees as permitted under the Settlement Agreement and/or by law.

30.     Accordingly, AT&T brings this action for: (1) breach of the 2021 Amendment; (2) in the alternative, reformation to correct the Scrivener's Error and give effect to the Parties' true intent with respect to the 2021 Amendment's MARC and the proper calculation of the Shortfall Charge; and (3) in the alternative, breach of the Settlement Agreement.

## THE PARTIES

31.     AT&T is a New York corporation with a principal place of business located at One AT&T Way, Bedminster, New Jersey 07921.

32.     Upon information and belief, Atos is a Delaware corporation with its principal place of business located at 4851 Regent Blvd, Irving, Texas 75063.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the dispute is between citizens of different states and the amount in controversy exceeds $75,000.00.

34.     Upon information and belief, Defendant is also subject to personal jurisdiction in New York pursuant to CPLR § 302 because Atos: (1) is authorized to conduct business in New York and regularly transacts or solicits business within the state; (2) should have reasonably expected its acts to have consequences in New York because the agreements at issue are governed by New York law and the Settlement Agreement contains a New York venue provision; and (3) derives substantial revenue from interstate or international commerce.

35.     Venue is proper in this District because, upon information and belief: Defendant had offices located in this District at relevant times; certain of the events or omissions giving rise to the claim occurred in this District; and, regardless, the Settlement Agreement on which AT&T sues contains a venue clause that provides for venue "in New York federal or state court."

## FACTUAL BACKGROUND

### A.     AT&T's Business.

36.     AT&T is one of the world's largest telecommunications companies.  A pillar of AT&T's business is—and has been—its broadband connectivity services.

37.     As a broadband connectivity provider, AT&T provides voice and data services that connect people and businesses across the United States through high-speed fiber and wireless broadband networks.

### B.     Atos' Business.

38.     Upon information and belief, Atos is an IT services company that provides cybersecurity, digital consulting, artificial intelligence, internet services, customer journey analytics, and cloud management solutions to its customers.

39.     Upon information and belief, as part of its business, Atos also provides network sourcing services to its customers.

### C.     The Master Agreement.

40.     AT&T has had a business relationship with Atos for more than twenty years.

41.     Effective October 9, 2002, AT&T and Atos Origin, Inc.—the predecessor-in-interest to Atos—entered into Master Agreement, Reference No. 120206 (the "MSA").[3]

---

[3]    The Addendum expressly identifies Atos as the "successor-in-interest to Atos Origin, Inc., effective December 31, 2011[.]" (*See* Addendum at 1.)  For avoidance of confusion, where this Complaint refers to Atos, such reference will also include any of its predecessors in interest such as Atos Origin, Inc.

42.    The MSA provides the "General Terms and Conditions" applicable to AT&T's provision of products and services to Atos (collectively, the "Services") under the MSA and all service attachments attached to the MSA or subsequently signed by the parties to the extent they reference the MSA.

43.    The precise Services to be provided by AT&T under the MSA were memorialized in separate service attachments (each, an "Attachment") that were executed at dates that followed the Parties' execution of the MSA.

44.    The MSA provides that in the event of a conflict between the General Terms and Conditions and an Attachment, the Attachment controls.

45.    The MSA states that its terms shall continue in effect for as long as any Attachment remains in effect, unless earlier terminated in accordance with the provisions of the Agreement. The MSA further provides that the term of each Attachment is stated in the Attachment.

46.    The MSA sets forth the terms governing AT&T's charges and billing and, among other things, provides that Atos:

> [S]hall pay AT&T for [Atos'] and [Atos' customers'] use of the Services at the rates and charges specified in the Attachments, without deduction, setoff or delay for any reason. Charges set forth in the Attachments are exclusive of any applicable taxes.

(MSA, § 2.1.)

47.    The MSA includes a no oral modification clause which requires that any modifications be set forth in a writing signed by both parties as follows:

> Any supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties. A waiver by either party of any breach of this Agreement shall not operate as a waiver of any other breach of this Agreement.

8

(MSA, § 12.1.)

48.     The MSA also provides that it—together with any Attachments—constitutes the

entire agreement of the parties with respect to AT&T's Services as follows:

> THIS AGREEMENT CONSTITUTES THE ENTIRE
> AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO
> THE SERVICES. THIS AGREEMENT SUPERSEDES ALL
> PRIOR AGREEMENTS, PROPOSALS, REPRESENTATIONS,
> STATEMENTS OR UNDERSTANDINGS, WHETHER
> WRITTEN OR ORAL CONCERNING THE SERVICES OR THE
> RIGHTS AND OBLIGATIONS RELATING TO THE SERVICES.
> THIS AGREEMENT SHALL NOT BE CONTRADICTED, OR
> SUPPLEMENTED BY ANY WRITTEN OR ORAL
> STATEMENTS, PROPOSALS, REPRESENTATIONS,
> ADVERTISEMENTS, SERVICE DESCRIPTIONS OR YOUR
> PURCHASE ORDER FORMS NOT EXPRESSLY SET FORTH
> IN THIS AGREEMENT OR AN ATTACHMENT.

(MSA, § 12.9.)

49.     Finally, the MSA includes a New York choice of law provision which provides:

> State law issues concerning construction, interpretation and
> performance of this Agreement shall be governed by the substantive
> law of the State of New York excluding its choice of law rules.

(MSA, § 12.6.)

**D.      *The October 2002 Amendment to the MSA.***

50.     Contemporaneously with the execution of the MSA on or about October 9, 2002,

Atos and AT&T executed an Addendum to the MSA which modified certain general terms and

conditions of the MSA (the "2002 Addendum").

51.     Among other things, the 2002 Addendum revised Section 2.3 of the MSA

regarding Atos' payment obligations.  Specifically, the Parties agreed that AT&T's invoices

must be paid by Atos when received and will be considered past due if not paid in full within

thirty (30) days as follows:

> Billing invoices are payable upon receipt by [Atos].  Charges shall be considered past due if not paid in full within thirty (30) days after the date of an invoice.

