UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/22/2023
```

-----------------------------------------------------------------------X
                                               :

AT&T CORP.,                                      :

                   Plaintiff,                 :

                                     :        23-cv-01395 (LJL)

        -v-                            :

                                     :       OPINION AND ORDER

ATOS IT SOLUTIONS AND SERVICES, INC.,     :

                                   :

                   Defendant.             :

                                   :

-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Defendant Atos IT Solutions and Services, Inc. ("Atos" or "Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing the complaint of plaintiff AT&T Corp. ("AT&T" or "Plaintiff") for failure to state a claim upon which relief can be granted. Dkt. No. 17.

       For the following reasons, Defendant's motion to dismiss is granted in part and denied in part.

## BACKGROUND

       For purposes of the motion to dismiss, the Court assumes the truth of the well-pleaded allegations of the complaint, as supplemented by the documents incorporated by reference. AT&T is a telecommunications company that, among other things, provides broadband connectivity services through high-speed fiber and wireless networks. Dkt. No. 1 ¶¶ 36–37. Atos is an IT services company that provides a suite of digital services. *Id.* ¶¶ 38–40. The two companies enjoy a contractual relationship pursuant to which AT&T provides services to Atos in exchange for payments by Atos to AT&T. The central question of this action is whether Atos is liable to AT&T for its failure to satisfy a contractually stipulated one-year minimum revenue

commitment of $6,200,000, by generating $2,832,649 in revenue for AT&T during that period. *Id.* ¶ 13.

Three layers of contract govern the relationship between AT&T and Atos and are relevant to this case.  The most broadly applicable contract between the parties is a master services agreement (the "Master Agreement"), which was entered into by AT&T and Atos's predecessor in interest on October 9, 2002.  *Id.* ¶ 41.  The Master Agreement provides the general terms and conditions applicable to the relationship, which are to be further defined by specific service agreements subsequently entered into by AT&T and Atos.  *Id.* ¶¶ 42–43.  The Master Agreement states that where its general terms and conditions conflict with terms and conditions in a specific service agreement, the terms and conditions in the specific service agreement control.  *Id.* ¶ 44.  The Master Agreement also contains a no oral modification clause, which states that "[a]ny supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties," *id.* ¶ 47, and a choice of law provision identifying New York as the source of law governing the agreement, *id.* ¶ 49.

The second layer of the contractual relationship is a Comprehensive Service Order Attachment (the "CSOA") to the Master Agreement, entered into by AT&T and Atos five years later, on or about April 4, 2007.  *Id.* ¶ 53.  Under the CSOA, AT&T would provide services to Atos that would be specified in later-executed pricing schedules.  *Id.* ¶ 54.  The CSOA also outlined the concept of a Minimum Annual Revenue Commitment ("MARC").  *Id.* ¶ 58. Specifically, the CSOA defines a MARC as "an annual revenue commitment set forth in an applicable Pricing Schedule that [Atos] agrees to satisfy during a Pricing Schedule Term."  Dkt. No. 19-2 § 2.  The CSOA specifies the charges that count toward the MARC as "the recurring

and usage charges, after applicable discounts and credits, incurred by [Atos] for the Services identified in the applicable Pricing Schedule as MARC-contributing." Dkt. No. 1 ¶ 59.  It defines such charges, which apply towards Atos's satisfaction of a MARC, as MARC-eligible charges ("MARC-Eligible Charges").  *Id.* ¶ 59.  The CSOA also provides:  "If, on any anniversary of a Pricing Schedule Term start date, [Atos] has failed to satisfy the MARC ***for the preceding 12 month period***, [Atos] will be billed a shortfall charge in an amount equal to *the difference between the MARC and the total of the applicable **MARC-Eligible Charges incurred during the 12 month period***."  *Id.* ¶ 62 (quoting CSOA § 4 (emphasis added)).

The third and most specific contract governing the relationship between AT&T and Atos and relevant to this dispute is a pricing schedule entered into in 2015, first amended and restated in 2018, again amended and restated in 2019, and further amended in 2021.  *Id.* ¶¶ 63–94.  Specifically, on September 30, 2015, AT&T and Atos executed a pricing schedule providing for AT&T's delivery of certain voice and data services to Atos (the "Pricing Schedule") for an initial term of three years commencing November 1, 2015 and continuing through October 2018. *Id.* ¶¶ 63, 65.  The Pricing Schedule set forth Atos's commitment to a MARC of $10,500,000 for each of the three years.  *Id.* ¶¶ 65–66.  On February 27, 2018, as the Pricing Schedule neared the end of its original term, Atos and AT&T executed an amended and restated version of the Pricing Schedule (the "First Amended and Restated Pricing Schedule").  *Id.* ¶ 68.

The First Amended and Restated Pricing Schedule extended the term of the initial Pricing Schedule to sixty-four months, ending February 2021.  *Id.* ¶¶ 74, 76.  The First Amended and Restated Pricing Schedule includes its own definition of MARC that was consistent with the definition of the term in the CSOA:  "'MARC (Minimum Annual Revenue Commitment)' means the total revenue commitment set forth in this Pricing Schedule that [Atos] agrees to satisfy

during each year of the Pricing Schedule Term." Dkt. No. 1 ¶ 70.[1]  Similarly, the First Amended

and Restated Pricing Schedule also includes its own definition of MARC-Eligible Charges that is

consistent with the definition in the CSOA:  "'MARC-Eligible Charges' means the recurring and

usage charges, after deducting applicable discounts and credits, invoiced to [Atos] and identified

in this Pricing Schedule as MARC-contributing . . . ."  *Id.* ¶ 71.  The First Amended and Restated

Pricing Schedule further contemplates a revenue commitment for a period of time greater than

one-year in duration, referred to as a Minimum Term Revenue Commitment ("MTRC").  *Id.*

¶ 72.

     At the time of the execution of the First Amended and Restated Pricing Schedule, twenty-

eight months—or more than two years—had already elapsed from the initial Pricing Schedule's

term beginning in November 2015.  Accordingly, the First Amended and Restated Pricing

Schedule left undisturbed the existing MARCs of $10,500,000 for each of the first two years of

the agreement.  *Id.* ¶ 78–79.  The first month under the First Amended and Restated Pricing

Schedule was month twenty-nine—the middle of the third year—of the initial Pricing Schedule

Term.  The First Amended and Restated Pricing Schedule altered Atos's revenue commitment

for the underway third twelve-month period, which had been $10,500,000.  *Id.* ¶ 78–79.  The

First Amended and Restated Pricing Schedule provided for no revenue commitment whatsoever

for its first three months, months twenty-five through twenty-eight, and no MARC at all for any

subsequent twelve-month period of the agreement's base Term.  Instead, it included a MTRC of

$18,500,000 for the remainder of the contract—the period spanning months twenty-nine through

sixty-four. *Id.* ¶ 78–79.  Additionally, the First Amended and Restated Pricing Schedule

contemplated an optional extension (the "Extension Term") for "Months 65–77," a period of

---

[1] The initial Pricing Schedule did not include a definition of MARC.  Dkt. No. 19-3.