(2002 Addendum, § 2.3.)

52.     The 2002 Addendum expressly provides that, "[e]xcept as modified herein, the terms of the [MSA] remain unchanged and in full force and effect." (2002 Amendment, at 2.)

**E.      *The April 2007 Comprehensive Service Order Attachment.***

53.     On or about April 4, 2007, AT&T and Atos executed a Comprehensive Service Order Attachment to the Master Agreement (the "CSOA").[4]

54.     Under the CSOA, AT&T agreed to provide the Services to Atos "identified in the applicable Pricing Schedules."  (CSOA, § 1(A).)

55.     The CSOA defines a "Pricing Schedule" as "a pricing schedule to this Attachment, either appended [to the Attachment] or subsequently signed by the parties referencing [the MSA]." (CSOA, § 2.)

56.     The CSOA provides that, "[t]he pricing, service descriptions and other provisions relating to the Services will be as set forth in: (i) this Attachment (including, the Pricing Schedules and any Addenda to this Attachment); (ii) the [MSA's] General Terms and Conditions; and (iii) the appropriate section of the Service Guide or the Applicable Tariffs." (CSOA, § 1(B).)

57.     The CSOA further provides that it "shall remain in effect until no Service Component provided under this Attachment remains in service." (CSOA, § 1(C).)

---

[4]     The CSOA expressly states that it "is a Service Order Attachment to the [MSA] between AT&T and [Atos]" and includes a specific reference to the MSA's Reference Number 120206.  (CSOA at 1.)

58.     The CSOA contemplates that a Pricing Schedule may require a "Minimum Annual Revenue Commitment" (or "MARC") that Atos agrees to satisfy during the Pricing Schedule's term and defines the MARC as follows:

> **"MARC (Minimum Annual Revenue Commitment)"** means an annual revenue commitment set forth in an applicable Pricing Schedule that [Atos] agrees to satisfy during a Pricing Schedule Term.

(CSOA, § 2.)

59.     The CSOA also defines the "MARC-Eligible Charges" that would apply towards Atos' satisfaction of a MARC as follows:

> **"MARC-Eligible Charges"** means, unless the applicable Pricing Schedule indicates otherwise, the recurring and usage charges, after applicable discounts and credits, incurred by Customer for the Services identified in the applicable Pricing Schedule as MARC-contributing.   Notwithstanding anything set forth in a Pricing Schedule, the following charges shall not be deemed MARC Eligible Charges: (a) charges for or in connection with Purchased Equipment; (b) charges for outsourcing services; (c) taxes, and (d) charges imposed in connection with governmentally imposed costs or fees (such as USF, PICC, payphone service provider compensation, E911 and deal relay charges).

(CSOA, § 2.)

60.     The Parties agreed that the MARC represents the *minimum* amount of revenues that Atos agreed to generate for AT&T in an annual period.

61.     The Parties further agreed that if Atos failed to satisfy a MARC for a given annual period, Atos would be liable for a shortfall charge equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred by Atos during the 12 month period that corresponds to the MARC.

62.     Indeed, Section 4 of the CSOA explains the Parties' original understanding and intent with respect to a MARC shortfall penalty charge as follows:

### 4. **MINIMUM COMMITMENTS/CHARGES**

If, on any anniversary of a Pricing Schedule Term start date, the Customer has failed to satisfy the MARC *for the preceding 12 month period*, the Customer will be billed a shortfall charge in an amount equal to *the difference between the MARC and the total of the applicable **MARC-Eligible Charges incurred during the 12 month period***. In such a case, Customer shall not be entitled to receive promotional, compliance or other credits until Customer pays the shortfall charge.

(CSOA, § 4 (emphasis added).)

### F. *The Pricing Schedule.*

63.     On or about September 30, 2015, Atos and AT&T executed the Pricing Schedule that provides the terms governing AT&T's provision of certain voice and data services to Atos in accordance with the terms of, *inter alia*, the MSA, the 2002 Addendum and CSOA ("Pricing Schedule").

64.     The Pricing Schedule expressly states that it is "part of" the MSA between Atos and AT&T and includes a specific reference to the MSA's Reference Number 120206. (Pricing Schedule, at 1.)

65.     The Pricing Schedule provides for an initial three-year term (a "Term"), with a Term Start Date of November 1, 2015.[5] (Pricing Schedule, § 2.)

66.     The Pricing Schedule further provides for specific MARC amounts for Years 1-3 of the Pricing Schedule's term as follows:

---

[5]     The Term Start Date is set forth in Section 2 of the Pricing Schedule, which provides that "If the Effective Date of [the] Pricing Schedule" is "[a]fter the 10th of the month" the term would start on the "1st day of the second full month following the Effective Date of [the] Pricing Schedule[.]" Since the Pricing Schedule was signed and effective as of September 30, 2015, the Term Start Date was deemed to be November 1, 2015.

|  | YEAR 1[6] | YEAR 2 | YEAR 3 |
|---|---|---|---|
| MARC under this Pricing Schedule | $10,500,000 | $10,500,000 | $10,500,000 |

67.     Although the Pricing Schedule provided for a Term Start Date of November 1, 2015, as a courtesy to Atos, AT&T began providing the contracted-for voice and data Services at the agreed-upon rates and discounts on or about October 19, 2015, based, in part, on the fact that Atos was subject to a billing cycle that began on the 19th of each month.[7]

**G.     *The 2018 Amendment to the Pricing Schedule and the Scrivener's Error.***

68.     AT&T and Atos executed the 2018 Amendment on or about February 27, 2018.

69.     The 2018 Amendment sets forth definitions for the terms "MARC" and "MARC-Eligible Charges" that are consistent with the definitions of those terms set forth in the CSOA. (2018 Amendment, § 1.1.)

70.     Specifically, the 2018 Amendment defines a MARC as follows:

> **"MARC (Minimum Annual Revenue Commitment)"** means the total revenue commitment set forth in this Pricing Schedule that [Atos] agrees to satisfy during each year of the Pricing Schedule Term.