thirteen months, but which the Amended and Restated Pricing Schedule referred to as an "Optional 12 Month extension." *Id.* ¶ 75.  The First Amended and Restated Pricing Schedule states that the MARC for "Optional Months 65-77[*sic*]" would be $6,200,000.  *Id.* ¶ 79.

The First Amended and Restated Pricing Schedule also contains a provision (the "Shortfall Charge Provision") that sets forth the charge that Atos would be required to pay in the event that it failed to meet a MARC or MTRC established therein (a "Shortfall Charge").  *Id.* ¶ 82.  The Shortfall Charge Provision in the First Amended and Restated Pricing Schedule differs from the provision in the CSOA that contemplates how a shortfall charge might be calculated within a pricing schedule.  The shortfall provision in the CSOA permits AT&T to bill Atos for "a shortfall charge in an amount equal to *the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during the 12 month period.*"  *Id.* ¶ 62 (quoting CSOA § 4 (emphasis added)).  The Shortfall Charge Provision in the First Amended and Restated Pricing Schedule allows for varying Shortfall Charges over the course of the Term, first based on Atos's failure to incur a specified level ($5,907,590) of MTRC-Eligible Charges for its first twelve months in effect, months twenty-nine through forty, and then based on Atos's failure to satisfy the MTRC for the full three-year period spanning months twenty-nine through sixty-four.  In addition, it contained a further provision, described below, for failure to satisfy the MARC at the end of the optional Extension Term, or by month seventy-seven.  Specifically, Section 3.2 provides:

> If, at the end of Month 40 of the Pricing Schedule Term, [Atos] fails to incur MTRC-Eligible Charges of $5,907,590 for the period during Months 29–40 ("Monitoring Period Amount"), [Atos] will be billed a penalty equal to 36% of the difference between the Monitoring Period Amount and the actual charges incurred during Months 29–40.  For example, if [Atos] incurs $4,000,000 of MTRC-Eligible Charges, the penalty would be equal to $686,732.40 (($5,907,590 - $4,000,000) x 36%).

> If, at the end of the MTRC measurement period for Months 29–64 of the Pricing Schedule Term, [Atos] fails to satisfy the MTRC, [Atos] will be billed a shortfall charge in an amount equal to the difference between the MTRC and the total of the applicable MTRC-Eligible Charges incurred by the end of the MTRC measurement period for Months 29–64.
>
> If, at the end of the optional one year term period for Months 65–77 of the Pricing Schedule Term, [Atos] will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru month 40.

Dkt. No. 19-4 § 3.2.

At the time of the First Amended and Restated Pricing Schedule, Atos had incurred more than $17,000,000 of MARC-Eligible Charges since the beginning of the original Pricing Schedule. Dkt. No. 1 ¶ 89. Thus, under one reading of the Shortfall Charge Provision—if "thru month 40" is read as "from month one through month forty"—the First Amended and Restated Pricing Schedule would impose no Shortfall Charge for Atos's failure to achieve a MARC of 6,200,000 for the months after month sixty-four; the difference between the MARC and the applicable MARC-Eligible Charges "thru month 40" would be a negative figure. Read alternatively, however— if "thru month 40" is read as "from month twenty-nine through month forty" (as month twenty-nine was the first operative month of the First Amended and Restated Pricing Schedule)—the Shortfall Charge Provision would permit Atos to avoid the Shortfall Charge for the months after sixty-five if, by month forty, Atos had incurred MARC-Eligible Charges of $6,200,000; in other words, Atos could unlock an Extension Term without a penalty for failure to meet the Extension Term MARC if it incurred charges of not only $5,907,590, but of $6,200,000, during the first twelve months after the enactment of the First Amended and Restated Pricing schedule.

The following month, on March 26, 2018, Atos and AT&T executed a third amendment to the Master Agreement, under which AT&T agreed to waive all Shortfall Charges already

accrued by Atos, including but not limited to the Shortfall Charges that had accrued under the initial Pricing Schedule. *Id.* ¶¶ 94, 95. The only Shortfall Charges that would remain would be those that accrued under the First Amended and Restated Pricing Schedule.

Atos and AT&T amended and restated the First Amended and Restated Pricing Schedule on January 28, 2019 ("Second Amended and Restated Pricing Schedule").[2] *Id.* ¶ 95. The Second Amended and Restated Pricing Schedule restates the definitions of MARC, MARC-Eligible Charges, MTRC, and MTRC-Eligible Charges as they appeared in the First Amended and Restated Pricing Schedule. *Id.* ¶ 97. It thus carries forward the $6,200,000 MARC for months sixty-five through seventy-seven. *Id.* ¶ 100. It also includes the same MTRC amount, and restates the same Shortfall Charge Provision. *Id.* ¶¶ 97–102. As in the First Amended and Restated Pricing Schedule, Section 3.2 of the Second Amended and Restated Pricing Schedule provides that if Atos fails to meet the Extension Term MARC of $6,200,000, Atos will be billed the difference between that amount "and the total of the applicable MARC-Eligible Charges incurred thru month 40." *Id.* ¶ 101 (quoting Second Amended and Restated Pricing Schedule).

---

[2] The parties also executed, on February 27, 2019, an addendum to the Master Agreement (the "Resale Addendum"). *Id.* ¶ 104. The Resale Addendum expressly incorporated the terms of the Master Agreement, and stated that it applied to "all products and services AT&T provides [Atos] pursuant to this Agreement . . . and shall continue in effect so long as Services are provided under this Agreement." *Id.* ¶ 105 (quoting the Resale Addendum). Additionally, it stated that, "[t]he order of priority of the documents that form this Agreement is:  the applicable Pricing Schedule; the General Terms and Conditions; the Master Agreement, the AUP; and Tariffs, Guidebooks, Service Guides, and Price Lists; . . . ." *Id.* ¶ 106 (quoting the Resale Addendum). Finally, the Resale Addendum contained its own definition of MARC, which defined the term as, "an annual revenue commitment set forth in a Pricing Schedule that [Atos] agrees to satisfy during each 12-consecutive-month period of the Pricing Schedule Term." *Id.* ¶ 109 (quoting the Resale Addendum). The definition of MARC in the Resale Addendum also included language explaining the consequences should Atos fail to satisfy the MARC: "***If [Atos] fails to satisfy the MARC for any such 12-month period, [Atos] will pay a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during such 12-month period***, and AT&T may withhold contractual credits until [Atos] pays the shortfall charge." *Id.* ¶ 109 (quoting the Resale Addendum (emphasis added)).