(2018 Amendment, § 1.1.)

71.     The 2018 Amendment also describes the charges that Atos could apply toward its satisfaction of a MARC as follows:

> **"MARC-Eligible Charges"** means the recurring and usage charges, after deducting applicable discounts and credits, invoiced to [Atos] and identified in this Pricing Schedule as MARC-contributing. [. . .]).  (2018 Amendment, § 1.1.)

MARC-Eligible Charges and MTRC-Eligible Charges are specifically set forth in a table.  (2018

---

[6]     Section 3.1 of the Pricing Schedule, as originally agreed to, provides the circumstances under which the MARC for year 1 may be reduced.

[7]     The Effective Date of Pricing Schedule was subsequently modified under the 2018 Amendment (as defined herein) to reflect an Effective Date of October 19, 2015.

Amendment, § 4.)

72.     The 2018 Amendment also provides for the possibility of revenue commitments

for periods of the Pricing Schedule's term in excess of one year referred to as the "MTRC

(Minimum Term Revenue Commitment)," which is defined as follows:

> **"MTRC (Minimum Term Revenue Commitment)"** means the
> total revenue commitment set forth in this Pricing Schedule that
> [Atos] agrees to satisfy during the specified periods of the Pricing
> Schedule Term.

(2018 Amendment, § 1.1.)

73.     The 2018 Amendment describes the charges that Atos could apply toward its

satisfaction of a MTRC as follows:

> **"MTRC-Eligible Charges"** means the recurring and usage
> charges, after deducting applicable discounts and credits invoiced
> to Customer and identified in this Pricing Schedule as MTRC-
> contributing.  The following charges shall not be deemed MTRC
> Eligible Charges: (a) charges for or in connection with Purchased
> Equipment; (b) charges for outsourcing services; (c) taxes, and (d)
> charges imposed in connection with governmentally imposed costs
> or fees (such as USF, PICC, payphone service provider
> compensation, Texas USF, E911 and deaf relay charges.

(2018 Amendment, § 1.1.)

74.     The 2018 Amendment also extends the Pricing Schedule Term to 64 months.  The

2018 Amendment further provides for an optional 12-month extension of the Pricing Schedule

Term (*i.e.*, the Extension Term).  (2018 Amendment, §§ 2, 3.c.)

75.     However, the Extension Term set forth under the 2018 Amendment contains an

obvious drafting error as to the length of the Extension Term—at once indicating that it is an

"Optional 12 Month extension" while, at the same time, stating that the Extension Term is

comprised of "Months 65-77," which is a total of 13 months.  (2018 Amendment, § 3.c.)

76.     Thus, the Pricing Schedule Term, as modified by the 2018 Amendment, corresponds to the following time periods:

| | |
|---|---|
| Year 1 (Months 1-12) | November 2015-October 2016 |
| Year 2 (Months 13-24) | November 2016-October 2017 |
| Year 3 (Months 25-36) | November 2017-October 2018 |
| Year 4 (Months 37-48) | November 2018-October 2019 |
| Year 5 (Months 49-60) | November 2019-October 2020 |
| Partial Year 6 (Months 61-64) | November 2020-February 2021 |
| Optional 12-Month Extension Term (Months 65-77*[sic]*) | March 2021-March 2022[8] |

(2018 Amendment, § 3.)

77.     The 2018 Amendment sets forth revised MARCs and a MTRC for the periods covered by the Pricing Schedule Term and Extension Term as amended.

78.     The MARCs for Months 1-12 and 13-24 are $10,500,000 each, and the MARC for Months 25-28 of the Pricing Schedule Term is $0.00.  (2018 Amendment, § 3.a.)

79.     The 2018 Amendment also establishes an MTRC for Months 29-64 of $18,500,000.  (2018 Amendment, § 3.b.)

80.     Finally, the 2018 Amendment states that the MARC for the optional 12-month Extension Term for "Optional Months 65-77*[sic]*" is $6,200,000.  (2018 Amendment, § 3.c.)

81.     Thus, the MARCs and MTRC set forth in the 2018 Amendment, and the time periods to which they apply, are as follows:

---

[8]   The Pricing Schedule's Term would extend to February 2022, if the Extension Term were to end at Month 76—as opposed to Month 77.

| | |
|---|---|
| Months 1-12 | $10.5 million MARC |
| Months 13-24 | $10.5 million MARC |
| Months 25-28 | $0 MARC |
| Months 29-64 | $18.5 million MTRC |
| Optional Months 65-77*[sic]* | $6.2 million MARC |

(2018 Amendment, § 3.)

82.     Section 3.2 of the 2018 Amendment introduces the shortfall charge provision (the "Shortfall Charge Provision").  That provision sets forth the shortfall charge (each, a "Shortfall Charge") for which Atos would be responsible if it failed to generate revenues of a certain amount of MTRC-Eligible Charges for AT&T for a period of the Pricing Schedule's Term referred to as the Monitoring Period (Months 29-40) as well as the MTRC for Months 29-64 of the Pricing Schedule's Term.

83.     The Shortfall Charge Provision also establishes the Shortfall Charge for which Atos would be responsible in the event the Pricing Schedule was extended for the optional 12-month Extension Term and Atos failed to satisfy the Extension Term's $6.2 million MARC.

84.     However, the Shortfall Charge Provision contains an obvious drafting error with respect to the calculation of the Shortfall Charge that Atos would owe to AT&T in the event Atos failed to satisfy the Extension Term's MARC.  This is the Scrivener's Error.

85.     The Scrivener's Error provides as follows:

> If, at the end of the optional one year term period for Months 65-77*[sic]* of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru*[sic]* month 40*[sic]*.

(2018 Amendment, § 3.2.)

16

86.     On its face, the Scrivener's Error contains two obvious drafting errors.  *First*, it refers to the "optional one year term period" of the Extension Term as covering "Months 65-77" which is a 13-month period, rather than, as was intended, a year-long period comprised of Months 65-76. (*Id*.)