As AT&T and Atos approached month sixty-four—the end of Second Amended and Restated Pricing Schedule Term absent entry into the optional Extension Term—it became apparent that Atos was not going to satisfy the $18,500,000 MTRC for months twenty-nine through sixty-four.  Dkt. No. 1 ¶ 111.  Accordingly, in the Fall of 2020, AT&T and Atos engaged in discussions aimed at resolving Atos's responsibility for the impending Shortfall Charge that the parties anticipated Atos would owe to AT&T as a result of Atos's failure to satisfy the MTRC.  *Id.* ¶ 112.  During those discussions, Atos sought AT&T's forgiveness of any MTRC Shortfall Charge in exchange for Atos's agreement to exercise its option to extend the Second Amended and Restated Pricing Schedule for the optional twelve-month Extension Term. *Id.* ¶ 113.  Specifically, on or about November 3, 2020, Atos sent AT&T an email with its proposal for how to address the pending Shortfall Charge, consisting of three primary components (the "November 2020 Email").  *Id.* ¶ 114.  First, Atos requested that AT&T waive the projected Shortfall Charge associated with the MTRC, which it estimated would amount to roughly $457,000 or 2.4% of the MRTC of $18,500,000.  *Id.* ¶ 115.  Second, Atos requested to amend the optional twelve-month renewal for months sixty-five to seventy-seven "with a reduced MARC of 2M based on projected 2021 with no increase to existing rates."  *Id.* ¶ 116; Dkt. No. 19-6.  Finally, Atos proposed that in exchange for the first two elements, it would agree to amend the pertinent portion of the Shortfall Charge Provision in an important fashion.  As noted, the First Amended and Restated Pricing Schedule and the Second Amended and Restated Pricing Schedule had contemplated that AT&T would bill Atos for the shortfall between the Extension Term MARC and the MARC-Eligible Charges "thru month 40."  Atos proposed that the parties agree to a revised Shortfall Charge Provision that would only address months sixty-five to seventy-seven and would read:  "If, at the end of the optional one year term period for

Months 65–77 of the Pricing Schedule Term, [Atos] fails to satisfy the MARC, [Atos] will be billed ***a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-eligible Charges incurred between months 65–77.***"  *Id.* ¶ 117 (quoting the November 2020 Email (emphasis added)); Dkt. No. 19-6.  In the months that followed, the parties continued to negotiate a resolution that would broadly consist of Atos agreeing to enter into the Extension Term in exchange for AT&T's agreement to waive the Shortfall Charge owed for Atos's failure to satisfy the Second Amended and Restated Pricing Schedule's MTRC.  *Id.* ¶ 118.

In or around March 2021, AT&T and Atos executed a settlement agreement with an effective date of April 21, 2021 (the "Settlement Agreement").  *Id.* ¶ 120.  Under the Settlement Agreement, AT&T acceded to Atos's first request and agreed to "cancel pending shortfall charges incurred by [Atos] in connection with the [Second Amended and Restated Pricing Schedule] on or before the Effective Date [of the Settlement Agreement (i.e., April 21, 2021)] in the amount of $455,237.00."  *Id.* ¶ 123 (quoting the Settlement Agreement).  In exchange, Atos agreed to "execute all necessary documentation to extend the Pricing Schedule Term to *76 months*, expiring February 18, 2022, with a $6,200,000 Minimum Annual Revenue Commitment."  *Id.* ¶ 122 (quoting the Settlement Agreement) (emphasis added).  The Settlement Agreement does not contain a provision requiring a change in the language of the Shortfall Charge Provision.

The next, and arguably most important, contract at issue in this dispute is the amendment to the Second Amended and Restated Pricing Schedule (the "2021 Amendment"), which the parties executed pursuant to the Settlement Agreement and which provided for an effective date of February 19, 2021.  *Id.* ¶ 128.  The 2021 Amendment states that its effect is to "modify the

9

terms and conditions of the Pricing Schedule." *Id.* ¶ 129.  In accordance with the Settlement

Agreement, it provides for a one-year Extension Term, consisting of months sixty-five through

seventy-six, concluding on February 18, 2022. *Id.* ¶ 130.  The 2021 Amendment also restates the

same MARCs and MTRC contained in the Second Amended and Restated Pricing Schedule for

months one through sixty-four, and in accordance with the Settlement Agreement, establishes a

MARC of $6,200,000 for the Extension Term.  *Id.* ¶ 131.  The 2021 Amendment does not

include a Section 3.2, addressing the Shortfall Charge, but nor does it purport to amend the

Shortfall Charge Provision language from the First Restated and Amended Pricing Schedule or

the Second Amended and Restated Pricing Schedule.  *Id.* ¶ 134.  The 2021 Amendment did,

however, revise the period of the Extension Term originally contained in the First Amended and

Restated Pricing Schedule and then repeated in the Second Amended and Restated Pricing

Schedule—which stated that the Extension Term would span the thirteen months from month

sixty-five through month seventy-seven—by defining the Extension Term as spanning months

sixty-five through seventy-six.  *Id.* ¶ 132.

On April 27, 2021, after the parties had executed the Settlement Agreement and the 2021

Amendment, AT&T emailed Atos proposing that the parties execute a further amendment to the

Second Amended and Restated Pricing Schedule that would include new language for the

Shortfall Charge Provision with respect to the Extension Term.  *Id.* ¶ 140.  The revised Shortfall

Charge Provision proposed by AT&T would correct the reference to month seventy-seven,

changing it to month seventy-six and thereby bringing the Shortfall Charge Provision into

alignment with the revised MARC provision in the 2021 Amendment.  *Id.* ¶ 141.  It also would

change the calculation of the Shortfall Charge should Atos fail to meet the Extension Term

MARC.  *Id.*  Atos responded, however, that it was "fine with the current language in place" and

that it therefore did "not need to execute the amendment . . . ."  *Id.* ¶ 143.  In several subsequent phone calls between the parties, Atos continued to state that it did not intend to enter into another amendment to the Second Amended and Restated Pricing Schedule.  *Id.* ¶¶ 144–45.

The Extension Term concluded on February 18, 2022—as provided for in the 2021 Amendment—and because the parties had not executed further amendments, the Second Amended and Restated Pricing Schedule expired.  *Id.* ¶ 152.

At the time, Atos incurred $2,832,649 of MARC-Eligible Charges during the Extension Term, leaving a shortfall of $3,367,351 compared to the Extension Term MARC of $6,200,000. *Id.* ¶¶ 153–55.  In April 2022, AT&T sent Atos an invoice for what it claimed was the Shortfall Charge, representing the difference between the Extension Term MARC established in the 2021 Amendment and the MARC-Eligible Charges incurred by Atos during the Extension Term.  *Id.* ¶¶ 155–56.  However, Atos refused to pay the invoice within the thirty days allowed by the Master Agreement and claimed that it was not responsible for payment of the invoice.  *Id.* ¶ 158.

AT&T filed the instant suit against Atos on February 17, 2023.  Dkt. No. 1.  AT&T seeks damages in the amount of at least $3,367,351, plus interest, along with the costs, fees, and expenses incurred in pursuing the action.  *Id.* at 34–35.  Atos filed its motion to dismiss, along with a memorandum of law and declaration in support of the motion, on April 25, 2023.  Dkt. Nos. 17–19.  AT&T submitted a memorandum of law in opposition to the motion on May 25, 2023.  Dkt. No. 26.  Atos filed a further reply memorandum of law in support of its motion to dismiss on June 21, 2023.  Dkt. No. 30.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

"Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials." *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  Although courts generally do not look beyond the facts stated on the face of the complaint, "'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding*, 949 F.2d 42, 47–48 (2d Cir. 1991)).  "As a necessary corollary to the foregoing principles, a plaintiff cannot avoid judicial consideration of a document upon which it bases its complaint by the expedient refusal to attach it to the pleading or refer to it *in haec verba*."