87.     *Second*, the Scrivener's Error calculates the Shortfall Charge owed for the Extension Term as the difference between the Extension Term's $6.2 million MARC and "the total of the applicable MARC-Eligible Charges incurred [by Atos] ***thru month 40***."  (*Id*.) (emphasis added)

88.     As a result, rather than calculating the Shortfall Charge for which Atos would be responsible for the Extension Term by measuring the Extension Term's $6.2 million MARC against all MARC-Eligible Charges incurred by Atos during the period of "Months 65-77" (the precise period for the Extension Term referred to in Section 3.2 of the 2018 Amendment), the Scrivener's Error would enable Atos to calculate the Shortfall Charge by measuring the Extension Term's MARC ($6.2 million) against ***all*** MARC-Eligible Charges generated by Atos from the inception of the Pricing Schedule's Term through Month 40—a period of 40 months, rather than 13 months.  That was also *not* the Parties' intent.

89.     In fact, Atos had already generated revenues of more than $17 million in MARC-Eligible Charges for AT&T at the time the Scrivener's Error first appeared in the 2018 Amendment signed in February 2018, which was Month 28 of the Pricing Schedule's Term.

90.     Thus, absent correction of the Scrivener's Error, the MARC to which the Parties agreed for the Extension Term would be entirely meaningless and superfluous.

91.     The calculation of the Shortfall Charge under the 2018 Amendment as drafted—*in error*—would always result in a negative number (*i.e.*, no Shortfall Charge) even if

Atos incurred no MARC-Eligible Charges during the Extension Term at all.  The Extension Term's $6.2 million MARC would always be offset by the "total of the applicable MARC-Eligible Charges incurred thru month 40."

92.     The Parties would never have agreed to an Extension Term MARC that had *already* been met at the time of signing.

**H.     *The Third Amendment to the MSA.***

93.     On or about March 26, 2018, Atos and AT&T executed the Amendment Number 3 to AT&T Master Agreement By and Between Atos Origin and AT&T Corp. (the "Third Amendment").

94.     Under the Third Amendment, AT&T agreed to waive all prior shortfall penalties accrued under the Pricing Schedule as amended (the "2018 Waiver") as of the date of the Third Amendment including, but not limited to, all Shortfall Charges that accrued under the Pricing Schedule as of February 27, 2018—the date of the 2018 Amendment.  (Third Amendment, § 5.)

**I.     *The 2019 Amendment to the Pricing Schedule.***

95.     AT&T and Atos executed the 2019 Amendment effective January 28, 2019.

96.     The 2019 Amendment expressly "amends and restates [the Pricing Schedule]" and "is part of the [MSA]." (2019 Amendment at 1.)

97.     Among other things, the 2019 Amendment restates the definitions of "MARC," "MARC-Eligible Charges," "MTRC" and "MTRC-Eligible Charges" that previously appeared in the 2018 Amendment.  (2019 Amendment, § 1.1.)

98.     Once again, under the 2019 Amendment, a "MARC" is defined as "the total revenue commitment set forth in this Pricing Schedule that [Atos] agrees to satisfy during each year of the Pricing Schedule Term."  (2019 Amendment, § 1.1.)

99.     The 2019 Amendment's definition of a MARC is consistent with the definitions of a MARC set forth in both the 2018 Amendment and the CSOA executed in April 2007.

100.     Additionally, the 2019 Amendment includes the same MARC and MTRC amounts for the same time periods set forth in the 2018 Amendment, including the same $6.2 million MARC for the erroneous "Optional Months 65-77*[sic]*" as follows:

| | |
|---|---|
| Months 1-12 | $10.5 million MARC |
| Months 13-24 | $10.5 million MARC |
| Months 25-28 | $0 MARC |
| Months 29-64 | $18.5 million MTRC |
| Optional Months 65-77*[sic]* | $6.2 million MARC |

(2019 Amendment, §§ 3.a, 3.b, 3.c.)

101.     The 2019 Amendment also restates the Shortfall Charge Provision pertaining to the calculation of the Shortfall Charge for which Atos would be responsible in the event the Parties exercised the optional Extension Term of "Months 65-77" and Atos failed to satisfy the Extension Term's MARC as follows:

> If, at the end of the optional one year term period for Months 65-77*[sic]* of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru*[sic]* month 40*[sic]*.

(2019 Amendment, § 3.2.)

102.     Accordingly, the 2019 Amendment contains the identical Scrivener's Error as that found in the 2018 Amendment's Shortfall Charge Provision: (a) it refers to the Extension Term's "optional one year term period" as the *13*-month period of "Months 65-77" rather than a year-long period of Months 65-76; and (b) it calculates the potential Shortfall Charge for which Atos could be responsible for the Extension Term as the difference between the Extension Term's MARC and "the total of the applicable MARC-Eligible Charges incurred [by Atos] thru month

19

40" rather than, as was obviously intended, the total of all MARC-Eligible Charges incurred by Atos during the Extension Term alone.

103.    The Scrivener's Error in the 2019 Amendment also does not reflect the Parties' true intent.

## J.    *The Resale Addendum.*

104.    On or about February 27, 2019, AT&T and Atos executed the System Integrator Unified Resale Addendum (the "Resale Addendum") to the MSA.  The Resale Addendum expressly incorporates the terms of the Master Agreement and is expressly identified as an Attachment.  (Resale Addendum, at 1, 3, § 3.4(d).)

105.    Section 1.1 of the Resale Addendum provides an overview of the relevant documents as follows:

> **1.1 Overview of Documents.**  This Addendum incorporates the terms of the [MSA] between AT&T and [Atos] referenced above [referencing the MSA] and together with the General Terms and Conditions herein and the following additional documents (collectively, "Agreement") shall apply to all products and services AT&T provides [Atos] pursuant to this Agreement ("Services") and shall continue in effect so long as Services are provided under this Agreement:

(Resale Addendum, § 1.1.)