*Bongiorno v. Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y. Sept. 20, 2021).  "Where a plaintiff has 'reli[ed] on the terms and effect of a document in drafting the complaint,' and that document is thus 'integral to the complaint,' we may consider its contents even if it is not formally incorporated by reference."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (alteration in original).  "Th[is] exception thus prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted).

While AT&T did not attach the First Amended and Restated Pricing Schedule, the Second Amended and Restated Pricing Schedule, the Settlement Agreement, or the 2021 Amendment to its complaint, the complaint makes clear, definite, and substantial reference to each of those documents.  There is no dispute as to the authenticity of those documents and they are thereby incorporated into the complaint by reference.  *See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *20 (S.D.N.Y. Sept. 30, 2022) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019)).  The Court is thus permitted to consider the entirety of the documents, including portions not quoted in the complaint, in deciding the motion to dismiss.

## DISCUSSION

AT&T's claim that Atos has breached its contract with AT&T and is liable for a shortfall of $3,367,351, comprised of the difference between the Extension Term MARC of $6,200,000 and the MARC-Eligible charges of $2,832,649, rests on three separate propositions or theories, each alleged in a separate cause of action.

First, AT&T alleges that Atos breached the 2021 Amendment.  Dkt. No. 1 ¶¶ 163–69.  AT&T alleges that Atos agreed in the 2021 Amendment to achieve a MARC of $6,200,000

during the Extension Term, and to pay AT&T any shortfall between that amount and its MARC-Eligible charges for the Extension Term. *Id.* ¶ 165. As AT&T puts it, making reference to the CSOA, "the 2021 Amendment establishes the Extension Term's $6.2 million MARC which . . . is the 'annual revenue commitment set forth in an applicable Pricing Schedule that [Atos] agrees to satisfy during a Pricing Schedule Term[]' (CSOA § 2.)," *id.* ¶ 135, and "[i]f Atos fails to provide AT&T with at least $6.2 million in revenue during Months 65-76 of the Pricing Schedule's Term (*i.e.*, the Extension Term), Atos is obligated to make up the difference by, paying 'an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurring during the 12 month period' (CSOA, § 4)," *id.* ¶ 137.

Second, AT&T alleges, in the alternative, that "[t]o the extent that the Court concludes that the Shortfall Charge Provision [from the First and Second Amended and Restated Pricing Schedules] is incorporated into or otherwise made part of the 2021 Amendment, . . . the Shortfall Charge Provision contains an obvious Scrivener's Error that does not reflect the Parties true intentions with respect to the calculation of the shortfall amount for which Atos would be responsible in the event it failed to satisfy the MARC for a proposed Extension Term." *Id.* ¶ 172. AT&T alleges that "[i]n actuality, the Parties intended and agreed that the Extension Term would be comprised of Months 65-76 (a one year term) and the Shortfall Charge would be comprised of an amount equal to the difference between the Extension Term's $6.2 million MARC and the total of the applicable MARC-Eligible Charges incurred by Atos during the 12-month period of the Extension Term." *Id.* ¶ 175. It asserts that the Shortfall Charge Provision must be reformed to reflect the proper calculation of the Shortfall Charge owed for Atos's failure to satisfy the Extension Term's MARC established by the 2021 Amendment. *Id.* ¶ 181.

14

Third, and also in the alternative, AT&T alleges that "[a]lthough the 2021 Amendment's MARC is enforceable as written, to the extent Atos is permitted to rely on the Scrivener's Error in the Amendments' Shortfall Charge Provisions to avoid its obligation to satisfy the 2021 Amendment's MARC," Atos will have violated the Settlement Agreement. *Id.* ¶ 186. In AT&T's view, the Settlement Agreement was intended to correct the scrivener's error in the Amendments' Shortfall Charge Provisions and Atos breached the Settlement Agreement "by refusing the execute the Proposed Amendment and/or any other documents necessary to extent the Pricing Schedule Term to 76 months with an enforceable $6.2 million MARC." *Id.* ¶ 188. In other words, while AT&T seemingly acknowledges that the 2021 Amendment does have a $6,200,000 MARC as required by the Settlement Agreement, it asserts that if the failure to achieve that MARC is inconsequential then the Settlement Agreement must have been breached.

Atos takes issue with each of these three claims. As to the first claim, for breach of the 2021 Amendment, Atos asserts that the 2021 Amendment by its terms does not give AT&T the right to a Shortfall Charge comprised of the difference between the Extension Term MARC and MARC-Eligible Charges incurred during the Extension Term. Dkt. No. 18 at 10. It highlights that the 2021 Amendment amends, and does not supersede, the existing Second Amended and Restated Pricing Schedule, and that it does not purport to amend Section 3.2, the Shortfall Charge Provision. *Id.* at 10–11. Accordingly, Atos contends that the pricing schedule in effect is the Second Amended and Restated Pricing Schedule, which has a $6,200,000 MARC, and does not calculate the Shortfall Charge for the Extension Term as the difference between the MARC and MARC-Eligible Charges incurred during the Extension Term. *Id.* at 11.

As to the second claim, for reformation based on a scrivener's error or mutual mistake, Atos argues that in order for the doctrine of mutual mistake or scrivener's error to apply, there

must have been a meeting of the minds on a different Shortfall Charge Provision that the scrivener simply failed to accurately capture. *Id.* at 12–15. And it asserts, particularly in light of its November 2020 email to AT&T explaining its understanding of the Shortfall Charge Provision, that AT&T has not established the existence of such other understanding by the requisite clear and convincing evidence. *Id.* at 15. It therefore claims that there is no basis for reformation.

As to the third claim, Atos argues that the allegations of the complaint do not establish any breach. *Id.* at 12. The Settlement Agreement required it to agree to a twelve-month Extension Term with a $6,200,000 million MARC and the 2021 Amendment contains a twelve-month Extension Term and a $6,200,000 MARC. *Id.* Atos asserts that AT&T could have bargained for an amendment to Section 3.2 of the First Amended and Restated Pricing Schedule and the Second Amended and Restated Pricing Schedule. Atos had suggested such an amendment. But AT&T did not bargain for such an amendment and consequently Atos could not be liable in breach of contract for failure to include in the 2021 Amendment a provision for which AT&T had not bargained. *Id.*

The Court discusses each claim in turn.