106.    The Resale Addendum also provides the following order of "Priority of Documents":

> The order of priority of the documents that form this Agreement is: the applicable Pricing Schedule; the General Terms and Conditions; the Master Agreement, the AUP; and Tariffs, Guidebooks, Service Guides, and Price Lists; provided that Tariffs will be first in priority in any jurisdiction where applicable law or regulation does not permit contract terms to take precedence over inconsistent Tariff terms.

(Resale Addendum, § 1.2.)

107.    The Resale Addendum defines "Pricing Schedule" as "a pricing schedule

(including related attachments) or other document that is attached to or is later executed by the parties and references this Agreement."  (Resale Addendum, § 1.1(a).)

108.    Section 4.7 of the Resale Addendum includes a definition of the term "MARC" that accords with the definition set forth in the 2018 and 2019 Amendments.  It also clarifies the Parties' intent with respect to the Shortfall Charge Provision.

109.    Specifically, the Resale Addendum explains that a Shortfall Charge is calculated by comparing the MARC for any 12-month period of the Pricing Schedule's term against the actual MARC-Eligible Charges incurred during that *same* 12-month period, as follows:

> **4.7**    **MARC.**  Minimum Annual Revenue Commitment ("MARC") means an annual revenue commitment set forth in a Pricing Schedule that Customer agrees to satisfy during each 12-consecutive-month period of the Pricing Schedule Term.  *If Customer fails to satisfy the MARC for any such 12-month period, Customer will pay a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during such 12-month period*, and AT&T may withhold contractual credits until Customer pays the shortfall charge.

(Resale Addendum, § 4.7 (emphasis added).)

110.    The Resale Addendum also provides that Atos "will reimburse AT&T for all costs associated with collecting undisputed overdue, delinquent or dishonored payments, including reasonable attorneys' fees." (Resale Addendum, § 4.4.)

### K.    *The Parties' Negotiations to Resolve a Shortfall in Atos' MTRC and Atos' Identification of the Scrivener's Error.*

111.    As AT&T and Atos approached the end of the 64-month Pricing Schedule Term, as amended by the 2018 and 2019 Amendments, it became apparent that Atos was not going to satisfy the $18,500,000 MTRC for Months 29-64 that was mandated by the 2018 and 2019 Amendments.

112.    In or about the Fall of 2020, AT&T and Atos engaged in discussions aimed at

resolving Atos' responsibility for the impending Shortfall Charge the Parties anticipated Atos would owe to AT&T as a result of Atos' failure to satisfy the Pricing Schedule's MTRC.

113.    During those discussions, Atos sought AT&T's forgiveness of any MTRC shortfall in exchange for Atos' agreement to exercise its option to extend the Pricing Schedule for the optional 12-month Extension Term.

114.    On or about November 3, 2020, Atos sent an email to AT&T (the "Shortfall Correction Email"), referencing a meeting held earlier that day between Atos and AT&T during which the Parties discussed the optional 12-month Extension Term.  In the email, Atos made three requests.

115.    *First*, Atos requested that AT&T waive Atos' projected shortfall on the $18.5 million MTRC.  Atos estimated the shortfall would be "457k or 2.4% of the total MTRC of 18.5M" and claimed the projected shortfall was caused by the "loss of customer business and reduced spend due to Covid-19."  (Shortfall Correction Email at 1.)

116.    *Second*, Atos requested a MARC reduction for the optional 12-month Extension Term from $6.2 million to $2.0 million.  (*Id.*)

117.    *Third*, and most importantly, ***Atos identified the Scrivener's Error and requested correction of the Shortfall Charge Provision***, as follows:

> ATOS is requesting to amend section 3.2 Shortall charges/Penalties, third paragraph to only address months 65-77.
>
> If, at the end of the optional one year term period for Months 65-77 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed ***a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred between months 65-77***.

(*Id.*)

118.    Between November 2020 and March 2021, AT&T and Atos continued to discuss

the terms by which Atos would agree to the Extension Term in exchange for AT&T's potential agreement to waive the Shortfall Charge owed for its failure to satisfy the Pricing Schedule's MTRC for Months 29-64 of the Pricing Schedule's Term.

119.    Throughout these negotiations, AT&T consistently advised Atos that it would require Atos to satisfy a $6.2 million MARC for the Extension Term.

**L.      *The Settlement Agreement.***

120.    In or about March 2021, AT&T and Atos executed the Settlement Agreement, effective as of April 21, 2021.

121.    Per the Settlement Agreement, AT&T agreed to waive the MTRC shortfall for Months 29-64 of the Pricing Schedule (through February 2021) in exchange for Atos' agreement to a 12-month Extension Term—extending the Pricing Schedule's Term to "76 months"—with a corresponding $6.2 million MARC.

122.    More specifically, under the Settlement Agreement, Atos agreed to, *inter alia*, "execute all necessary documentation to extend the Pricing Schedule Term to 76 months, expiring February 18, 2022, with a $6,200,000 Minimum Annual Revenue Commitment[.]" (Settlement Agreement, § 1(a).)

123.    In exchange, AT&T agreed to "cancel pending shortfall charges incurred by [Atos] in connection with the [Pricing Schedule] on or before the Effective Date [of the Settlement Agreement (*i.e.*, April 21, 2021)] in the amount of $455,237.00." (Settlement Agreement, §1(b).)

124.    The parties' extensive negotiation of the amount of the Extension Term MARC, as described herein and reflected in the Settlement Agreement, illustrates the parties' mutual intent that the Extension Term's MARC would not be meaningless or superfluous. Rather, the

Parties' conduct illustrates a mutual understanding that the Extension Term's $6.2 million MARC would be a significant, binding, and enforceable obligation upon Atos.

125.    The Settlement Agreement provides that "[i]n addition to Customer's extension of the [Pricing Schedule's] term, (see 1(a) above), this Agreement is the sole, only, entire and complete agreement of the parties relating to the subject matter hereof." (Settlement Agreement, § 4.)

126.    The Settlement Agreement provides for a New York forum and that New York law would govern any disputes as follows:

> 8.    <u>Applicable Law and Venue</u>
>
> This Agreement shall be construed in accordance with and be governed by the internal laws of the State of New York in effect as of the date of execution, in New York federal or state court.