## I.      The First Count: Atos Breached the 2021 Amendment

AT&T's first count alleges that Atos breached the 2021 Amendment. Dkt. No. 1 ¶¶ 163–69. AT&T alleges that "Atos failed to satisfy the 2021 Amendment's $6.2 million MARC to which it agreed in breach of the 2021 Amendment," *id.* ¶ 167, and that consequently, it is liable for the difference between that amount and the MARC-Eligible Shortfall Charges for the Extension Term, *id.* ¶ 169. AT&T alleges that, by agreeing in the 2021 Amendment to a $6,200,000 million MARC for months sixty-five through seventy-six, Atos also agreed that AT&T could bill Atos for the difference between the $6,200,000 MARC and the MARC-Eligible

Charges for the Extension Term.  It points out that "the 2021 Amendment does not include the Shortfall Charge Provision found in the 2018 and 2019 Amendments" and argues that therefore, the Shortfall Charge Provision did not apply to the Extension Term MARC.  Dkt. No. 1 ¶ 134. Thus, AT&T alleges that in the absence of an applicable Shortfall Charge Provision in the 2021 Amendment, "by agreeing to the 2021 Amendment's $6.2 million MARC, Atos became *obligated* to provide AT&T with a minimum of $6.2 million in revenue during the 2021 Amendment's Extension Term."  *Id.* (emphasis in original).  It further alleges that any contrary interpretation would make Atos's agreement to satisfy a $6,200,000 MARC illusory—there would be no consequence for failure to comply with it.  As such, because Atos incurred only $2,832,649 of MARC-Eligible Charges during the Extension Term, Atos failed to satisfy its obligations under the 2021 Amendment and is liable for the resulting shortfall.  Dkt. No. 1 ¶¶ 167, 169.

The standards applicable to AT&T's claim are well established.  In order to state a breach of contract claim under New York law, Plaintiff must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).  "A sufficient pleading for breach of contract must 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'"  *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)); *see Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *6 (S.D.N.Y. Apr. 23, 2021), *on reconsideration*, 2021 WL 2075481 (S.D.N.Y. May 24, 2021) (same).  "New York courts require plaintiffs to 'plead the provisions of the contract upon which the claim is based'—in other words,

'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.'"  *Anders v. Verizon Commuc'ns*, 2018 WL 2727883, at *8 (S.D.N.Y. June 5, 2018) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993)).

In interpreting the parties' respective contractual obligations as of the time of the alleged breach in 2022, the Court does not look in isolation to the business rationale behind the 2021 Amendment.  Instead, the Court looks to totality of the agreements in effect in 2022 and attempts to "give 'effect and meaning . . . to every term of [the] contract' and strive 'to harmonize all of its terms.'"  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (citation omitted); *see also* Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").  The Court should "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018) (quoting *MBIA Ins. Corp. v. Patriarch Partners VII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012), *aff'd*, 769 F. App'x 40 (2d Cir. 2019)).  Further, under New York law, the question "'[w]hether multiple writings should be construed as one agreement depends on the intent of the parties,' . . . which is typically a question of fact for the jury."  *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (first alteration in original) (quoting *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52–53 (2d Cir. 1993) and citing *Rudman v. Cowles Commc'ns, Inc.*, 330 N.Y.S.2d 33, 42 (1972)).  Where,

however, "the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *Id.*  In such cases, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)).

The Court must also be mindful of the "well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012). Even so, "[c]ourts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements. . . .  In that regard, a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996)).

Atos argues that the complaint fails to state a claim for breach of the 2021 Agreement. Dkt. No. 18 at 10–11.  In its view, the Shortfall Charge Provision in the First and Second Amended and Restated Pricing Schedules covers the same subject matter as the shortfall provision in the CSOA and thus, as the Second Amended and Restated Pricing Schedule is the more specific agreement with higher priority than the CSOA, the Shortfall Charge Provision controls.  Dkt. No. 1 ¶ 106 ("The order of priority of the documents that form this Agreement is: the applicable Pricing Schedule; the General Terms and Conditions; the Master Agreement, . . .

.") (quoting the Resale Addendum)); Dkt. No. 19-2 at 1 ("This AT&T [CSOA] is a Service

Order Attachment to the [Master Agreement] . . . ."); Restatement (Second) of Contracts § 213.

The Shortfall Charge Provision itself, absent reformation, does not give AT&T a claim for

relief—that provision by its terms counts the MARC only against MARC-Eligible Charges

through month forty and, by any calculation, the MARC-Eligible Charges through month forty

exceeded the Extension Term MARC.  Dkt. No. 18 at 11.

Atos also addresses AT&T's argument that, reading the third paragraph of the Shortfall

Charge Provision literally, the provision is illusory and absurd.  *Id.*  According to Atos, the

provision should be read to address MARC-Eligible charges from month twenty-nine, when the

First Amended and Restated Pricing Schedule was executed, through month forty.  Under such a

reading, there would have been a business logic to the Shortfall Charge Provision as written in

2018 when the First Amended and Restated Pricing Schedule was entered into; so read, the

provision incented Atos to frontload its usage of AT&T services, and rewarded Atos with an

Extension Period without any penalty-inducing revenue commitment if Atos used enough of

AT&T's services in months twenty-nine through forty.  *Id.*  Atos asserts that the provision was

repeated in the Second Amended and Restated Pricing Schedule because—and in order to

document that—Atos had already earned the free "Extension Period."  *Id.*  In Atos's view, it is

irrelevant whether AT&T would have received any consideration for its agreement in 2021 to

waive the amounts that Atos had due in exchange for an extension term with a MARC (that had

already been satisfied).  The contract as a whole can be given meaning in 2022 and that is

sufficient to defeat AT&T's claim.

To summarize, Atos's argument is based on the premise that the Shortfall Charge

Provision covers the same subject matter as, and is inconsistent with, the shortfall provision in

the CSOA.  From that premise, its conclusion logically follows; where the CSOA and Second

Amended and Restated Pricing Schedule cover the same subject matter, and where they conflict,

the Second Amended and Restated Pricing Schedule controls both under general contract law

and under the MSA.  The Court is required to give meaning to every contractual provision if it

can do so, and Atos has offered a plausible interpretation of the third paragraph of the Shortfall

Charge Provision.  The 2021 Amendment amends only specific portions of the First and Second

Amended and Restated Pricing Schedules, and not Section 3.2.  It therefore follows that AT&T

is not entitled to the benefit of the provision in the CSOA that would entitle it to bill Atos based

on the difference between the MARC for the Extension Period and the MARC-Eligible Charges

during that period.

However, Atos's reading that the CSOA and the Shortfall Charge Provision cover the

same material as one another is not the only plausible reading of the agreements.  It is a bedrock

principle of contract law that "a subsequent contract not pertaining to 'precisely the same subject

matter' will not supersede an earlier contract unless the subsequent contract has definitive

language indicating it revokes, cancels or supersedes that specific prior contract."  *A & E

Television Networks, LLC v. Pivot Point Ent., LLC*, 2013 WL 1245453, at *10 (S.D.N.Y. Mar.

27, 2013) (quoting *CreditSights, Inc. v. Ciasullo*, 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29,

2007)).  Further, "the fact that a subsequent contract contains provisions which are of the same

subject matter as those in an earlier agreement is not sufficient to supersede the entire contract;

rather, a subsequent agreement supersedes only those terms of the earlier contract that are of the

same subject matter."  *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 810 (S.D.N.Y.