(Settlement Agreement, § 8.)

127.    The Settlement Agreement also contains a prevailing party provision allowing for recovery of attorneys' fees in any action brought to enforce the Settlement Agreement as follows:

> 9.    <u>Enforcement of Agreement</u>
>
> If any action at law or in equity, including an action for declaratory or injunctive relief, is brought to enforce or interpret the provisions of the Agreement, the prevailing party shall be entitled to seek all of its costs in prosecuting or defending said action, including a reasonable amount of its attorneys' fees, which may be set by the court in which the action for enforcement if brought, or in separate action for that purpose, in addition to any other relief to which the prevailing party may be entitled.

(Settlement Agreement, § 9.)

*M.*     *The 2021 Amendment.*

128.     Pursuant to the terms of the Settlement Agreement, AT&T and Atos also executed the 2021 Amendment with an effective date of February 19, 2021.

129.     The 2021 Amendment memorialized the Parties' agreement "to modify the terms and conditions of the Pricing Schedule" as set forth in the 2021 Amendment.

130.     Consistent with the understanding set forth in the Settlement Agreement, the 2021 Amendment provides for an Extension Term that extends the Pricing Schedule for an additional year (from Month 65 to Month 76), expiring on February 18, 2022.  (2021 Amendment, § 2.)

131.     The 2021 Amendment reiterates the same MARCs and MTRC set forth in the 2018 and 2019 Amendments for the original Pricing Schedule Term (Months 1-64) and, consistent with the Settlement Agreement, imposes a $6.2 million MARC for the 12-month Extension Term.  (2021 Amendment, §§ 3.a, 3.b and 3.c.)

132.     However, the 2021 Amendment addresses the drafting error in the 2018 and 2019 Amendments with respect to the months covered by the Extension Term, correctly stating that the Extension Term spans from Month 65 through Month 76—rather than Month 65 through Month 77.  (2021 Amendment, § 3.c.)

133.     Thus, the 2021 Amendment covers a 12-month Extension Term, rather than the 13-month Extension Term referred to in the Shortfall Charge Provisions of the 2018 and 2019 Amendments that contain the Scrivener's Error.

134.     Moreover, the 2021 Amendment does not include the Shortfall Charge Provision found in the 2018 and 2019 Amendments.  As such, the 2021 Amendment does not include—much less, repeat—the Scrivener's Error found in the Shortfall Charge Provisions of the 2018 and 2019 Amendments.

135.    Instead, the 2021 Amendment establishes the Extension Term's $6.2 million MARC which, as noted, is the "annual revenue commitment set forth in an applicable Pricing Schedule that [Atos] agrees to satisfy during a Pricing Schedule Term." (CSOA, § 2.)

136.    Accordingly, under the 2021 Amendment, Atos is obligated to provide a minimum guarantee of $6.2 million in revenue to AT&T for the Extension Term of Months 65-76 of the Pricing Schedule—period, end.

137.    If Atos fails to provide AT&T with at least $6.2 million in revenue during Months 65-76 of the Pricing Schedule's Term (*i.e.*, the Extension Term), Atos is obligated to make up the difference by, paying "an amount equal to *the difference between the MARC and the total of the applicable **MARC-Eligible Charges incurred during the 12 month period***." (CSOA, § 4 (emphasis added).)

138.    In any event, because the Shortfall Charge Provisions of the 2018 and 2019 Amendments pertain to an Extension Term comprised of "Months 65-77," on their face, the provisions do not apply to the 2021 Amendment because the 2021 Amendment covers a shorter Extension Term of twelve months—Months 65 through 76.

**N.    *Atos' Refusal to Correct the Scrivener's Error Violates the Settlement Agreement.***

139.    The Extension Term's $6.2 million MARC established under the 2021 Amendment is fully enforceable.  Accordingly, Atos is responsible for satisfying such MARC.

140.    However, after executing the 2021 Amendment, in an attempt to avoid any confusion regarding the method of calculating the Shortfall Charge for which Atos would be responsible if it failed to satisfy the Extension Term's MARC, AT&T emailed Atos (the "April 27, 2021 Email") to propose that the Parties' execute an amendment (the "Proposed Amendment") to correct the Scrivener's Error found in the 2018 and 2019 Amendments.

141.    The Proposed Amendment sought to correct the two drafting errors comprising the Scrivener's Error—the error as to the months covered by the Extension Term and the error as to the calculation of the Shortfall Charge for the Extension Term.

142.    However, Atos refused to sign the Proposed Amendment to correct the Scrivener's Error—despite the fact that Atos, itself, had previously acknowledged the need for such correction in the Shortfall Correction Email.

143.    Specifically, on May 3, 2021, Atos emailed AT&T stating that "ATOS is fine with the current language in place. Therefore, we will not need to execute the amendment to the mini OneNet Agreement."

144.    In a call between AT&T's Robert Yuhas and Atos' Diego Escorcia on May 11, 2021, AT&T again requested that Atos sign the Proposed Amendment.  In response, Atos reiterated that it was not willing to sign the Proposed Amendment.

145.    In a call between the Parties' representatives on May 13, 2021, AT&T again requested that Atos execute the Proposed Amendment to correct the Scrivener's Error.  And, once again, Atos refused to sign the Proposed Amendment.

146.    On May 14, 2021, Atos again refused to sign the Proposed Amendment and confirmed by email that "ATOS has decided to keep the original shortfall language in Section 3.2."

147.    On May 25, 2021, in-house counsel for AT&T, Vince Sood, wrote to Ashley Crandall, Atos' North America Chief Financial Officer, explaining the dispute and requesting— once again—that Atos execute a proposed amendment (included with the letter) to correct the Scrivener's Error.  Atos again refused.

148.    Although the 2021 Amendment's $6.2 million MARC is independently, fully

enforceable, Atos has denied that it is obligated to satisfy a $6.2 million minimum annual revenue commitment to AT&T under the 2021 Amendment based on the Scrivener's Error.