2008) (quoting *CreditSights*, 2007 WL 943352, at *6) (internal quotations omitted).  In

considering whether a particular contractual provision is superseded by a later contractual

provision, courts assess: (1) whether the later contract contains an integration and merger clause stating that the earlier provision is superseded; (2) "whether the two provisions have the same general purpose or address the same general rights[;]" and (3) "whether the two provisions can coexist or work in tandem." *A & E Television Networks*, 2013 WL 1245453, at *10–11 (quoting *Medtech*, 596 F. Supp. 2d at 809) (internal quotations omitted); *see also Alessi Equip., Inc. v. American Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 504 (S.D.N.Y. 2022).  Finally, New York law "favors applying specific contract terms over more general ones when they conflict." *Vogt v. DG Fastchannel, Inc.*, 2010 WL 11571117, at *3 (S.D.N.Y. Nov. 9, 2010) (citing *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001)).

Here, it is plausible to read the provisions as co-existing and working in tandem with one another, with the CSOA applying to periods of time that the Shortfall Charge Provision does not speak to.  In particular, the Shortfall Charge Provision as written does not apply to the Extension Term ultimately entered into because it refers to a period spanning "Months 65–77," Dkt. No. 19-5 at ECF p. 5, whereas the actual Extension Term in the 2021 Amendment spanned "Months 65–76," Dkt. No. 19-8 at ECF p. 3.  The Shortfall Charge Provision states, "[i]f, at the end of the optional one-year term period for Months 65–77 of the Pricing Schedule Term, [Atos] fails to satisfy the MARC, [Atos] will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru month 40."  Dkt. No. 19-5 at ECF p. 5.  Section 3.c of the 2021 Amendment, meanwhile, states that the "MARC under this Pricing Schedule during renewal period," which it identifies as "Months 65–76," is $6,200,000.  Dkt. No. 19-8 at ECF p. 3.  Under this reading, the parties did not need to amend the last paragraph of Section 3.2 in the Second Amended and Restated Pricing Schedule.  By setting the Extension Term to run only until month 76 the parties eliminated the effect of that

paragraph, leaving the consequences of failing to meet the MARC to be addressed by the provision in the CSOA.  Thus, AT&T has plausibly alleged that no "optional one-year term period for Months 65–77" was ever entered into, that the Shortfall Charge Provision is silent with respect to the "renewal period" spanning "Months 65–76," that, as a result, the provision in the CSOA applies, and that—when Atos fell short of the MARC at the end of month 76—AT&T was entitled to bill Atos for the difference between the MARC for the Extension Term and the MARC-Eligible Charges during the Extension Term.

## II.     The Second Count: Reformation

In its second count, recognizing that the plain language of the Shortfall Charge Provision does not support its claim for relief, AT&T asserts that—in the event the Court ultimately concludes that the Second Amended and Restated Pricing Schedule as modified by the 2021 Amendment does include the Shortfall Charge Provision, and that the third paragraph of the Shortfall Charge Provision does apply to the Extension Term—the complaint alleges a plausible claim for reformation based on a Scrivener's Error.  Dkt. No. 1 ¶¶ 170–82.  AT&T argues that the Shortfall Charge Provision, which states that the Shortfall Charge for the Extension Term is calculated as "an amount equal to the difference between the MARC [for Months 65-77] and the total of the applicable MARC-Eligible Charges incurred [by Atos] thru month 40," *id.* ¶ 173, "contains an obvious Scrivener's Error that does not reflect the Parties true intentions with respect to the calculation of the shortfall amount . . . ," *id.* ¶ 172.  According to AT&T, the Shortfall Charge Provision does not reflect the parties' intent "with respect to either: (i) the months covered by the Extension Term; or (ii) the proper calculation of the Shortfall Charge that Atos would owe in the event it failed to satisfy the Extension Term's MARC."  *Id.* ¶ 174.  AT&T alleges that instead, "the Parties intended and agreed that the Extension Term would be comprised of Months 65-76 (a one year term) and the Shortfall Charge would be comprised of an

23

amount equal to the difference between the Extension Term's $6.2 million MARC and the total of the applicable MARC-Eligible Charges incurred by Atos during the 12-month period of the Extension Term." *Id.* ¶ 175.  AT&T argues that the Court should reform the Shortfall Charge Provision such that it reads: "If, at the end of the optional one year term period for Months 65-76 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred between months 65-76." *Id.* ¶ 182.

"[T]he New York courts have 'sharply limited' the remedy of reformation." *S.E.C. v. Credit Bancorp, Ltd.*, 232 F. Supp. 2d 260, 265 (S.D.N.Y. Nov. 20, 2002) (quoting *Collins v. Harrison-Bode*, 303 F.3d 429, 434 (2d Cir. 2002)).  "A party seeking reformation of a contract must show, by clear and convincing evidence, either a mutual mistake or a fraudulently induced unilateral mistake." *Roc Nation LLC v. HCC Int'l Ins. Co., PLC*, 523 F. Supp. 3d 539, 561 (S.D.N.Y. 2021) (citing *Imrie v. Ratto*, 145 A.D.3d 1358, 1360 (3d Dep't 2016) and *Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992)).  "A mutual mistake occurs when both parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent." *Healy*, 981 F.2d at 73.  New York law requires the party seeking reformation to show not only that a mistake or fraud occurred, but also the actual intent of the parties:

> The burden upon a party seeking reformation is a heavy one since it is presumed that a deliberately prepared and executed written instrument accurately reflects the true intention of the parties: The proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.

*William P. Pahl Equip. Corp. v. Kassis*, 588 N.Y.S.2d 8, 12 (1st Dep't 1992).  Additionally, the party seeking reformation on the basis of a mutual mistake is required to plead such mistake in accordance with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

*Palmer/Kane LLC v Rosen Book Works LLC*, 204 F. Supp. 3d 565, 581 (S.D.N.Y. 2016).

Finally, "[p]arol evidence is admissible to correct a mutual mistake." *Aristocrat Leisure Ltd. v.*

*Deutsche Bank Tr. Co. Ams.*, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005).

AT&T's second count fails to state a claim for relief. The count is premised on the

notion that the First Amended and Restated Pricing Schedule "contains an obvious drafting error

with respect to the calculation of the Shortfall Charge that Atos would owe to AT&T in the event

Atos failed to satisfy the Extension Term's MARC," Dkt. No. 1 ¶ 84—a "Scrivener's Error"—

that was carried forward in the Second Amended and Restated Pricing Schedule, *id.* ¶ 102, but

was not included in the 2021 Amendment, *id.* ¶ 134. AT&T contends that the Shortfall Charge

Provision of the First and Second Amended and Restated Pricing Schedules, as drafted, could not

possibly have reflected the parties' intent, because the provision would enable Atos to calculate

the Shortfall Charge by measuring the Extension Term's MARC against all MARC-Eligible

Charges generated by Atos from the inception of the Pricing Schedule's Term through month 40,

an interpretation that "would always result in a negative number", *id.* ¶¶ 88, 91, and thus would

render the MARC for the Extension term "entirely meaningless and superfluous," *id.* ¶ 90.