149.    AT&T has sought to correct the Scrivener's Error and address Atos' baseless claim that the error permits Atos to avoid its obligation to satisfy its $6.2 million minimum annual revenue commitment to AT&T under the 2021 Amendment by, among other things, requesting that Atos execute the Proposed Amendment.

150.    However, Atos has repeatedly refused to "execute all necessary documentation" necessary to "extend the Pricing Schedule Term to 76 months, expiring February 18, 2022 *with a $6,200,000.00 Minimum Annual Revenue Commitment*" in breach of the Settlement Agreement.

**O.    AT&T's Continued Performance of its Obligations Under the Pricing Schedule.**

151.    Despite Atos' breach of the Settlement Agreement, AT&T nonetheless continued to perform its obligations under the amended Pricing Schedule, including by providing Atos with the contracted-for voice and data connectivity Services at the applicable rates and discounts under the Pricing Schedule through the end of the Extension Term.

152.    The Extension Term ended on February 18, 2022.  As a result, the Pricing Schedule Term expired pursuant to the terms of the Pricing Schedule (as amended).

**P.    The April 2022 Shortfall Invoice.**

153.    Atos incurred MARC-Eligible Charges during the Extension Term (Months 65-76, *i.e.*, from March 2021 through February 18, 2022) totaling approximately $2,832,649.00.

154.    Atos' MARC-Eligible Charges of approximately $2,832,649.00 during Months 65-76 represented a significant shortfall from the $6.2 million MARC for Months 65-76 that Atos agreed to satisfy under the 2021 Amendment.

28

155.    In or about April 2022, AT&T issued an invoice (No. 11759500019) to Atos in the amount of $3,367,351.00, representing the Shortfall Charge for Months 65-76 (the "Shortfall Invoice").

156.    The Shortfall Invoice represents the difference between the $6.2 million MARC for Months 65-76 imposed by the 2021 Amendment and Atos's MARC-Eligible Charges incurred during *the same* Months 65-76, which accords with the calculation of a Shortfall Charge mandated by, *inter alia*, the MSA including, without limitation, the CSOA.

157.    Under Section 2.3 of the 2002 Addendum to the MSA, "[b]illing invoices are payable upon receipt by [Atos]" and "[c]harges shall be considered past due if not paid in full within thirty (30) days . . ."  (2002 Addendum, § 2.3.)

158.    Atos failed to pay the Shortfall Invoice in full within 30 days, as required by the 2002 Addendum. Instead, Atos has claimed that it is not responsible for payment of the Shortfall Invoice because of the Scrivener's Error.

159.    Thus, the Shortfall Invoice remains unpaid and Atos still owes AT&T the full Shortfall Amount of $3,367,351.00 as a result of Atos' failure to satisfy the $6.2 million MARC required under the 2021 Amendment.

160.    Atos' refusal to pay the Shortfall Invoice constitutes a material breach of the 2021 Amendment.

161.    As a result of Atos' material breaches of the 2021 Amendment and/or the Settlement Agreement, AT&T has been damaged in an amount to be determined at trial but believed to be no less than the full amount of the Shortfall Invoice ($3,367,351.00), plus interest, as well as the costs, fees and expenses incurred in bringing this action, including, without limitation, reasonable attorneys' fees.

162.    To date, Atos has failed to make any payments toward satisfaction of the amounts

due and owing to AT&T as a result of Atos' failure to satisfy the $6.2 million MARC imposed

by the 2021 Amendment and/or Atos' breach of the Settlement Agreement.

**COUNT I**
**(Breach of Contract – the 2021 Amendment)**

163.    AT&T repeats and realleges the allegations contained in paragraphs 1 through

162 of this Complaint as if fully set forth herein.

164.    As described above, the Master Agreement, together with its amendments and

attachments including, but not limited to the 2021 Amendment, each and collectively constitute a

valid and legally binding contract between AT&T and Atos.[9]

165.    The 2021 Amendment requires Atos to satisfy a $6.2 million MARC for Months

65-76 of the Pricing Schedule's Term in exchange for AT&T's provision of certain services to

Atos during such months.

166.    AT&T fully performed its obligations under the 2021 Amendment through (and

beyond) the date of Atos' breach.

167.    Despite AT&T's performance of its obligations under the 2021 Amendment, Atos

failed to satisfy the 2021 Amendment's $6.2 million MARC to which it agreed in breach of the

2021 Amendment.

168.    The effect of Atos' breach of the 2021 Amendment was material.

169.    As a result of Atos' material breach of the 2021 Amendment, AT&T has been

damaged in an amount to be determined at trial, but believed to be no less than $3,367,351.00,

plus interest from the date of the breach, plus all of the costs in bringing this action including, but

---

[9]    Nothing in this allegation or in this Complaint as a whole is intended to allege that the
Scrivener's Error language is valid or in any way binding.

not limited to, its reasonable attorneys' fees as may be permitted by the agreements at issue and/or by law.

**COUNT II**
***(In the Alternative*, Reformation)**

170.    AT&T repeats and realleges the allegations contained in paragraphs 1 through 169 of this Complaint as if fully set forth herein.

171.    Although the 2021 Amendment's $6.2 million MARC is enforceable on its face and the 2021 Amendment does not include the Shortfall Charge Provision in which the Scrivener's Error appears, Atos has nonetheless disputed that it is responsible for satisfying the 2021 Amendment's MARC based on the language of the Shortfall Charge Provision contained in the 2018 and 2019 Amendments.

172.    To the extent the Court concludes that the Shortfall Charge Provision is incorporated into or otherwise made part of the 2021 Amendment, as described herein, the Shortfall Charge Provision contains an obvious Scrivener's Error that does not reflect the Parties true intentions with respect to the calculation of the shortfall amount for which Atos would be responsible in the event it failed to satisfy the MARC for a proposed Extension Term.