AT&T asserts that a Resale Addendum executed by the parties on or about February 27, 2019

"clarifies the Parties' intent with respect to the Shortfall Charge Provision," because it provides

that the MARC is to be measured against MARC-Eligible Charges for the 12-months period for

purposes of calculating the shortfall. *Id.* ¶¶ 108–09. It also relies upon the November 2020

Email in which Atos proposed that the Shortfall Charge Provision be amended to measure the

Shortfall Charge against MARC-Eligible Charges incurred during the twelve-month Extension

Period. *Id.* ¶ 117.

AT&T cannot rely upon conclusions to state a claim for relief.  *Twombly*, 550 U.S. at 555, 557; *Iqbal*, 556 U.S. at 678.  Its factual allegations fail to support the notion that the third paragraph of the Shortfall Charge Provision in the First and Second Amended and Restated Pricing Schedules contains an obvious drafting error, and therefore fails to express the parties' intent.  AT&T is correct that it is possible to read the third paragraph of the Shortfall Charge Provision to measure the MARC against all MARC-Eligible Charges from the inception of the initial Pricing Schedule through month forty and that, so read, the provision would have rendered the MARC illusory and meaningless at the time the First Amended and Restated Pricing Schedule was executed.  That reading gains force from the fact that the parties elsewhere in that same section used the language "Months 29-40" when they intended to convey a time span that ran from the execution of the First Amended and Restated Pricing Schedule through month forty. Dkt. No. 19-5 § 3.2.  That is not, however, the only interpretation of Section 3.2 of the First Amended and Restated Pricing Schedule, and when confronted with two or more plausible interpretations of a contract, New York courts are not to adopt that interpretation which would be illusory.  *See Axiom Inv. Advisors, LLC by and through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 534 (courts should avoid an interpretation that renders a provision "superfluous"); *Kolmar Ams., Inc. v. Bioversal Inc.*, 932 N.Y.S.2d 460, 494 (1st Dep't 2011) (holding that a court should adopt an interpretation that "renders no portion of the contract meaningless"); *Georgia Malone & Co. v. E & M Assocs.*, 81 N.Y.S.3d 387, 394 (1st Dep't, 2018) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").  Instead, New York courts are to interpret a contract to give meaning to each provision.  *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Breed v. Ins. Co. of N. Am.*, 413 N.Y.S.2d 352, 355 (1978)).

Atos has proffered an alternative plausible reading of the third paragraph of Section 3.2 that would not make the MARC for the Extension Term illusory and that would give the provision meaning.  Dkt. No 18 at 11.  The language referring to the "total of the applicable MARC-Eligible Charges incurred through month 40" should be understood to refer to "MARC-Eligible Charges" incurred from the execution of the First Amended and Restated Pricing Schedule, *i.e.*, month twenty-nine, through month forty.  So understood, the MARC would not only have meaning but the provision as a whole would have a business logic.  At the time the First Amended and Restated Pricing Schedule became operative—the end of month twenty-eight—Atos would not yet have incurred any MARC-Eligible Charges for the period beginning in month twenty-nine.  Particularly in light of Atos's inability to satisfy previous revenue commitments, AT&T had an interest in incentivizing Atos to use more AT&T services, and thus to accrue more charges, early in the First Amended and Restated Pricing Schedule so as to ensure that Atos was more likely to satisfy the newly imposed revenue commitments and to ensure that not all of the charges were accrued at the end of the term.  That interest is reflected in the first paragraph of Section 3.2, which imposes a penalty on Atos of at most $2,126,732 (36% of $5,907,590) if, at the end of month forty, Atos did not incur MTRC-Eligible Charges of $5,907,590.  Dkt. No. 19-5 ¶ 3.2.  But it is also plausible that AT&T would have had an interest in encouraging Atos to incur even more charges in the first year of the First Amended and Restated Pricing Schedule, and the means by which it encouraged Atos to incur even more charges is reflected in the third paragraph.  If Atos incurred $6,200,000 of MARC-Eligible Charges in months twenty-nine through forty (and not just $5,907,590), then Atos would be relieved of the possibility of any penalty with respect to the Extension Term.

27

Put differently, it is plausible that the Shortfall Charge Provision was not illusory, and thus, AT&T has not offered non-conclusory evidence that it reflected a mutual mistake.  And, on Atos's account, while at the time of the Second Amended and Restated Pricing Schedule month forty would have expired, the provision would not have been illusory because it would have confirmed that while there was a MARC, Atos had earned the right to be free from any penalties for failing to achieve it.  For purposes of reformation, and in the context of AT&T's claims, the question is not whether that interpretation actually reflected the understanding of any of the parties who actually negotiated the First and Second Amended and Restated Pricing Schedules—which is a question of parol evidence that is not included in AT&T's complaint.  The question is whether Atos has provided a plausible interpretation of the contractual language that would give it meaning, and thus, whether AT&T's assertion that the provision as written must have reflected a mistake is itself plausible.  Atos has done so.  Accordingly, AT&T has not pleaded facts that would establish a mutual mistake.

Even if AT&T had plausibly alleged that the Shortfall Charge Provision reflected a mutual mistake, AT&T has also failed to plead facts that show there was a different meeting of the minds that the contract failed to capture, and that reformation is therefore permissible.  AT&T argues that it has alleged a meeting of the minds that the shortfall would be measured based on the difference between the Extension Term MARC and MARC-Eligible Charges during the Extension Term based upon the CSOA and upon the Resale Addendum.  Dkt. No. 1  ¶ 175.  But the CSOA cannot itself establish a meeting of the minds as to a shortfall provision with respect to the months after sixty-four in the First and Second Amended and Restated Pricing Schedules.  The CSOA establishes the framework and the background rules with respect to the parties' relationship at a broader level than with respect to the specific provision of certain goods

28

and services pursuant to an executed pricing schedule.  But the parties agreed upon a pricing schedule in the years after the CSOA was signed.  AT&T cites no evidence that in crafting the First or Second Amended and Restated Pricing Schedules, the parties intended to adopt the shortfall provision from the CSOA.

The Resale Addendum also does not support reformation of the Shortfall Charge Provision.  Dkt. No. 1 ¶ 175.  Within its definition of MARC, the Resale Addendum states, "*If [Atos] fails to satisfy the MARC for any such 12-month period, [Atos] will pay a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during such 12-month period . . . .*"  *Id.* ¶ 109 (quoting the Resale Addendum) (emphasis in original).  As with the CSOA, the text of the Resale Addendum does not constitute concrete evidence as to AT&T's belief, let alone Atos's belief, with respect to the specific Shortfall Charge Provision ultimately enacted.  And as with the CSOA, the text of the Resale Addendum could shed light on the parties' intent with respect to the Shortfall Charge Provision, but only if AT&T offered affirmative evidence that the parties intended for the Shortfall Charge Provision to match the Resale Addendum.  Instead, AT&T offers no such evidence, and the parties themselves definitively indicated a willingness to depart from the definition in the Resale Addendum when they formulated a different calculation with respect to the Monitoring Period.  Dkt. No. 19-4 § 3.2.  Thus without more, the Resale Addendum cannot serve as evidence of what the parties intended with respect to the Shortfall Charge Provision.