173.    Specifically, as drafted, the Shortfall Charge Provision provides that the shortfall owed for "Months 65-77*[sic]*" would be comprised of "an amount equal to the difference between the MARC [for Months 65-77] and the total of the applicable MARC-Eligible Charges incurred [by Atos] thru month 40."

174.    Accordingly, as a result of the Scrivener's Error, the Shortfall Provision does not accurately reflect the Parties' agreement and intentions with respect to either: (i) the months covered by the Extension Term; or (ii) the proper calculation of the Shortfall Charge that Atos would owe in the event it failed to satisfy the Extension Term's MARC.

31

175.    In actuality, the Parties intended and agreed that the Extension Term would be comprised of Months 65-76 (a one year term) and the Shortfall Charge would be comprised of an amount equal to the difference between the Extension Term's $6.2 million MARC and the total of the applicable MARC-Eligible Charges incurred by Atos during the 12-month period of the Extension Term. This intent is evidenced in numerous documents and agreements between the Parties including, but not limited to, the CSOA and Resale Addendum in which the Shortfall Charge is expressly defined as the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred *during such 12 month period*.

176.    As described herein, if enforced as written, the Shortfall Charge Provision would lead to absurd results because Atos would never owe a Shortfall Charge for the Extension Term regardless of whether it incurred any MARC-Eligible Charges during the Extension Term at all.

177.    Moreover, the Scrivener's Error contained in the Shortfall Charge Provision was the result of the Parties' mutual mistake.

178.    Indeed, the Parties openly acknowledged the Scrivener's Error in their communications both before and after their execution of the 2021 Amendment.

179.    To the extent the Shortfall Charge Provision is deemed incorporated into or otherwise made part of the 2021 Amendment, the Scrivener's Error is so substantial and material that it impacts and affects the very foundation of the 2021 Amendment.

180.    AT&T has performed all of its obligations under the 2021 Amendment and its related agreements.

181.    To the extent the Shortfall Charge Provision is deemed incorporated into or otherwise made part of the 2021 Amendment, the Shortfall Charge Provision must be reformed to reflect the proper calculation of the Shortfall Charge owed for Atos's failure to satisfy the

Extension Term's MARC established by the 2021 Amendment.

182.    Accordingly, to the extent Atos is permitted to rely on the Scrivener's Error found in the Shortfall Charge Provisions of the 2018 and 2019 Amendments (collectively, the "Amendments") to avoid its obligations to satisfy the 2021 Amendment's MARC, it is respectfully requested that the Court reform the Shortfall Charge Provision to correct the Scrivener's Error so that it accurately reflects the Parties' true intentions and agreement with respect to the calculation of a Shortfall Charge as follows: "If, at the end of the optional one year term period for Months 65-*76* of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed *a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred between months 65-76*."

## COUNT III
### (*In the Alternative,* Breach of Contract – Settlement Agreement)

183.    AT&T repeats and realleges the allegations contained in paragraphs 1 through 182 of this Complaint as if fully set forth herein.

184.    The Settlement Agreement constitutes a valid and legally binding contract between AT&T and Atos.

185.    AT&T fully performed its obligations under the Settlement Agreement through (and beyond) the date of Atos' breach.

186.    Although the 2021 Amendment's MARC is enforceable as written, to the extent Atos is permitted to rely on the Scrivener's Error in the Amendments' Shortfall Charge Provisions to avoid its obligation to satisfy the 2021 Amendment's MARC, under the Settlement Agreement, Atos was required to "execute all necessary documentation to extend the Pricing

33

Schedule Term to 76 months . . . with a $6,200,000.00 Minimum Annual Revenue Commitment[.]"

187.    As described herein, AT&T repeatedly requested that Atos execute a Proposed Amendment to correct the Scrivener's Error contained in the Amendments' Shortfall Charge Provisions to ensure that Atos is held to "a $6,200,000.00 Minimum Annual Revenue Commitment" for the Extension Term.

188.    Despite AT&T's repeated requests, Atos materially breached the Settlement Agreement by refusing to execute the Proposed Amendment and/or any other documents necessary to extend the Pricing Schedule Term to 76 months with an enforceable $6.2 million MARC.

189.    As a result of Atos' material breach of the Settlement Agreement, AT&T has been damaged in an amount to be determined at trial, but believed to be no less than $3,367,351.00, plus interest from the date of the breach, as well as all of its costs in bringing this action, including, but not limited to, its reasonable attorneys' fees in accordance with Section 9 of the Settlement Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, AT&T demands that judgment be entered in its favor against Atos as follows:

(i)    Awarding AT&T damages in an amount to be determined at trial but believed to be no less than $3,367,351.00, plus interest, as a result of Atos' breach of the 2021 Amendment;

(ii)    *In the alternative*, granting AT&T the remedy of reformation to correct the Scrivener's Error contained in the Shortfall Charge Provision to accurately reflect

34

the Parties' true agreement and intentions concerning the calculation of the

Shortfall Charge under the 2021 Amendment and awarding AT&T an amount to

be determined at trial but believed to be no less than $3,367,351.00, plus interest;

(iii)     *In the alternative*, awarding AT&T damages in an amount to be determined at

trial but believed to be no less than $3,367,351.00, plus interest, as a result of

Atos' breach of the Settlement Agreement;

(iii)     Awarding AT&T the costs, fees and expenses incurred in this action, including,

without limitation, reasonable attorneys' fees to the extent permitted by any of the

agreements at issue including, but not limited to, the Settlement Agreement,

and/or by law; and

(iv)     Awarding AT&T such other and further relied as the Court may deem just and

proper.


Dated:  New York, New York                          Respectfully submitted,
        February 17, 2023

                                                    BAKER HOSTETLER LLP

                                           By: */s/ Jonathan D. Pressment*
                                                Jonathan D. Pressment
                                                Christos G. Papapetrou
                                                Victoria L. Stork
                                                45 Rockefeller Plaza, 14th Floor
                                                New York, New York 10111-0100
                                                (t): (212) 847-2835
                                                jpressment@bakerlaw.com
                                                cpapapetrou@bakerlaw.com
                                                vstork@bakerlaw.com