AT&T also argues its memorandum of law opposing Atos's motion to dismiss that the parties' performance "throughout the course of their relationship" indicates that "the Parties agreed to calculate the Shortfall as the difference between a MARC and the total MARC-Eligible Charges incurred during the same annual period to which the MARC is tied."  Dkt. No. 26 at 22.

It is true that "[g]enerally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913); *see also IBJ Schroder Bank & Trust Co. v. Resolution Tr. Corp.*, 26 F.3d 370, 374 (quoting same); Restatement (Second) of Contracts § 202, cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."). And specifically, "[w]hen a party to a contract conducts itself in a manner that might be probative of its interpretation of the contract 'for any considerable length of time before it becomes a subject of controversy,' that 'practical interpretation of [the] contract' is 'entitled to great . . . weight.'" *Waterloo Cap. Partners, LLC v. BWX Ltd.*, 2022 WL 2063762, at *13 (S.D.N.Y. June 8, 2022) (quoting *Stone Key Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 324–35 (S.D.N.Y. 2018)).  But the complaint itself does not allege that the parties had ever "performed" the Shortfall Charge Provision with respect to the Extension Term.  Thus, the parties' conduct cannot indicate what the parties understood their agreement under the Shortfall Charge Provision to be.

Indeed, contrary to AT&T's argument that the November 2020 Email constitutes evidence that Atos "openly acknowledged the Scrivener's Error . . . ." Dkt. No. 26 at 22, to the extent the November 2020 Email does shed light on the parties' intent in a manner material to the instant claim, it serves to demonstrate that Atos did not understand the Shortfall Charge Provision to provide for what AT&T claims that it should.  And because reformation requires "clear and convincing evidence" that the mistake was "mutual," *Roc Nation LLC*, 523 F. Supp. 3d at 561, evidence that Atos itself did not perceive the Shortfall Charge Provision to have

reflected an error (and absent an allegation that there was a fraudulently induced unilateral error), is sufficient to defeat a claim for reformation.

## III.  The Third Count: Breach of the Settlement Agreement

In its third count, AT&T claims that—if the Shortfall Charge Provision is incorporated in the operative Pricing Schedule as amended by the 2021 Amendment and does not require Atos to pay any Shortfall Charge for failing to satisfy the MARC during the Extension Term—Atos breached its obligations under the Settlement Agreement.  Dkt. No. 1 ¶¶ 183–89.  AT&T asserts that Atos violated the provision in the Settlement Agreement that required Atos to "execute all necessary documentation to extend the Pricing Schedule Term to 76 months . . . with a $6,200,000.00 Minimum Annual Revenue Commitment[.]"  *Id.* ¶ 186 (quoting the Settlement Agreement).  According to AT&T, "[b]y agreeing to 'execute all necessary documentation to extend the Pricing Schedule Term to 76 months . . . with a $6,200,000 Minimum Annual Revenue Commitment[,]' Atos became 'obligated' to provide a minimum $6.2 million in revenue to AT&T during the Extension Term."  Dkt. No. 26 at 24 (quoting the Settlement Agreement) (alteration in original).  After the 2021 Amendment was signed, AT&T requested that Atos execute a proposed amendment to the Shortfall Charge Provision in order to ensure that Atos would be charged a Shortfall Charge if it failed to incur $6,200,000 of MARC-Eligible Charges during the Extension Term.  Dkt. No. 1 ¶ 187.  AT&T claims that "by refusing to execute the Proposed Amendment and/or any other documents necessary to extend the Pricing Schedule Term to 76 months with an enforceable $6.2 million MARC," Atos "materially breached the Settlement Agreement," *id.* ¶ 188, causing damage to AT&T in an amount not less than $3,367,351, *id.* ¶ 189.

Atos responds that it met its obligations under the Settlement Agreement in full.  Dkt. No. 18 at 12.  Atos argues that because the 2021 Amendment "replaces Section 2 of the Second

Restated Pricing Schedule with a provision establishing the Pricing Schedule Term as '76 Months, expires 2/18/2022.'. . .  [a]nd it replaces Section 3.c with a $6,200,000 MARC for that period[,]" Atos satisfied its obligations under the Settlement Agreement.  *Id.* (quoting the 2021 Amendment) (internal citation omitted).  Atos also highlights that the Settlement Agreement "makes no mention of amending the Shortfall Charge Provision, adjusting how to calculate the Shortfall Charge, or making any changes to Section 3.2 of the Second Restated Pricing Schedule."  *Id.*  Atos asserts that it therefore did not violate the Settlement Agreement by declining to amend the Shortfall Charge Provision when asked to do so by AT&T.  *Id.*

AT&T fails to state a claim for breach of the Settlement Agreement.  The Settlement Agreement states that "[Atos] shall execute all necessary documentation to extend the Pricing Schedule Term to 76 months, expiring February 18, 2022 with a $6,200,000.00 Minimum Annual Revenue Commitment."  Dkt. No. 19-7 at ECF p. 2.  Section 2 of the 2021 Amendment defines the "Pricing Schedule Term" as "76 Months, expires 02/18/2022."  Dkt. No. 19-8 at ECF p. 2.  Section 3.c of the 2021 Amendment defines the "MARC under this Pricing Schedule during renewal period"—further clarified as "Months 65–76"—as "$6,200,000."  *Id.* at ECF p. 3.  The 2021 Amendment therefore extends the term of the Second Amended and Restated Pricing Schedule to seventy-six months ending February 18, 2022, and establishes a MARC of $6,200,000, fulfilling both requirements established by the Settlement Agreement.  If, as AT&T alleges, the effect of changing the extension period from months sixty-five through seventy-seven to months sixty-five through seventy-six was to eliminate the applicability of the third paragraph of the Shortfall Charge Provision and to give effect to the shortfall provision in the CSOA, then AT&T will have achieved its desired result.  The correspondence regarding the Settlement Agreement may be relevant to that question of interpretation.  But the Settlement

Agreement itself is silent with respect to the Shortfall Charge Provision, and therefore establishes no obligation for Atos to agree to explicitly amend it.  Thus, if, after discovery, it turns out that AT&T has not established its preferred interpretation of the relevant contracts, and it had no right to bill Atos for the difference between the Extension Term MARC and the MARC-Eligible Charges for the Extension Term, that will not be as a result of Atos's violation of the Settlement Agreement.  It will be the result of AT&T's failure to insist in the Settlement Agreement that the parties amend Shortfall Charge Provision.

## CONCLUSION

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 17 and 27.


SO ORDERED.


Dated: December 22, 2023
     New York, New York                                     LEWIS J. LIMAN
                                                  United States District Judge