UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

:

AT&T ENTERPRISES, LLC,                                    :

:

Plaintiff,                    :

:                    23-cv-1395 (LJL)

-v-                                :

:                    OPINION AND ORDER

ATOS IT SOLUTIONS AND SERVICES, INC.,                    :

:

Defendant.                    :

:

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff AT&T Enterprises, LLC ("Plaintiff" or "AT&T") and Defendant Atos IT

Solutions and Services, Inc. ("Defendant" or "Atos") cross-move, pursuant to Federal Rule of

Civil Procedure 56, for summary judgment. Dkt. Nos. 170, 173. Atos also moves for sanctions

against AT&T pursuant to Federal Rule of Civil Procedure 37(e). Dkt. No. 139. For the

following reasons, AT&T's motion for summary judgment is granted, and Atos's motions for

sanctions and summary judgment are denied.

## BACKGROUND

The following facts are undisputed except where otherwise indicated.

AT&T is a limited liability company organized under the laws of Delaware. Dkt. No.

171 ("Joint Statement of Undisputed Facts" or "JS") ¶ 3.[1] It is one of the world's largest

telecommunications companies and provides broadband connectivity services including voice

and data services. *Id.* ¶ 4. A portion of AT&T's business pertains to "system integrators"—

---

[1] Attachments to the Joint Statement of Undisputed Facts at Dkt. No. 171 are denoted "JX__."

companies that provide a single source for a variety of IT services that customers might otherwise have to obtain from several different service providers. *Id.* ¶ 6.

Atos is a Delaware corporation with a principal place of business in Texas. *Id.* ¶ 5. It is a systems integrator that provides customers with a wide range of IT services, including digital consulting and cloud management solutions. *Id.* ¶¶ 5, 7.

The two companies enjoy a contractual relationship pursuant to which AT&T provides services to Atos in exchange for payments by Atos to AT&T. Three layers of contract govern their relationship and are relevant to this case. Effective October 9, 2002, Atos's predecessor-in-interest, Atos Origin, Inc., and AT&T's predecessor-in-interest, AT&T Corp., entered into a Master Services Agreement (the "MSA"). *Id.* ¶ 8. The MSA provides "General Terms and Conditions" applicable to AT&T's provision of products and services to Atos. *Id.* ¶ 9. The MSA contemplates that the parties' obligations—including the precise services provided by AT&T and the rates and charges payable by Atos for those services—are to be further defined by specific service agreements entered into by the parties and attached to the MSA. *Id.* ¶ 10. The MSA states that where its general terms and conditions conflict with terms and conditions in a specific service agreement, the terms and conditions in the specific agreement control. *Id.* ¶ 11. The MSA also contains a no-oral-modification clause, which states that "[a]ny supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties," JX7 § 12.1, and a choice of law provision identifying New York as the source of law governing the agreement, *id.* § 12.6.

The second layer of the parties' contractual relationship comes from the Comprehensive Service Order Attachment (the "CSOA"), an attachment to the MSA executed on April 4, 2007. JS ¶ 15. Under the CSOA, AT&T agreed to provide services to Atos that would be specified in

2

later-executed "Pricing Schedules." *Id.* ¶ 18.  The CSOA also outlined the concept of a Minimum Annual Revenue Commitment ("MARC"), defined as "an annual revenue commitment set forth in an applicable Pricing Schedule that [Atos] agrees to satisfy during a Pricing Schedule Term." *Id.* ¶ 22; JX9 § 2.  The CSOA specifies that the charges that count toward the MARC ("MARC-Eligible Charges") are "the recurring and usage charges, after applicable discounts and credits, incurred by [Atos] for the Services identified in the applicable Pricing Schedule as MARC-contributing," excluding certain charges such as governmentally imposed costs, fees, and taxes.  JX9 § 2.  In a section titled "Minimum Commitments/Charges," the CSOA provides that "[i]f, on any anniversary of a Pricing Schedule Term start date, [Atos] has failed to satisfy the MARC for the preceding 12 month period, [Atos] will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during the 12 month period."  JS ¶ 23; JX9 § 4.

The third and most specific contract governing the relationship between the parties is a pricing schedule originally entered into in 2015, first amended and restated in 2018, again amended and restated in 2019, and further amended in 2021.

On or about September 30, 2015, the parties signed the "AT&T SDN OneNet BTB Pricing Schedule" (the "Pricing Schedule").  JS ¶ 24.  Under the Pricing Schedule, AT&T agreed to provide Atos with "voice services, long distance voice services in particular."  Dkt. No. 207 ("Atos 56.1") ¶ 5.  The Pricing Schedule originally provided for a three-year term beginning November 1, 2015.  JS ¶ 26; JX11 § 2.  The Pricing Schedule set forth Atos's commitment to a MARC of $10,500,000 for each of the three years in exchange for certain rates for AT&T's services during the Pricing Schedule's term.  JS ¶ 27; JX11 § 3.  It did not contain any separate provision for calculating a shortfall penalty if Atos failed to satisfy the MARC in a given year.

On or about May 23, 2017, AT&T advised Atos that based on Atos's projected MARC-Eligible spend for Year 2 of the Pricing Schedule (from roughly November 2016 through October 2017), Atos was likely to fall short of satisfying the second year's $10.5 million MARC by approximately $2–2.5 million.  JS ¶ 28; JX12.  On or about September 2017, the parties began negotiating a new agreement (the "2018 Restated Pricing Schedule").  JS ¶ 29; JX13.  On December 7, 2017, Atos sent AT&T a "Commercial Construct" detailing Atos's requested terms for the 2018 Restated Pricing Schedule (the "Commercial Construct").  JS ¶ 30; JX14.  Commercial constructs generally outline the key financial terms of a contract, JS ¶ 31, and Atos's Commercial Construct contained, among other things, the following requests for the 2018 Restated Pricing Schedule: (1) a 36-month term with an additional 12-month renewal period available at Atos's sole discretion; (2) that the revenue commitment under the amended pricing schedule be a "Minimum Term Revenue Commitment" ("MTRC") covering a period of multiple years (i.e., the proposed 36-month term) rather than annual MARCs for each year of the proposed 36-month term; (3) that "[a]t the end of the MTRC measurement period, if Atos fails to meet the MTRC, Atos will pay a shortfall charge of no more than fifty percent (50%) of the difference between the net MTRC and the sum of the term's net contributory payments"; and (4) a "Transition Period" in which "[u]pon Atos request and at Atos sole discretion, AT&T will continue to provide services for at least six (6) months following the expiration or termination of the contract.  All rates, service level agreements and terms and conditions of the contract will apply during that period, but no minimum commitments will apply."  JX14.

On January 4, 2018, AT&T advised Atos that it agreed to the following proposed constructs: (1) a three-year contract extension with a proposed MTRC of $18.5 million; (2) AT&T would waive the Year 2 shortfall under the Pricing Schedule; and (3) AT&T would apply

4

"run rate reductions of 36% (i.e., the latest AT&T offer), but applied to existing business as well as new business—no further unit rate improvements." JS ¶ 33; JX16. Thereafter, the parties engaged in additional discussions and negotiations over the Commercial Construct for the 2018 Restated Pricing Schedule. JS ¶¶ 34–37. Those negotiations are reflected, in part, by notes taken by Andrew Ritter ("Ritter"), AT&T's Executive Negotiator of the Pricing Schedule. *Id.* ¶¶ 35–36. The notes confirm AT&T's agreement to a 36-month term governed by a three-year $18.5 million MTRC (as opposed to annual MARCs), with the possibility of an additional 12-month renewal period available at Atos's discretion. *Id.* The notes further state that "[t]he commitment in the option year would be a MARC and it would be 1/3 of the $18.5M [MTRC] or $6.2M." *Id.* ¶ 37.

It is undisputed that AT&T did not agree to Atos's request that the shortfall penalty be 50% of the shortfall amount in the event that Atos failed to satisfy the full amount of the MTRC at the end of the MTRC period. *Id.* ¶ 38. Instead, AT&T advised Atos that "[t]he whole purpose of the commitment is to agree on a spend level. If the remedy for failing to meet the spend level is repayment of only 50% of the difference, this effectively cuts the commitment in half . . . If the agreement goes to full term and Atos has failed to spend an amount equal to or greater than the commitment, AT&T will bill Atos the difference between the amount achieved and the amount committed." *Id.*

On January 15, 2018, Sharletta McKinney ("McKinney"), a Senior Solutions Architect for AT&T who, along with Ritter, was AT&T's primary drafter of the 2018 Restated Pricing Schedule, *id.* ¶¶ 53–54, forwarded a draft of the agreement to AT&T personnel requesting them to "review and reply back with any changes tonight so that I can finalize the contracts," *id.* ¶ 39. The draft that McKinney circulated provided for an $18.5 million MTRC covering "YEAR 3,

YEAR 4, YEAR 5 (Combined)," as well as a $6.2 million MARC for the "optional one year extension" referred to as "Optional YEAR 6." *Id.* ¶ 40.  The draft also included a Section 3.2, entitled "SHORTFALL CHARGES," which explained that if at the end of the 36-month term contemplated in the 2018 Restated Pricing Schedule (beginning in Year 3 and ending at the end of Year 5 of the original Pricing Schedule Term) Atos failed to satisfy the MTRC, AT&T would bill Atos a shortfall charge in an amount equal to the difference between the MTRC and the total applicable MTRC-Eligible Charges incurred by the end of the three-year period.  *Id.* ¶ 42.

The AT&T employees to whom McKinney sent this draft responded with input, including the following: "Section 3.2 – it might be worth adding another paragraph making the same statement about the option year 6 – like 'If the Year 6 extension is put into effect then at the end of Year 6 if customer . . .'"  *Id.* ¶ 43.  McKinney reformulated the agreement, including Section 3.2, which was sent to Atos the next day with the following language:

> If, at the end of the three year MTRC measurement period for Years 3, 4, and 5 of the Pricing Schedule Term, the Customer fails to satisfy the MTRC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MTRC and the total of the applicable MTRC-Eligible Charges incurred by the end of the three year period.

> If, at the end of the optional one year term period for Year 6 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred in Year 6.

*Id.* ¶¶ 44–45; JX21.

On February 12, 2018, AT&T followed up by delivering Atos its "best and final offer for the 2018 Restated Pricing Schedule" (the "BAFO").  JS ¶ 48.  Atos's Chief Procurement Officer for North America, Alexandre Pakasi ("Pakasi"), remarked in an internal Atos email chain, which included Atos negotiators Leok van Stekelenburg ("Stekelenburg") and Judith Fling

("Fling"), that "[t]he team made significant progress on the renegotiation of the AT&T contract and we now have a good BAFO." *Id.* ¶ 46, 51; JX26; Dkt. No. 206 ("AT&T 56.1") ¶¶ 14–16.

The BAFO stated, among other things, that a new 36-month contract would replace the existing Pricing Schedule between AT&T and Atos, that the new contract would waive the $2.1 million shortfall from Year 2 of the initial Pricing Schedule, and that AT&T agreed to move from an annual MARC arrangement to an MTRC approach with lowered overall revenue commitments. JX24. AT&T also agreed to provide Atos with certain "incentive credits" for "reasonable stretch and reward" based on Atos's spending during each year of the contract. *Id.* Two other provisions of the BAFO are notable. First, AT&T wrote that it would "provide for a transition period post the contract at ATOS sole discretion at the current rates for a period not to exceed 6 months. Revenue commitment for the transition period will only be required if committed resources are deployed." *Id.* Second, the BAFO stated that "AT&T has agree [sic] to participate in one market review during the 36 month period. If AT&T and ATOS can not [sic] agree to new rates, AT&T will reduce the amount of the unsatisfied MTRC by 10%." *Id.* Atos replied that it "would like to move forward with the BAFO offer listed" and requested that AT&T being preparing the contract. JS ¶ 51.

Ritter and McKinney then began the process of incorporating the BAFO's terms into the written 2018 Restated Pricing Schedule, *id.* ¶¶ 52–54, with the parties exchanging multiple drafts thereafter, *id.* ¶ 56. For example, Atos inserted proposed edits to portions of the agreement relating to certain credits. *Id.* ¶ 57. In particular, Atos wanted to receive upfront credits that it could recognize immediately, as opposed to rate reductions which would have been spread out over the course of the 2018 Restated Pricing Schedule's term. *Id.* ¶¶ 58–59. AT&T initially opposed this request but subsequently agreed to it on the condition that Atos would repay a

prorated portion of the credits if Atos failed to achieve approximately $6 million of spending in the first year of the new agreement. *Id.* ¶¶ 60–64. Atos responded that it needed the credits to be free of any contingencies in order for them to be recognized in the first quarter of 2018, *id.* ¶ 66, so the parties removed the "repayment" language from the draft and replaced it with a new MARC for the first year of the 2018 Restated Pricing Schedule (Months 29–40 of the Pricing Schedule), *id.* ¶¶ 68–73. In other words, AT&T agreed to provide upfront credits that Atos could immediately recognize in exchange for Atos's agreement to repay the credits, in the form of a shortfall penalty, if Atos failed to meet certain spending goals framed as a MARC in the first year of the new agreement, Months 29–40 (even though the 2018 Restated Pricing Schedule was otherwise intended to replace annual MARCs with an MTRC governing the entire length of the agreement's term).

To reflect the addition of a new MARC for the first year of the 2018 Restated Pricing Schedule, i.e., Months 29–40 of the agreement, Ritter added the words "month 40 or" to what was then the second paragraph of Section 3.2, entitled "Shortfall Charges," so that it read as follows:

> If, at the end of ***month 40 or*** the optional one year term period for Year 6 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred in Year 6.

*Id.* ¶ 73 (emphasis added). Ritter added a comment to this revision: "Note change to accommodate the new MARC in section 3 above." *Id.* ¶ 74.

That same day, McKinney further edited the draft to change the time references throughout the agreement from "years" to "months" because the full term of the 2018 Restated Pricing Schedule totaled 64 months—five years plus four months—so it was not possible to divide the term into yearly increments without having an undefined period of four months. *Id.*

8

¶¶ 75–76.  In doing so, McKinney inserted the edit at the heart of this lawsuit.  Specifically, she changed the phrase "incurred in Year 6" to "incurred thru month 40" in the second paragraph of Section 3.2 dealing with shortfall penalties, including for the optional extension term in Year 6. *Id.* ¶ 77.  Before McKinney's edit, Section 3.2 of the draft read as follows:

> 3.2 SHORTFALL CHARGES
>
> If, at the end of the **three year** MTRC measurement period for **Years 3, 4 and 5** of the Pricing Schedule Term, the Customer fails to satisfy the MTRC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MTRC and the total of the applicable MTRC-Eligible Charges incurred by the end of **the three year period**
>
> If, at the end of Month 40 or the optional one year term period for **Year 6** of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred in **Year 6**

*Id.* ¶ 78; JX42 (emphasis added).

> After McKinney's edits, the provision read:
>
> 3.2 SHORTFALL CHARGES
>
> If, at the end of the MTRC measurement period for **Months 29-64** of the Pricing Schedule Term, the Customer fails to satisfy the MTRC, the Customer will be billed a shortfall charge equal to the difference between the MTRC and the total of the applicable MTRC-Eligible Charges incurred by the end of **period month 64**.
>
> If, at the end of Month 40 or the optional one year term period for **Months 65-77** of the Pricing Schedule term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred **thru month 40**.

*Id.* ¶ 79; JX42 (emphasis added).  Ritter further edited the section by, among other things, changing "period month 64" to "the MTRC measurement period for Months 29–64" before sending the draft on to Atos.  JS ¶¶ 81–84.  This draft, circulated on February 22, 2018 at 3:49 PM, was the first draft sent to Atos including the "thru month 40" language at the end of the Shortfall Charge provision.  *Id.* ¶ 85.

9

The next day, on February 23, 2018, AT&T sent Atos the 2018 Restated Pricing Schedule "in final and markup form." *Id.* ¶ 89. The parties signed the agreement on or about February 27, 2018. *Id.* ¶ 92.

The final version of Section 3.2 of the agreement reads as follows:

3.2 SHORTFALL CHARGES/PENALTIES

If, at the end of Month 40 of the Pricing Schedule Term, Customer fails to incur MTRC-Eligible Charges of $5,907,590 for the period during Months 29-40 ("Monitoring Period Amount"), the Customer will be billed a penalty equal to 36% of the difference between the Monitoring Period Amount and the actual charges incurred during Months 29-40. For example, if the Customer incurs $4,000,000 of MTRC-Eligible Charges, the penalty would be equal to $686,732.40 (($5,907,590 – $4,000,000) x 36%).

If, at the end of the MTRC measurement period for Months 29-64 of the Pricing Schedule Term, the Customer fails to satisfy the MTRC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MTRC and the total of the applicable MTRC-Eligible Charges incurred by the end of the MTRC measurement period for Months 29-64.

If, at the end of the optional one year term period for Months 65-77 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru month 40.

*Id.* ¶ 90; JX 44. As this language reflects, rather than framing the first year of the new term as including a MARC, the agreement instead sets forth a "Monitoring Period Amount" that needs to be met in order for Atos to avoid a penalty.

Elsewhere, the agreement reflects the following minimum revenue commitments made by Atos:

10

3. **MARC, MTRC,**

3.a    **MARC**

|  | Months 1-12 | Months 13-24 | Months 25-28 |
|---|---|---|---|
| MARC under this Pricing Schedule | $10,500,000 | $10,500,000 | $0.00 |

3.b  **MTRC**

|  | Months 29-64 |
|---|---|
| MTRC under this Pricing Schedule | $18,500,000 |

3.c Optional 12 Month  Extension

| Optional 12 Month  extension | Optional Months 65-77 |
|---|---|
| MARC under this Optional 12 Month extension | $6,200,000 |

JS ¶¶ 97–102; JX45 § 3.a–c.  The 2018 Restated Pricing Schedule picks up at Month 29 to

reflect the parties' preexisting relationship, which started with the Pricing Schedule in November

2015.  The 2018 Restated Pricing Schedule includes its own definition of "MARC" consistent

with that provided in the CSOA: "'MARC (Minimum Annual Revenue Commitment)' means the

total revenue commitment set forth in this Pricing Schedule that Customer agrees to satisfy

during each year of the Pricing Schedule Term."  JX45 § 1.1.  The agreement likewise defines

MARC-Eligible Charges in line with the CSOA.  *See id.*

Section 6.4.2 of the 2018 Restated Pricing Schedule contemplates that the parties would

further amend the Pricing Schedule in Month 39 (January 2019) to reflect additional rate

reductions, which Atos requested go into effect in Month 41 (March 2019) of the Pricing

Schedule's term.  JS ¶ 104.  Accordingly, the parties executed a second amended and restated

pricing schedule (the "2019 Restated Pricing Schedule") on or about January 28, 2019.  *Id.*

¶ 105.  At the time the 2019 agreement was signed, Atos had already incurred more than $6.2

11

million in MTRC-Eligible Charges for the period of Months 29 through 40 (thereby easily satisfying the Monitoring Period Amount of $5,907,590 and avoiding the applicable penalty mentioned in the first paragraph of Section 3.2). *Id.* ¶ 108.

On October 29, 2020, around Month 60 of the agreement, Atos approached AT&T to discuss the possibility of extending the contract. *Id.* ¶ 114. At the time, Atos was forecasting a shortfall for the MTRC and hoped that AT&T would agree to waive the resulting charge. *Id.* ¶¶ 109–16. Atos's Fling memorialized these initial discussions with notes indicating that Atos was requesting that AT&T: (1) waive any pending shortfall on the MTRC of $18.5 million because of customers and business lost during the COVID-19 pandemic; and (2) reduce the Optional Extension Period MARC from $6.2 million to $2 million with no increased rates. *Id.* ¶ 117. Fling further requested that the third paragraph of Section 3.2, which included the "thru month 40" language, be amended "to only address months 65–77." JX53. Her proposed amendment would remove the "thru month 40" language from the provision such that it read: "If, at the end of the optional one year term period for Months 65–77 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC Eligible Charges incurred ***between months 65–77***." *Id.* (emphasis added). Internally, AT&T remarked, "On #3, what's actually changing? What's written sort of looks like how I would have expected the original agreement to be written, so want to understand what's proposed to change." Dkt. No. 186-44 at 5. Another AT&T employee responded, "Agreed it looks like what one would expect. The agreement originally looked further back to the period of MTRC that we are in now and ending this month. Since we agreed to the bus[iness] downturn in #1 above, their change makes sense." *Id.*

Over the ensuing months, Atos repeatedly requested that AT&T reduce the MARC for the optional extension term from $6.2 million to anywhere from $2 to $3 million. JS ¶ 123. On February 4, 2021, the parties had a call to address Atos's requests. *Id.* ¶ 120. The next day, Fling wrote to AT&T Account Manager Kirk Pouttu ("Pouttu"), stating, "I am putting together executive overview for the AT&T offer and need to include what happens if we let the agreement go month to month," *id.*, to which Pouttu responded that there could be significant adverse outcomes for Atos beyond the mere loss of discounts, including the loss of custom list rates, *id.* ¶ 121. Fling then reported to Denis Courtois ("Courtois"), Atos's Group Procurement IT Telecom Category Director, and Diego Escorcia ("Escorcia"), Atos's Senior Director of IT Procurement, that the costs of going month to month were much higher than originally anticipated. *Id.* ¶¶ 109, 122.

On March 9, 2021, Doris Hendrick ("Hendrick"), a Global Supplier Manager and Team Lead at Atos, reviewed the Shortfall Provision in Section 3.2 and sent an email to Courtois, Fling, and Escorcia flagging the "thru month 40" language, stating, "I am confused and somewhat excited about this language, but I am not 100% sure what it means." *Id.* ¶ 124. She continued, "Does this sentence refer to the optional MARC of $6,200,000, must be because it does MARC and not MTRC (All commitments) // Note the timeframe used to calculate the penalty MARC-Eligible Charges incurred thru month 40 // Month 40 was February 2019—I only have the spend for month 29–40 and it already exceeds $6,200,000—penalty would be $0. This sounds too good to be true, did AT&T make a error in our favor or am I reading this wrong?" *Id.* ¶ 125. Both Courtois and Escorcia replied to this email instructing Hendrick to reach out to Atos Legal to "clarify that asap" and to "vet the understanding." *Id.* ¶ 126.

13

Courtois subsequently followed up with Atos's legal team and sent an email a few days later to several Atos executives in which he explained that the shortfall calculation for the optional extension term was "not clear and we may have several ways to understand the calculation mechanism." *Id.* ¶¶ 127–30. Courtois explained that the shortfall could be calculated in three different ways: (1) the difference between the $6.2 million MARC and the total MARC-Eligible Charges from Months 29 to 40; (2) the difference between the $6.2 million MARC and the total MARC-Eligible Charges from Months 0 to 40; or (3) the difference between the Total Marc-Eligible Charges from Months 0 to 40 and the sum of all MARCs from Months 0 to 40." *Id.* ¶ 132. Courtois stated that he would "check separately with Loek Van Stekelenburg if he can help," as Stekelenburg "was involved in negotiating or drafting this language [i.e., the Shortfall Provision] when it was agreed to by Atos and AT&T." *Id.* ¶¶ 132–33. Courtois spoke to Stekelenburg to understand "what the parties agreed to," writing in an email to Stekelenburg, "Can you take a look on the mail below and on the attached contract. We are currently trying to calculate what will be the calculation to determine the shortfall for the 12 months extension of the AT&T contract. There is several [sic] ways to calculate, do you recall what was agreed with AT&T at this time?" *Id.* ¶¶ 134–35. Stekelenburg responded the next day: "If we would extend the contract we have to spend 6.2M USD between Mch 2021 and Feb 2022. So I would recommend not to take this option and see for another contract with less commitments and probably less discount. This is what I see as we agreed at that time." *Id.* ¶ 136.

Shortly after sharing his thoughts, Stekelenburg's boss, Elena van Bockel ("Bockel"), called him and told him that he "misread the contract" and "did it wrong." *Id.* ¶ 137. Stekelenburg recalled that Bockel said something along the lines of "[y]ou missed what was the real meaning of the mail from Denis [Courtois], and you didn't know the background and you

14

didn't look at the contract correctly enough." *Id.* ¶ 138.  Bockel then sent an email to other Atos

executives explaining:

> Following the logic of the other clauses (see initial period), the end of the clause *could* have been "incurred for months 65–77". Meaning 6,2M commitment for 12 months—your real spend (e.g. estimated at 3M) = shortfall to be paid 3,2M.  One may argue it could have been something else, it's not unusual to have different calculation approach at the end of the contract.
>
> The draft of the contract (including this clause "thru month 40["]) has been delivered by AT&T to Atos, so it was AT&T proposal that we have accepted.  We could go and execute renewal clause and argue at the end of the period that the shortfall is zero as per exact language of the clause.

JX68.

On March 26, 2021, AT&T shared a draft of the 2021 Amendment with Atos, which

Following this email, Atos rescinded its request that the MARC be reduced to between $2

and $3 million and advised AT&T it "would take the 12 month extension at the MARC of $6.2m

as defined in our Agreement" if AT&T agreed to waive the existing MTRC shortfall of

approximately $2 million.  JS ¶ 143.  AT&T accepted, stating that "[t]he amendment will extend

the term by an additional 12 months and will have a corresponding MARC of $6.2M." *Id.* ¶ 145.

AT&T then began the process of drafting two agreements—an amendment to the Pricing

Schedule governing the optional extension term (the "2021 Amendment"), and a release and

settlement agreement waiving the MTRC shortfall (the "Settlement Agreement").  *Id.* ¶ 146.

On March 26, 2021, AT&T shared a draft of the 2021 Amendment with Atos, which

included the following language: "The current Section 3 is deleted in its entirety and replaced

with the following . . ."  JS ¶ 147–48; JX73.  Section 3 of the Pricing Schedule originally

included a list of MARCs for Months 1 through 28 in subsection 3.a, the MTRC for Months 29

through 64 in subsection 3.b, and the MARC for the "Optional 12 Month extension" for Months

65 through 77 in subsection 3.c.  *See* JX46.  Although the draft 2021 Amendment proposed

replacing Section 3 "in its entirety," the replacement language included only two minor edits to

15

the original language.  JX73.  First, the draft replaced the language discussing the "Optional 12 Month extension" period with the "MARC under this Pricing Schedule during renewal period." *Id.*  Second, the draft indicated that the renewal period was for Months 65 through 76, as opposed to Months 65 through 77 as originally indicated in the Pricing Schedule.  *Id.*  Upon receiving the draft, Fling requested that the language regarding "current Section 3 [being] deleted in its entirety" instead read: "The current Section 3.a, 3.b, 3.c is deleted in its entirely [sic] and replace [sic] with the following."  JX74.  Fling stated that Atos objected to deleting all of Section 3 because "only 3.a, 3.b, and 3.c need to be replaced.  The rest of 3 is necessary to calculate any shortfalls."  JS ¶ 153.  In other words, Fling stated that there was an ambiguity with deleting Section 3 "in its entirety"—namely, whether that meant also deleting Section 3.2, the "Shortfall Charges/Penalties" provision, which contained the shortfall calculations, including the "thru month 40" language for the "optional one-year term."  JX46.  AT&T agreed to amend the draft as proposed by Atos such that only Sections 3.a, 3.b, and 3.c from the Pricing Schedule were amended.  JS ¶ 157.  The parties made no edits or modifications to Section 3.2 and its shortfall calculations, nor did they negotiate any such modifications.

On April 15, 2021, Courtois explained the situation to Aurelian Tremblaye ("Tremblaye"), Atos's Global Chief Procurement Officer, this way: "12 months extension is linked with a 6.2m$ spend commitment.  But, thanks to the clause 3.2 in the existing contract which is not removed and remain [sic] valid in the extension language, the penalty will be zero whatever the amount spend [sic] during the extension period."  *Id.* ¶ 163.  Tremblaye responded that she was "not comfortable with signing a new commitment we don't expect to fulfill," although she "underst[ood] the strategy" and noted that "indeed [Atos] cannot afford a 200% increase."  *Id.* ¶ 164.

The parties executed the 2021 Amendment and the Settlement Agreement on April 20 and 21, 2021. *Id.* ¶¶ 165–66. Section 3.c of the 2021 Amendment, entitled "MARC," states that the MARC for the Months 65–76 is $6,200,000. JX78.

Only one week later, AT&T wrote to Atos that it "identified a minor correction that is needed for section 3.2 SHORTFALL CHARGES/PENALTIES of the OneNet Agreement. The correction once made, actually delivers what Atos specifically asked for in point number 3 of your email sent Wednesday, 11-11-20." JS ¶ 171. Specifically, AT&T indicated that the "thru month 40" language should be removed from Section 3.2 such that the provision instead reads: "If, at the end of the optional one-year term period for Months 65–76 of the Pricing Schedule Term, the Customer fails to satisfy the MARC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru Months 65–76." *Id.* ¶ 172. Atos responded approximately one week later that it was "fine with the current language in place" and accordingly was not willing to execute any further amendment to the Pricing Schedule. *Id.* ¶ 176. AT&T's in-house counsel then sent Atos a letter again requesting that Atos sign the proposed amendment and reserving all rights if it refused. *Id.* ¶ 179. Atos did not sign.

The Pricing Schedule term under the 2021 Amendment expired on February 18, 2022. *Id.* ¶ 180. As of that date, Atos had incurred a total of $2,832,649 in MARC-Eligible Charges between Months 65 and 76 of the Pricing Schedule's term. *Id.* On or about April 19, 2022, AT&T sent Atos an invoice in the amount of $3,367,351 representing the shortfall charge for months 65–76 of the Pricing Schedule under the 2021 Amendment's MARC. *Id.* ¶ 181.

On July 25, 2022, Atos informed AT&T that it would not pay the invoice, relying on the "thru month 40" language in Section 3.2. *Id.* ¶ 182.

17

**PROCEDURAL HISTORY**

AT&T initiated this action by complaint on February 17, 2023. Dkt. No. 1. On December 22, 2023, the Court granted in part and denied in part Atos's motion to dismiss the complaint. Dkt. No. 31. The Court denied the motion to dismiss as to Plaintiff's first claim for relief (breach of the 2021 Amendment). *Id.* at 16–23. It granted the motion to dismiss with respect to Plaintiff's second and third claims for relief (reformation and breach of the Settlement Agreement). The Court subsequently denied Plaintiff's motion for reconsideration. Dkt. No. 46.

The parties engaged in extensive discovery. On May 31, 2024, AT&T moved to amend its complaint to reinstate the previously dismissed claim for reformation and to add a claim for breach of the implied covenant of good faith and fair dealing. Dkt. No. 66. On August 16, 2024, the Court issued an order granting the motion to file an amended complaint. Dkt. No. 90. AT&T filed its amended complaint on August 22, 2024. Dkt. No. 94.

On March 5, 2025, Atos filed a Rule 37(e) motion for sanctions, contending that AT&T spoliated relevant evidence. Dkt. No. 139. It also filed a memorandum of law in support of that motion and the declaration of Leon Medzhibovsky. Dkt. Nos. 140, 141, 142. AT&T filed a memorandum of law in opposition to the motion for sanctions along with the declaration of Edward J. Jacobs on March 19, 2025. Dkt. Nos. 152, 153, 154. On March 26, 2025, Atos filed a reply memorandum of law and the declaration of Leon Medzhibovsky in further support of the motion for sanctions. Dkt. Nos. 161, 162, 163, 164.

AT&T filed its motion for summary judgment on April 25, 2025, supported by a memorandum of law, a Rule 56.1 statement with a number of attachments, and the declaration of Jonathan D. Pressment. Dkt. Nos. 170, 171, 172, 180, 181, 182. Atos filed its cross-motion for summary judgment the same day supported by a memorandum of law, a Rule 56.1 statement with a number of attachments, and the declaration of Leon Medzhibovsky. Dkt. Nos. 173, 174,

175, 176.  On June 6, 2025, AT&T and Atos both filed memoranda of law and declarations in opposition to the other party's motion for summary judgment, Dkt. Nos. 202, 203, 204, 205, 208, 211, and on June 20, 2025, the parties filed reply memoranda of law and declarations in support of their respective motions, Dkt. Nos. 224, 225, 226, 227, 228.

The Court heard oral argument on the motions on January 27, 2026.  Dkt. No. 237.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Because the question of genuineness turns on whether a reasonable jury could return a verdict for the nonmovant, that inquiry "must be guided by the substantive evidentiary standards that apply to the case."  *Anderson*, 477 U.S. at 255 (explaining that summary judgment standard incorporates "clear and convincing" evidence requirement in First Amendment cases).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

19

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-movant must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

"Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." *AFS/IBEX v. AEGIS Managing Agency Ltd.*, 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). Accordingly, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

20

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York prescribes the manner and method in which a party is to present undisputed issues of fact to the Court. The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L. Civ. R. 56.1(a). The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L. Civ. R. 56.1(b). The statements "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." L. Civ. R. 56.1(d). The consequences of failure to follow these rules can be severe. "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L. Civ. R. 56.1(c).

A Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Courts are instructed to disregard any portions of a Rule 56.1 counterstatement that do not cite to admissible evidence in support of the denials and to deem the factual statements in the original Local Rule 56.1 statement admitted. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded); *Colton v. N.Y. Div. of State*

21

*Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C.H.A.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

## DISCUSSION

AT&T and Atos cross-move for summary judgment with respect to AT&T's claim for reformation of the Restated Pricing Schedule and breach of the 2021 Amendment. *See* Dkt. Nos. 174, 182.[2] The two claims are interrelated, with the parties assuming nearly mirror opposite litigating positions for each. The key question presented by both claims is how to calculate the shortfall penalty for Atos's failure to meet the MARC in the extension term. The answer to that question determines what, if anything, Atos owes for failing to hit the $6.2 million MARC in Months 65–76. The issue can be divided into two sub-questions reflecting AT&T's two claims.

First, does the specific shortfall provision in Section 3.2 of the 2018 Restated Pricing Schedule (and again restated in the 2019 Restated Pricing Schedule) control the extension term's shortfall calculation, or does the more general shortfall provision in the CSOA apply? That is the question posed by AT&T's breach of contract claim. AT&T argues that the CSOA applies because the 2021 Amendment and the Restated Pricing Schedule cover different periods (Months 65–76 versus Months 65–77), such that the Restated Pricing Schedule does not preempt the

---

[2] Atos also moves for summary judgment on AT&T's claim for breach of the implied covenant of good faith and fair dealing. Dkt. No. 174 at 23–26. Because AT&T brought this claim in the alternative and is entitled to summary judgment on its reformation claim, the Court need not address the implied covenant claim. *See* Dkt. No. 208 at 24–25 (AT&T clarifying that its implied covenant claim assumes in the alternative that the reformation claim fails).

22

CSOA's generally applicable shortfall provision, which states that "[i]f, on any anniversary of Pricing Schedule Term start date, the Customer has failed to satisfy the MARC for the preceding 12 month period, the Customer will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during the 12-month period." Dkt. No. 182 at 23–25. Atos responds that although the Restated Pricing Schedule refers to Months 65–77 rather than Months 65–76, that was a clear typographical error, and the parties intended for the extension term to be governed by Section 3.2 of the Restated Pricing Schedule. Dkt. No. 174 at 12–17.

Second, and in the alternative, assuming the Restated Pricing Schedule controls the shortfall calculation rather than the CSOA, should its language be reformed to replace the "thru month 40" language such that the shortfall penalty for the optional extension term is the difference between the MARC and the MARC-Eligible Charges in that same period, as opposed to the difference between the MARC-Eligible Charges during that period and Atos's spending "thru month 40" of the Pricing Schedule? AT&T argues that the "thru month 40" language reflects a scrivener's error, and that the parties intended for the extension term's shortfall calculation to be the full difference between the extension term's MARC and MARC-Eligible Charges in that term. Dkt. No. 182 at 15–23. Atos responds that the provision should not be reformed because reformation requires a mutual mistake between the parties in memorializing a shared agreement, and even if AT&T mistakenly inserted the "thru month 40" language, Atos was not mistaken in accepting that language. Dkt. No. 174 at 17–23.

The Court begins with AT&T's motion for summary judgment with respect to the second question as presented by the reformation claim. In doing so, the Court will assess the facts in the light most favorable to Atos as the non-movant, drawing all reasonable inferences in its favor.

Finding that AT&T is entitled to summary judgment on this claim, the Court need not address the breach of contract claim, as the two claims are expressly pleaded "in the alternative" and seek the same relief. *See* Dkt. No. 94 ¶¶ 196–218; *see also id.* at 48 (Amended Complaint's Prayer for Relief); *cf. Shaoxing Chenyee Textile Co. v. Louise Paris Ltd.*, 2024 WL 3347036, at *4 (S.D.N.Y. July 8, 2024) (noting in a contract case that the plaintiff was entitled to summary judgment on one claim and declining to address an alternative claim). Even if, as Atos argues, the shortfall calculation for the optional extension term is governed by Section 3.2 of the Restated Pricing Schedule rather than the CSOA, Section 3.2 requires Atos to pay AT&T the full difference between the MARC and MARC-Eligible Charges in the extension term. Because it is undisputed that Atos did not pay that amount, Atos is liable under the contract to AT&T.

## I.    AT&T Is Entitled to Summary Judgment on its Reformation Claim.

### A.    Legal Standard

Under New York law, a contract may be "reformed" where "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233–34 (N.Y. 1986). "The mutual mistake must exist at the time the contract is entered into and must be substantial." *Gap Inc. v. Ponte Gadea N.Y. LLC*, 524 F. Supp. 3d 224, 239 (S.D.N.Y. 2021) (quoting *Weissman v. Bondy & Schloss*, 660 N.Y.S.2d 115, 117 (1st Dep't 1997)). In that circumstance, "such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected." *Deutsch v. Pressler, Felt & Warshaw, LLP*, 535 F. Supp. 3d 322, 326 (S.D.N.Y. 2021) (quoting *Washington v. NYC Med. Prac., P.C.*, 2021 WL 918753, at *5 (S.D.N.Y. Mar. 10, 2021)). This doctrine is designed to vindicate the true intentions of the parties in entering into an agreement. *See Speranza v. Repro Lab Inc.*, 875 N.Y.S.2d 449, 453 (1st Dep't 2009) ("The equitable remedy of reformation will not make a new agreement for the parties but, instead, will establish and perpetuate the true,

24

existing contract by making the instrument express the real intent of the parties." (quoting 27 Williston on Contracts § 70.20 (4th ed. 2009)); *see also Robinson v. Metro N. Commuter R. Co.*, 325 F. Supp. 2d 411, 412 (S.D.N.Y. 2004) ("Reformation of contract . . . is not a matter of resolving an ambiguity in a contract but rather of supplying what the parties clearly intended to include but inadvertently omitted.").

"Because the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties, generally neither the parol evidence rule nor the Statute of Frauds applies to bar proof, in the form of parol or extrinsic evidence, of the claimed agreement." *Chimart*, 489 N.E.2d at 234; *see also Silverberg v. SML Acquisition LLC*, 2017 WL 758520, at *5 n.11 (S.D.N.Y. Feb. 27, 2017) ("A scrivener's error may be corrected through the use of parol evidence to establish mutual mistake." (citing Restatement (Second) of Contracts § 214(d) (1981))).  This exception, however, "obviously recreates the very danger against which the parol evidence rule and Statute of Frauds were supposed to protect—the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract." *Chimart*, 489 N.E.2d at 234.  Accordingly, reformation claims are significantly curtailed both substantively and procedurally. *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002); *accord Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F. Supp. 3d 379, 390 (S.D.N.Y. 2014).

With respect to substance, a reformation claim is unavailable where the parties intended their agreement to be based upon uncertain or contingent events. *Chimart*, 489 N.E.2d at 234 (citing *Sears v. Grand Lodge A.O.U.W. of N.Y.*, 57 N.E. 618, 619 (N.Y. 1900)); *see also Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 496 (S.D.N.Y. 2004) ("Substantively, neither reformation nor rescission is permitted if the parties entered an

agreement based upon uncertain or contingent events and the claim is based upon mistake as to the outcome of such an event."). "[A]s used in the doctrine of 'mutual mistake,' mistake means being in error in one's belief as to what a contract states." *AMEX Assurance Co. v. Caripede*s, 316 F.3d 154, 162 (2d Cir. 2003) (citing Restatement (Second) of Contracts § 155 cmt. a (1981)). Two parties can agree to allocate the risk of an event that neither expects to occur without their agreement later being reformed when the unexpected occurs. As the New York Court of Appeals explained over a century ago:

> Where parties have entered into a contract or arrangement based upon uncertain or contingent events purposely as a compromise of a doubtful claim arising from them, and where parties have knowingly entered into a speculative contract or transaction, one in which they intentionally speculated as to the result, and there is in either case an absence of bad faith, violation of confidence, misrepresentation, concealment, and other inequitable conduct mentioned in a former paragraph, if the facts upon which such agreement or transaction was founded or the event of the agreement itself turned out very differently from what was expected or anticipated, this error, miscalculation, or disappointment, although relating to a matter of fact and not of law, is not such a mistake, within the meaning of the equitable doctrine, as entitles the disappointed party to any relief, either by way of canceling the contract and rescinding the transaction, or of defense to a suit brought for its enforcement. In such classes of agreements and transactions the parties are supposed to calculate the chances, and they certainly assume the risks.

*See Sears*, 57 N.E. at 619 (citation omitted).

As for procedure, there is a "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties," and "evidence of a very high order is required" to overcome that presumption. *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1066 (N.Y. 1978). Specifically, "[t]he proponent of reformation must 'show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'" *Chimart*, 489 N.E.2d at 234 (quoting *Backer*, 385 N.E.2d at 1066). Put another way, a party seeking reformation must show "by clear and convincing evidence" that the written instrument does not reflect the parties' intent at the time the agreement

26

was entered into.  *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 708 F. Supp. 3d 385, 404

(S.D.N.Y. 2023) (quoting *Roc Nation LLC v. HCC Int'l Ins. Co., PLC*, 523 F. Supp. 3d 539, 561

(S.D.N.Y. 2021)).

"Although a mutual mistake must exist at the time the agreement is signed, the parties'

course of performance under the contract is considered to be the most persuasive evidence of the

agreed intention of the parties."  *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 797 F.

Supp. 2d 254, 265 (S.D.N.Y. 2011) (citations and internal quotation marks omitted), *aff'd*, 482 F.

App'x 662 (2d Cir. 2012) (summary order).  The plaintiff must offer evidence and allegations

that reflect the "prior or contemporaneous understanding" that the parties shared at the time of

contract execution, but that does not mean that such evidence must have been created at the time

of the contract's execution.  *See Compania Embotellador Del Pacifico, S.A. v. Pepsi Cola Co.*,

607 F. Supp. 2d 600, 604 (S.D.N.Y. 2009); *see also Zacharius v. Kensington Publ'g Corp.*, 90

N.Y.S.3d 25, 27 (1st Dep't 2018).  A party seeking reformation may not establish mutual

mistake solely by relying on self-serving and conclusory affidavits.  *Weider Health & Fitness v.*

*AusTex Oil Ltd.*, 2018 WL 8579820, at *11 n.13 (S.D.N.Y. Dec. 19, 2018), *report and*

*recommendation adopted*, 2019 WL 1324049 (S.D.N.Y. Mar. 25, 2019).

B.    **AT&T Has Demonstrated Mutual Mistake in the Restated Pricing Schedule
      by Clear and Convincing Evidence.**

In seeking summary judgment on its reformation claim, AT&T faces an undoubtedly

high bar.  But it has met that bar.  The undisputed evidence unequivocally establishes that the

"thru month 40" language in the Restated Pricing Schedule was the result of a mutual mistake

and contrary to the parties' agreement at the time the language was adopted.  Reformation is

required.  *See Bank of Am., N.A. v. Pennicooke*, 129 N.Y.S.3d 445, 447 (2d Dep't 2020)

(granting summary judgment to party seeking reformation); *Scott v. Sept. 24th St., LLC*, 95

N.Y.S.3d 45, 46 (1st Dep't 2019) (same); *Martiny v. Introcaso-Allison*, 2019 WL 198985, at \*1 (S.D.N.Y. Jan. 15, 2019) (same); *Fahrenholz v. Sec. Mut. Ins. Co.*, 822 N.Y.S.2d 346, 347 (4th Dep't 2006) (same); *U.S. Russia Inv. Fund v. Neal & Co.*, 1998 WL 557606, at \*7 (S.D.N.Y. Sept. 2, 1998) (same); *Blakeslee v. Royal Ins. Co. of Am.*, 1996 WL 694346, at \*3 (S.D.N.Y. Dec. 4, 1996) (same).

### 1.    The Negotiators' Understandings

One of the ways in which courts assess parties' intent is through the eyes of their respective negotiators. *See, e.g.*, *Citibank*, 797 F. Supp. 2d at 266–76, 273 n.137 (collecting cases and discussing understandings of various negotiators in analyzing alleged mutual mistake); *In re Est. of Vadney*, 634 N.E.2d 976, 977 (N.Y. 1994) (relying, in part, on testimony of attorney who drafted the agreement to find mutual mistake by clear and convincing evidence); *Ribacoff v. Chubb Grp. of Ins. Cos.*, 770 N.Y.S.2d 1, 2 (1st Dep't 2003) (similar). Here, the evidence demonstrates that AT&T and Atos's negotiators shared an understanding of the optional extension term: If Atos exercised the option and enjoyed the discounted rates provided by AT&T in connection with that term, it would need to spend $6.2 million during the extension term to avoid a shortfall penalty.

AT&T's lead negotiator, Ritter, testified that "[t]he agreement of the parties was that . . . if [Atos] made a commitment to a MARC in year six, months 65 to 77, and they failed to meet that commitment, then they would owe the difference between what was attained and what was committed." Dkt. No. 179-7 at 315:10–15. Ritter further testified that "while there [were] lots of details" during the negotiations, "some of the key points associated with the deal are points that resonate with me. And this is one of the key points." *Id.* at 317:3–8. Specifically, he stated that a "critical deal point is that an MTRC or a MARC that is agreed upon but not achieved, the remedy is the difference for the same period of the commitment between what you committed to

28

and what you achieved.  There was never any disagreement on that after we initially agreed to it."  *Id.* at 317:22–318:5; *see also id.* at 315:10 (stating that the "thru month 40" language "was an error in the last few days of drafting that doesn't reflect our mutual agreement").[3]

McKinney, AT&T's drafter who inserted the "thru month 40" language, also testified that she believed the language did not reflect the parties' agreement and that she added it in error. She stated that "it was clearly a mistake on my part for not catching that."  Dkt. No. 179-20 at 391:22–392:3.  McKinney inserted the relevant language at the same time she was changing all the "years" to "months" in the agreement.  JS ¶¶ 75–79.  In addition to changing "Years 3, 4, and 5" in Section 3.2 to "Months 29–64," she changed "Year 6" to "thru month 40."  *Id.*  She testified that doing so was "definitely" a mistake because Month 40 did not correspond with Year 6.  Dkt. No. 179-20 at 391:11–18.

AT&T has come forward with additional, positive evidence to corroborate Ritter and McKinney's understanding, including statements from Atos's own negotiator, Stekelenburg, whom Atos acknowledges "was involved in negotiating or drafting [the Shortfall Provision on Atos's behalf] when it was agreed to by Atos and AT&T."  JS ¶¶ 132–33, 135.  In 2021, when Atos recognized the "thru month 40" language, Courtois asked Stekelenburg point blank, "We

---

[3] In its motion for spoliation sanctions, Atos suggests that Ritter testified that the parties specifically discussed "revising the Shortfall Charge Provision from imposing a penalty 'in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred in Year 6 [the Extension Period]' to 'an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred in thru month 40'—the very opposite of the change AT&T asks this Court to impose—during their 2:30 EST call on February 22, 2018."  Dkt. No. 140 at 5 (citing Dkt. No. 141-25 at 310:16–24).  Ritter nowhere testified as much, and Atos's suggestion that he did is entirely baseless.  As explained, Ritter repeatedly and consistently testified that the "thru month 40" language was added in error and did not reflect the parties' agreement.  And when asked at his deposition if he "ever recall[ed] Atos suggesting at all that the MARC for the optional one-year extension term should be measured against what Atos spent in months 29 to 40," he responded, "Never."  Dkt. No. 179-7 at 380:18–381:5.

are currently trying to calculate what will be the calculation to determine the shortfall for the 12 months extension of the AT&T contract.  There is several [sic] ways to calculate, do you recall what was agreed with AT&T at this time?" to which Stekelenburg responded, "If we would extend the contract we have to spend 6.2M USD between Mch 2021 and Feb 2022.  So I would recommend not to take this [extension] option and see for another contract with less commitments and probably less discount.  This is what I see as we agreed at that time."  *Id.* ¶¶ 135–36.  Stekelenburg therefore shared Ritter's understanding that failing to achieve the MARC in the extension term would result in a penalty.

Atos argues that Stekelenburg's remark referred only to what the MARC would be for the extension term, not what the shortfall penalty would be for missing that MARC.  Dkt. No. 205 at 18.  Atos has no affirmative evidence such as testimony to support that interpretation, and no reasonable jury could accept it.  *See Jackson v. Nassau County*, 2024 WL 4252047, at *20 (E.D.N.Y. Sept. 20, 2024) ("When drawing inferences from evidence in the record in favor of the non-moving party . . . a court should not accord the non-moving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'" (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005))).  Stekelenburg asserted that Atos would "have to spend" $6.2 million during the extension term.  JS ¶ 135.  And he suggested that because this spending level was required, he "would recommend not to take this [extension] option and see for another contract with less commitments and probably less discount."  *Id.*  Furthermore, Stekelenburg made these comments in response to a question not about what the MARC was for the extension term, but what the "*calculation to determine the shortfall*" for that period was.  *Id.* (emphasis added).  In context, then, it makes no sense to say that Stekelenburg's statements went only to what the agreed-upon MARC was rather than what

30

the penalty would be for failing to meet that MARC.  Stekelenburg was responding directly to a question about how to calculate the shortfall.  And if there was no resulting penalty, Atos would not "have to" meet the MARC, and there would be no reason to pass on the extension option and seek a different contract with less commitments and a smaller discount.

Atos also suggests that Stekelenburg has since walked back his statements, but that too mischaracterizes matters.  After sending his email to Courtois, Stekelenburg's boss, Bockel, called Stekelenburg to inform him that he "misread the contract," "did it wrong," "didn't know the background," and "didn't look at the contract correctly enough."  *Id.* ¶¶ 137–38.  Bockel— who was not involved in the 2018 Restated Pricing Schedule negotiations, Dkt. No. 179-7 at 314:15–20—never asked Stekelenburg if he remembered what was agreed to in 2018, *id.* at 342:13–19.  Instead, she explained how she read the agreement.  *Id.* at 273:8–10.  Bockel plainly understood the impact of Stekelenburg's remark—he was relaying the contemporaneous understanding of Atos's obligations during the extension term and the contractual consequences if Atos failed to satisfy those obligations.  In response to Bockel presenting her own view of how to interpret the contract, Stekelenburg did not retract his historical understanding of the parties' agreement.  He responded simply with respect to Bockel's present-day reading, "Yes, you're right."  *Id.* at 273:8–20.  He did not say anything else of substance during the approximately five-minute call.  *See id.* at 272:3–275:6, 342:8–13.  And he was never asked by Courtois, Bockel, or anyone else about this issue after the call with Bockel.  *Id.* at 275:23–276:7.

Bockel then sent an email in which she wrote, among other things, that although the "thru month 40" language could be viewed as a mistake, it could also be viewed as intentional because "it's not unusual to have different calculation approach at the end of the contract," and the contractual language was "delivered by AT&T to Atos, so it was AT&T proposal that we have

31

accepted.  We could go and execute renewal clause and argue at the end of the period that the shortfall is zero as per exact language of the clause." JX68.  Tellingly, Bockel did not identify any contemporaneous evidence that Atos had a contrary understanding to that expressed by AT&T.  Stekelenburg testified that this email reflected Bockel's words and "her take on the language" rather than his own.  Dkt. No. 179-7 at 271:10–15; *see also id.* at 341:4–20, 342:3–9. Although he testified that his response to Courtois was "rapidly done" without reviewing the contract, he also confirmed that his response was based on his best recollection at the time.  *Id.* at 262:19–263:2.

Even if Stekelenburg subsequently agreed with Bockel's interpretation of the language written in the 2018 Restated Pricing Schedule, that would not generate a genuine issue of fact. Contract interpretation is a matter for the Court; it does not turn upon the parties' post-hoc interpretations of contractual language.  *See Sea Shipping Inc. v. Half Moon Shipping, LLC*, 848 F. Supp. 2d 448, 457 (S.D.N.Y. 2012); *KJD, Inc. v. Queens Ballpark Co., Inc.*, 2017 WL 1233843, at *3 (E.D.N.Y. Mar. 24, 2017).  The question at the heart of this case, and every reformation case, is what the parties agreed to when the contract was entered into, not what they today say about the contractual language.  *See Gap Inc.*, 524 F. Supp. 3d at 239; *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005).  As to the reformation issue, Stekelenburg has never offered a recollection contrary to the one he provided to Courtois in his March 15, 2021 email.  In fact, no one at Atos ever has.  Fling, who was also involved in the negotiations and drafting of the 2018 Restated Pricing Schedule, testified that she had no reason to dispute Stekelenburg's recollection about AT&T and Atos's agreement with respect to the required spending for the optional extension term and the consequences for not making that spending.  Dkt. No. 179-10 at 502:7–503:5.  Atos has

identified no testimonial or documentary evidence to point to a contrary understanding.  The testimony and statements of the people most directly involved in the negotiations of this provision therefore point forcefully in the direction of a mutual mistake.

### 2.    Context of the Negotiations

The context surrounding the parties' negotiations only confirms this conclusion.

Eight Atos witnesses were deposed in this case, and none recalled ever requesting that the shortfall penalty for the extension term be measured against Atos's spending "thru month 40," as opposed to its spending during the extension term.  AT&T 56.1 ¶¶ 71, 143–45.  Nor did any witness from either AT&T or Atos recall ever hearing about such a request from others.  *Id.*  The record reflects no such requests or negotiations.

What the evidence does demonstrate is that when Atos proposed that it be on the hook for only 50% of the MTRC if it failed to meet that spending level, AT&T flatly rejected the proposal, stating, "The whole purpose of the commitment is to agree on a spend level."  JS ¶¶ 32, 38.  AT&T's representative continued that "[i]f the remedy for failing to meet the spend level is repayment of only 50% of the difference, this effectively cuts the commitment in half . . .  If the agreement goes to full term and Atos has failed to spend an amount equal to or greater than the commitment, AT&T will bill Atos the difference between the amount achieved and the amount committed."  *Id.* ¶ 38.  Atos's then-Chief Procurement Officer for the Americas, Chris Zueski ("Zueski"), echoed this sentiment during his deposition, testifying, "I would not see any reason anybody would sign an agreement that doesn't, you know, have some kind of consequences for not meeting a MARC.  Right?  Why would AT&T do that?"  Dkt. No. 179-4 at 159:16–22.

At least after Atos's initial proposal, then, the parties understood that MARCs or MTRCs—as their names suggest—represented real and binding spending "commitments" with real consequences for failing to satisfy them.  The 2018 Restated Pricing Schedule reflects this

understanding, defining "MARC" as "the total revenue commitment set forth in this Pricing Schedule that *Customer agrees to satisfy* during each year of the Pricing Schedule Term."  JX45 (emphasis added).  Indeed, when the parties wanted to reduce or eliminate a spending commitment, they adjusted the MARC itself rather than the applicable shortfall penalty.  The 2018 Restated Pricing Schedule set a MARC of $0.00 for Months 25–28.  JS ¶ 99.  At no point did the parties ever similarly set a $0.00 MARC for the optional extension term—even though, when the parties executed the 2019 Restated Pricing Schedule, Atos had already achieved more than $6.2 million eligible charges "thru month 40," thereby rendering the extension term's $6.2 million MARC meaningless under the precise language of Section 3.2.  *See id.* ¶ 108.

Atos's internal discussions further underscore that the parties never agreed to a penalty-free extension term if Atos spent $6.2 million between Months 29 and 40.  The agreement by AT&T that Atos could enjoy an extension term without any consequences if it failed to meet a MARC would have been a contractual concession of overwhelming importance.  The extension term carried with it the Pricing Schedule's steeply discounted custom list rates.  Dkt. No. 172-20 at 2–3.  Without these rates, the cost to Atos of providing services to just one of its clients over the course of one month could balloon from approximately $2,000 to *over $15 million*.  *See* Dkt. No. 172-20 at 2–3.  Accordingly, locking in the Pricing Schedule's custom rates for an additional year would have been exceptionally significant.

Yet, when AT&T provided Atos with its BAFO—an offer that Stekelenburg believed was the best deal Atos was going to get, *see* AT&T 56.1 ¶ 50—Atos was entirely silent with respect to that purported contractual boon.  Stekelenburg and Fling worked to prepare a summary of the deal for Atos executives "explain[ing] why this is a good deal for Atos."  *Id.* ¶¶ 40–44.  Their presentation included a slide titled "New contract achievements," which touted, among

34

other things, the fact that Atos was going to receive an upfront credit of $190,000.  Dkt. No.

179-18 at 9.  It made no mention of what was potentially a multi-million-dollar gift from AT&T

in the form of Atos's ability to satisfy the optional extension term's MARC with money spent on

MARC-Eligible Charges during Months 29–40 of the Pricing Schedule's term.  *Id.*

Similarly, when Fling created a "Contract Workspace" document summarizing the key

deal points in preparation of Atos signing the agreement, she too was silent about what Atos now

claims was its right to enjoy an extension term without any enforceable commitment to generate

any amount of spending.  AT&T 56.1 ¶¶ 79–81.  The Contract Workspace document has a row

labeled "Business case/rationale—This is the key summary the approvers/signers will read—

please be clear and precise," in which Fling wrote: "One-time credit for Atos and lower monthly

recurring rates in following years."  *Id.* ¶ 82.  The document also asks, "Are there any discounts

and/or rebates?" to which Fling replied: "Yes, one time credit of $190k to be issued in month 31,

$1.058m to be issued in month 32, and $1.058[m] to be issued in month 38 of the 64 month

term."  *Id.* ¶ 83.  As with the "New contract achievements" presentation, the Contract Workspace

document makes no mention of the potential for a penalty-free extension or of Atos's ability to

satisfy the optional extension term's MARC with money spent on MARC-Eligible Charges

during Months 29–40 of the Pricing Schedule's term.  Dkt. No. 179-24.

The same goes for a "Contract Overview" document prepared by Fling after the

execution of the 2018 Restated Pricing Schedule.  AT&T 56.1 ¶¶ 107–112.  That document

likewise outlined certain sections and aspects of the agreement, including the fact that Section

3.2 waived the shortfall charges for Year 2, without making any mention of the possibility of a

penalty-free extension term.  *Id.* ¶ 112; Dkt. No. 179-31.

35

The omission of any mention of the free extension term from all of these materials is telling. Given the significance that provision would have had for the parties' bargain—especially in contrast to more minor provisions which were repeatedly highlighted—the only reasonable inference is that no penalty-free extension provision was agreed to, and that the $6.2 million MARC for the extension term represented, as the BAFO indicated, an actual "[r]evenue commitment . . . if committed resources are deployed" (i.e., if Atos exercised the option). JX24.

### 3.    The Parties' Course of Performance

The parties' course of performance after the agreement was executed—often "considered to be the most persuasive evidence of the agreed intention of the parties," *Citibank*, 797 F. Supp. 2d at 265—also strongly supports the finding of a mutual mistake. "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." *Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 886 N.Y.S.2d 133, 143 (1st Dep't 2009); *see also Aspen Specialty Ins. Co. v. 4 NYP Ventures LLC*, 162 F. Supp. 3d 337, 343 (S.D.N.Y. 2016) ("The practical interpretation of an agreement by a party to it is always a consideration of great weight. . . . There is no surer way to find out what parties meant, than to see what they have done." (quoting *IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Corp.*, 26 F.3d 370, 374 (2d Cir. 1994))).

Here, the undisputed evidence reveals that for years, both parties believed and acted as if Atos would have to pay the complete shortfall for the extension term if it missed the MARC during the optional term. From at least 2018, when the "thru month 40" language was added to the Pricing Schedule, the parties maintained a "dashboard" tracking Atos's MARC-Eligible spending to "monitor whether or not Atos was on track to meet its spend commitments to AT&T." AT&T 56.1 ¶¶ 114–15. This tracking detailed Atos's spending under the Pricing

Schedule by month, including how that spending compared to the "Contract Commitment." *Id.* ¶¶ 116, 118. Courtois testified that the dashboard was a "common document" shared between Atos and AT&T and that it was "very important" that the information in it be "current" because Atos relied on that information. Dkt. No. 179-11 at 170:6–20. The dashboard listed a commitment of $6.2 million for "2022—1 year ext." AT&T 56.1 ¶ 123. Based on this commitment, the dashboard forecasted an approximately $2.7 million shortfall for the extension term. Dkt. No. 194-12 at 7. The dashboard also indicated that the "Shortfall Penalty" was "100% of shortfall" and highlighted the extension-term months in red. *Id.*

The parties further operated under this assumption in their negotiations over the optional extension term. As of June 2020, Atos predicted that if it chose to exercise the extension option, it would fall short of achieving the term's MARC by nearly $3 million. AT&T 56.1 ¶ 166. This understanding was consistently repeated and confirmed over the ensuing months. *See id.* ¶ 168. For example, in an October 2020 presentation prepared by Fling and Hendrick, Atos laid out certain "AT&T Contract Renewal Scenarios." *Id.* ¶¶ 170–71. One option was to "[a]ccept the optional 12-month extension" with "MARC $6.2M & deal with the Est. $3.8M shortfall in Q1 22 (Mar 21–Feb 22)." *Id.* ¶ 172. Another option was to "[t]ry to negotiate 12-month extension to lower the MARC under $3M (Mar 21–Feb 22)." *Id.* ¶ 173. Neither option would have been necessary unless Atos believed it had to pay a shortfall penalty for failing to meet the extension term's MARC. And this understanding led Atos to repeatedly urge AT&T to reduce the MARC to between $2 and $3 million—which again would have been unnecessary if the MARC had already been satisfied. JS ¶ 123.

Along similar lines, Courtois wrote in December 2020 to Atos's Global Head of Operations, Laurent Barbet ("Barbet"), that Atos was expecting a "2.7M$ . . . shortfall on Feb

37

2022 if nothing is done to avoid the 1 year extension linked to a 6.2M committed spend." Dkt. No. 179-51 at 2. And in March 2021, Ashley Crandall ("Crandall"), Atos's North America CFO, "directed [her] team to start accruing for that $3 million shortfall [for the extension term] as a liability on Atos's books and records." AT&T 56.1 ¶ 246; *see also* Dkt. No. 179-3 at 82:21–84:3. But, at that time, Atos had already spent more than $6.2 million in MARC-Eligible Charges through Month 40. There would have been nothing to accrue and thus no liability to record if the interpretation Atos offers in this litigation had been the interpretation the parties were operating under at the time. Atos relented to the originally agreed-upon $6.2 million MARC only after discovering an interpretation of the contractual language that no one at Atos had ever previously expressed. This conduct shows that when the parties entered into the Restated Pricing Schedule, neither intended for Section 3.2 to operate exactly as written with the "thru month 40" language.

Atos's conduct following March 9, 2021, when Hendrick discovered the "thru month 40" language, further supports that the language was a mutual mistake that did not reflect the agreement the parties thought they had reached. As indicated above, in the preceding months, Atos had been requesting, and AT&T had been resisting, a reduction of the MARC for the extension term, a request that would have made sense only if it had consequences. Hendrick's March 9, 2021 email did not convey that, in making the demand for the $6.2 million MARC, AT&T had been operating under an understanding of the agreement between the parties different from the understanding held by Atos. Hendrick expressed that the language of the agreement appeared to differ from what both Atos and AT&T understood it to be. She indicated that she was "confused and somewhat excited about this language, but I am not 100% sure what it means," an excitement that would make sense only if the language differed from the agreement

38

Atos had previously understood the parties to have reached.  JS ¶ 124.  And she added, *"This sounds too good to be true, did AT&T make a error in our favor or am I reading this wrong?"* expressing that the document stated something different from what she previously understood the parties' agreement to be.  *Id.* ¶ 125.  More pointedly, Hendrick wrote: "We have a massive shortfall and contract language that results in[] no penalty, *due to an error when it was written*." Dkt. No. 179-118 at 2 (emphasis added).  Crandall, who signed the 2021 Amendment on Atos's behalf, testified that she likewise understood the language to be "a typo."  Dkt. No. 179-3 at 175:21–176:17.  Accordingly, it is undisputed that at least some Atos employees understood the "thru month 40" language to have been added in error.

It is no answer to say, as Atos does, that all of these individuals—the people who tracked the commitments, who made the statements about the expected shortfall, who negotiated the 2021 Amendment, who prepared Atos's books for the shortfall liability, and who described the relevant language as a typo—were not the people who negotiated the 2018 agreement and had no firsthand knowledge of the negotiations.  Dkt. No. 205 at 18–20.

For one, it is incorrect that all of the Atos employees lacked firsthand knowledge.  Fling was involved with both the 2018 and 2021 negotiations, and as part of the 2021 negotiations, she repeatedly requested that AT&T reduce the extension term's MARC (which would have been unnecessary if there was no shortfall penalty for the extension term).  JS ¶¶ 51, 55, 117–22.[4]

---

[4] Atos asserts that Fling was not involved in the substance of the negotiations or familiar with the legal consequences of the terms, AT&T 56.1 at 124, but the testimony Atos cites for that proposition does not support its contention.  At most, the testimony indicates that Fling was not responsible for making decisions in the negotiations, not that she lacked knowledge regarding the substance or consequences of the negotiations.  *See* Dkt. No. 210-11 at 157:4–14; Dkt. No. 210-12 at 40:2–7, 41:16–20, 45:21–46:14, 70:13–72:6.  In fact, the evidence reveals that Fling was at the center of the negotiations and had personal knowledge regarding the Pricing Schedule and its broader context.  *See, e.g.*, JS ¶ 122 (Fling explaining to Atos executives her understanding of the consequences of going month to month rather than exercising the optional

Even more tellingly, in 2020, Fling specifically requested that the language in Section 3.2 be corrected to remove the "thru month 40" language and to replace it with "between months 65–77"—that is, Fling requested the very language that Ritter and Stekelenburg believed the parties had agreed to. JX53. Internally, AT&T agreed that the language should be changed. Although Pouttu misunderstood Fling's request, thinking that Atos was requesting there be no shortfalls for the period preceding Month 65, *see* JX54 at 2, he subsequently recognized that the language should be changed. In response to one AT&T employee's question, "On #3, what's actually changing? [The 'months 65–77' language] sort of looks like how I would have expected the original agreement to be written," Pouttu responded, "Agreed it looks like what one would expect. . . . [T]heir change makes sense." Dkt. No. 186-44 at 5. Pouttu then informed Fling that "AT&T will work with Atos to accommodate this request. This will be subject to AT&T Financial and Pricing and Legal approval." JX55 at 8. Pouttu testified with respect to his response to Fling: "That's standard boilerplate. I don't have the authority to—I just don't have that authority. So basically, what I'm saying to Atos is, 'Yeah, we'll do it, but it's got to be signed off by the appropriate approvers.'" Dkt. No. 202 at 123:13–17. This ultimately fell through the cracks, and AT&T realized only one week after the 2021 Amendment had been signed that it had failed to make the change. JS ¶ 171.

In any event, even assuming one or more of the relevant individuals at Atos did not have firsthand knowledge of the negotiations from 2018, the understanding that they had with respect to the agreement and which they conveyed to AT&T is still powerful proof of Atos's

---

extension); Dkt. No. 179-9 at 115:6–14 (Stekelenburg testifying that "the primary negotiations were done by Judy [Fling] and [himself]"); Dkt. No. 179-25 at 2 (Atos executive thanking "Judy [Fling] and Loek [van Stekelenburg] for this major achievement" (i.e., the 2018 Restated Pricing Schedule)).

understanding of the agreement reached between the parties. The persons who carry out an agreement not infrequently are different from those who negotiate it. That does not mean that the manner in which the agreement is executed is irrelevant to its meaning. Course of conduct evidence is relevant in contract disputes between corporations just as it is in disputes between individuals. *See China Privatization Fund (Del.), L.P. v. Galaxy Ent. Grp. Ltd.*, 135 N.Y.S.3d 18, 20 (1st Dep't 2020) (stating in context of contract dispute between two sophisticated entities that "[e]ven if some of those witnesses did not personally participate in the negotiations, the voluminous evidence before the court, taken as a whole," including "the parties' post-contract course of performance," "overwhelmingly reflects an intent communicated and shared among the parties to use a fixed floor price")[5]; *see also Gulf Ins. Co.*, 886 N.Y.S.2d at 143–45 (discussing course of performance evidence in context of sophisticated corporations); *cf. Citibank*, 797 F. Supp. 2d at 275 (rejecting reformation claim because evidence demonstrated that only one negotiator *might* have been mistaken about an agreement's terms, and noting that there was not course of performance evidence from others at the corporation sharing the apparently mistaken view). Here, the relevant individuals' shared understandings and assumptions thus provide strong circumstantial evidence regarding what the parties agreed to at the time.

In sum, AT&T has provided clear and convincing evidence that the "thru month 40" language in Section 3.2 of the Restated Pricing Schedules was added in error and failed to reflect the parties' intended agreement. In particular, both parties' negotiators recalled agreeing that the penalty for failing to meet the extension term's MARC would be the full difference between the

---

[5] While *China Privatization* involves "the interpretation of ambiguous contract language (as opposed to reformation of those contracts), this Court is aware of no special limitation, as a matter of law, on the type of evidence from which intent may be inferred in reformation versus contract interpretation cases—even if the standard of proof for reformation is higher." *Citibank*, 797 F. Supp. 2d at 273 n.137.

amount committed for that period and the amount achieved in that period.  That shared understanding was confirmed by the parties in their discussions and through their actions before, during, and after execution of the agreement—and it reflected the business logic of having a "minimum annual revenue commitment" in the first place.  In other words, at all relevant points, the parties assumed that failing to meet the revenue commitment for the extension term would result in real financial consequences for Atos.  That assumption grounded, among other things, the parties' 2021 negotiations, Atos's tracking of its contractual commitments, and its preparation for a shortfall penalty for the extension term.  No individual has ever testified that Atos requested a commitment-free extension term or that AT&T offered one.  Nor does any document in the record reflect such a request or offer.  That absence is striking given the significance such a provision would have had for the parties' bargain.  If Atos reached the target spend level for Months 29 through 40, not only would it have avoided a penalty, but it would have earned the ability to spend as little or as much as it wanted over the course of an additional year with discounts and custom rates locked in place.  It is implausible that if such a provision were actually agreed to, no one would have mentioned it at any point over the ensuing years or have any recollection of it.  AT&T's reformation claim is therefore supported by both positive and negative evidence.  Because the written agreement does not reflect the parties' shared intent, its language must be reformed.

### C. Atos's Arguments to the Contrary Lack Merit.

Resisting this conclusion, Atos attempts to generate a genuine issue of material fact precluding summary judgment in AT&T's favor.  Its efforts fall short.

#### 1. Atos's Recognition of the Mistake in 2021 Does Not Defeat Summary Judgment

Atos's primary argument to defeat summary judgment is its contention that there was no *mutual* mistake supporting reformation because the parties amended the Restated Pricing

42

Schedule in 2021, and when they did so, Atos understood that a mistake had been made, and it relied upon that mistake in deciding to sign the 2021 Amendment. Dkt. No. 205 at 15–17. This argument rests on a misunderstanding of the impact of a contractual amendment.

A contractual amendment does not supplant the entire agreement it is amending but only those provisions that the amendment addresses. It is "axiomatic" that "[w]hen there is a modification or amendment to a contract, . . . 'the modification establishes a new agreement between the parties which supplants the affected provisions of the underlying agreement *while leaving the balance of its provisions unchanged.*'" *See Baraliu v. Vinya Cap., L.P.*, 2009 WL 959578, at *4 (S.D.N.Y. Mar. 31, 2009) (emphasis added) (quoting *Benipal v. Herath*, 674 N.Y.S.2d 815, 816 (3d Dept.1998)). "A modification agreement leaves intact those provisions of the original agreement which were not expressly or impliedly supplanted." *Mary Matthews Interiors, Inc. v. Levis*, 617 N.Y.S.2d 39, 41 (2d Dep't 1994) (cleaned up) (quoting *Tejani v. Allied Princess Bay Co.*, 612 N.Y.S.2d 227, 228 (2d Dept. 1994)); *accord Chavarria v. Bruce Nagel & Partners Architects, P.C.*, 220 N.Y.S.3d 57, 61 (2d Dep't 2024); *P&B Cap. Grp., LLC v. RAB Performance Recoveries, LLC*, 9 N.Y.S.3d 515, 517 (4th Dep't 2015); *see also Eagle Star Ins. Co. v. Seneca Ins. Co.*, 1995 WL 733642, at *5 (S.D.N.Y. Dec. 12, 1995); *ACI Worldwide Corp. v. Churchill Lane Assocs., LLC*, 847 F.3d 571, 577 (8th Cir. 2017) (applying New York law). "[T]he terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms." *Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 878 F.2d 41, 46 (2d Cir. 1989) (cleaned up and citation omitted); *see also United States v. Agnello*, 344 F. Supp. 2d 360, 368 (E.D.N.Y. 2004) ("A modification to a contract leaves intact those provisions of the original agreement that are not directly inconsistent."). It follows that if the written contract does not accurately reflect the agreement that the parties reached, they

43

cannot be deemed to have accepted that inaccurate understanding by virtue of the fact that they have agreed to amend the agreement in other respects.  Rather, bedrock contract principles suggest that the parties' original understanding is carried over into the amended agreement, so long as the amendment does not expressly or impliedly supplant that original and shared understanding.

Here, the 2021 Amendment indisputably modified the Restated Pricing Schedule.  And it did so without amending or replacing Section 3.2 or the parties' original intent regarding shortfall penalties for the extension term.  That original intent therefore controls.  The title of 2021 Amendment is: "AMENDMENT TO AT&T SDN ONENET BTB AMENDED AND RESTATED PRICING SCHEDULE."  JX78.  The document states that "[t]he parties agree to modify the terms and conditions of the Pricing Schedule as specified herein."  *Id.*  And the body of the agreement simply notes particular portions of the Restated Pricing Schedule that are deleted and replaced with alternative language.  *Id.*  The 2021 Amendment does not reproduce the language of the Restated Pricing Schedule in its entirety—it mentions only those sections of the agreement that are modified.  *Id.*  Section 3.2 is not mentioned.  *Id.*  Thus, the 2021 Amendment did not modify that provision of the Restated Pricing Schedule.  Because that provision was not supplanted, whatever it was that the parties previously agreed to was "le[ft] intact" by the modification agreement.  *See Mary Matthews Interiors*, 617 N.Y.S.2d at 41.  This suggests that the relevant timeframe for assessing the parties' intent is 2018, when they entered into the agreement, rather than 2021, when they executed an amendment that did nothing to alter that original agreement.[6]

---

[6] There is likewise no suggestion or indication that the parties revisited the issue of Section 3.2 or shortfalls for the extension term when they executed the 2019 Restated Pricing Schedule.  That agreement was identical to the 2018 Restated Pricing Schedule and intended only to reflect

AT&T initially drafted the 2021 Amendment to state that "[t]he current Section 3 is deleted in its entirety and replaced with the following . . ." JS ¶ 147–48; JX73. Fling requested that the draft language be changed to clarify that only Section 3.a, 3.b, and 3.c were deleted and replaced, as "[t]he rest of 3 is necessary to calculate any shortfalls." JX74. AT&T agreed to Fling's proposal such that only Sections 3.a, 3.b, and 3.c from the Pricing Schedule were amended. JS ¶ 157. There were no additional negotiations over shortfall penalties generally or Section 3.2 specifically in 2021. The negotiations thus confirm what the language of the 2021 Amendment reflects—that it was intended to change only sections 3.a, 3.b., and 3.c. It was not intended to revise the parties' prior understanding reached with respect to the shortfall provision. If the evidence supported that there was not a mutual mistake, then AT&T would be bound by that original understanding as reflected in the agreement. The fact that AT&T has established that the parties reached an agreement different from what was reflected in the language they used means that Atos is bound by that agreement.

Atos argues in essence that it would be unjust to hold it to the parties' prior understanding of Section 3.2 because at the time it executed the 2021 Amendment, it relied on a new and different understanding of that provision. Dkt. No. 205 at 15–17. That argument, however, does not answer the question presented by this case. At the time AT&T executed the 2021

---

additional rate reductions, which Atos requested go into effect in 2019. JS ¶ 104; JX10 at 52:5–23; JX45; JX46. Atos points to the fact that McKinney removed extra spaces from Section 3.2 in 2019, including in the third paragraph near the "thru month 40" language. Atos 56.1 ¶ 42. AT&T disputes McKinney did this, chalking up the change to an automated "line wrapping" feature of Microsoft Word. *Id.* This dispute is immaterial, as regardless, it is clear that there were no new negotiations, and no new meeting of the minds, over the substance of this provision in 2019. To the extent Atos suggests that McKinney reviewed this provision for anything more than formatting and that she failed to recognize the scrivener's error, she also failed to recognize other typos in the agreement as further detailed below, so her failure to catch the error in Section 3.2 says little to nothing about whether that language was intentional or added in error.

45

Amendment, it too relied on an assumption regarding Section 3.2. It assumed that Atos's failure to meet the MARC for the extension term would result in a shortfall charge for the extension term. That is the reason it was insisting on a $6.2 million MARC—a provision that would have been meaningless if the MARC could have been satisfied by charges that were already incurred. And that is the reason AT&T agreed to waive the MTRC's approximately $2 million shortfall in exchange for Atos exercising the optional extension term. That AT&T believed that the "thru month 40" language was a mistake is confirmed by its email to Atos only one week after signing the 2021 Amendment, which characterized the language as a mistake and asked that it be corrected. JS ¶¶ 170–72. Thus, any injustice to Atos from the Court's reformation of the Restated Pricing Schedule would be matched or exceeded by the injustice to AT&T if it is not reformed. The reformation question cannot be answered by resort to injustice on one side or the other. Rather, it is informed by a related body of law.

It is black letter law, reflected in leading treatises, that "[w]hen the mistake of one party, with respect to the meaning of some material provision of the signed contract, is accompanied not only by the other party's knowledge but, also, by that other party's silence, this is treated as the equivalent of a mutual mistake and equity will reform that instrument." Williston on Contracts § 70:9 (4th ed. 2025). In short, a party—knowing that its contractual counterparty is operating under a mistaken understanding of an agreement—cannot sit silent and thereby become the beneficiary of its adversary's mistake. If it understands that the language in an agreement does not reflect the agreement from the negotiation, it should say something. If it does not, it runs the risk that the agreement the courts will enforce is the one that the parties actually reached, and not the one that they mistakenly documented. Here, the Court will enforce the agreement that the parties reached—the agreement in 2021 with respect to the MARC, and

46

the agreement in 2018 (and not amended in 2021) with respect to the shortfall consequences of failing to meet the MARC.  In the absence of evidence of ratification or modification by a course of conduct (not offered here by Atos),[7] Atos should have negotiated for a different arrangement if it was unwilling to abide by the parties' previous agreement.

 2. *Reformation Is Available for Agreements Between Sophisticated Parties*

Atos next suggests that the fact that this was "a multimillion dollar transaction involving sophisticated, counseled parties dealing at arm's length" creates a genuine issue of fact regarding whether the parties intended Section 3.2 to read exactly as written.  Dkt. No. 174 at 18 (quoting *Chimart*, 489 N.E.2d at 234).  It does not.  There is no carveout to the mutual mistake doctrine for agreements reached between large companies.  Even two parties represented by counsel can fail to accurately reflect in a document the agreement that they have reached in negotiations.  Nor is there a carveout for circumstances in which the party seeking reformation is the one who drafted the agreement.  As then-Judge Cardozo put it over a century ago, "Even if [the party seeking reformation] should be shown . . . to have written [the agreement] himself, the right to reformation would not be lost if the true agreement of the parties was imperfectly expressed." *Susquehanna S.S. Co. v. A.O. Andersen & Co.*, 146 N.E. 381, 385 (N.Y. 1925) (Cardozo, J.).  To be sure, the presumption against reformation is particularly strong where negotiations are "conducted by sophisticated, counseled businessmen." *Chimart*, 489 N.E.2d at 234; *see also Backer*, 385 N.E.2d at 1067.  But there is no bar to reformation in such cases. *See Stache Invs. Corp. v. Ciolek*, 106 N.Y.S.3d 458, 460–62 (4th Dep't 2019); *Gulf Ins.*, 886 N.Y.S.2d at 141–45.

---

[7] *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013) (Under New York law, "any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." (citation omitted)).

47

And this factor carries especially limited weight where, as here, it is clear that notwithstanding the parties' sophistication, their negotiations were far from "meticulous" and "unhurried." *Cf. Backer*, 385 N.E.2d at 1067.

It is undisputed that the Restated Pricing Scheduling contains several errors, typos, and mistakes that neither party caught before (or after) executing the agreement. For example, Stekelenburg testified that "nobody saw" the typos in Section 6.2.5, which state that Atos would have to spend "over $8,654,866 up to $8,148,348" to earn some credits and "over 9,629,866 up to $8,973,348" to earn others. AT&T 56.1 ¶¶ 101–02, 232–33. Furthermore, Atos itself relies on the fact that the MARC for the "Optional 12 Month extension" refers to "Months 65–77"—a period of thirteen months, not twelve months. At the time the parties were negotiating the 2018 Restated Pricing Schedule, they were simultaneously negotiating thirteen other agreements. *Id.* ¶ 94. Atos requested that the deal be finalized less than two weeks from the parties' agreement on the BAFO terms so that it could more quickly enjoy the negotiated rate reductions. *Id.* ¶ 97. Ritter testified that this was "without question" a quick turnaround for a contract of this nature, especially due to the complexity and number of requests Atos made which AT&T "typically [did not] do in a time frame that was compressed." *Id.* ¶¶ 98–99. Given these other errors and the negotiations' tight turnaround, the parties' sophistication, standing alone, does not create a triable issue of fact regarding their intent in adopting the "thru month 40" language.

3. *Atos's Argument that the "Thru Month 40" Language Was Intended as an Incentive*

Atos has also offered in this litigation the argument that the "thru month 40" language was intentionally added to Section 3.2 in order to incentivize Atos to ramp up its sales in the first year of the new term. Dkt. No. 205 at 21. This Court previously discussed that "stretch and reward" theory at the motion to dismiss stage:

At the time the First Amended and Restated Pricing Schedule became operative—the end of month twenty-eight—Atos would not yet have incurred any MARC-Eligible Charges for the period beginning in month twenty-nine. Particularly in light of Atos's inability to satisfy previous revenue commitments, AT&T had an interest in incentivizing Atos to use more AT&T services, and thus to accrue more charges, early in the First Amended and Restated Pricing Schedule so as to ensure that Atos was more likely to satisfy the newly imposed revenue commitments and to ensure that not all of the charges were accrued at the end of the term. That interest is reflected in the first paragraph of Section 3.2, which imposes a penalty on Atos of at most $2,126,732 (36% of $5,907,590) if, at the end of month forty, Atos did not incur MTRC-Eligible Charges of $5,907,590. . . . But it is also plausible that AT&T would have had an interest in encouraging Atos to incur even more charges in the first year of the First Amended and Restated Pricing Schedule, and the means by which it encouraged Atos to incur even more charges is reflected in the third paragraph. If Atos incurred $6,200,000 of MARC-Eligible Charges in months twenty-nine through forty (and not just $5,907,590), then Atos would be relieved of the possibility of any penalty with respect to the Extension Term.

Put differently, it is plausible that the Shortfall Charge Provision was not illusory, and thus, AT&T has not offered non-conclusory evidence that it reflected a mutual mistake. And, on Atos's account, while at the time of the Second Amended and Restated Pricing Schedule month forty would have expired, the provision would not have been illusory because it would have confirmed that while there was a MARC, Atos had earned the right to be free from any penalties for failing to achieve it. For purposes of reformation, and in the context of AT&T's claims, the question is not whether that interpretation actually reflected the understanding of any of the parties who actually negotiated the First and Second Amended and Restated Pricing Schedules—which is a question of parol evidence that is not included in AT&T's complaint. The question is whether Atos has provided a plausible interpretation of the contractual language that would give it meaning, and thus, whether AT&T's assertion that the provision as written must have reflected a mistake is itself plausible. Atos has done so. Accordingly, AT&T has not pleaded facts that would establish a mutual mistake.

708 F. Supp. 3d 385, 406–07 (S.D.N.Y. 2023).

At the stage where the Court was considering the motion to dismiss AT&T's original complaint, AT&T had offered no allegations that Atos shared its understanding of the agreement reached between the parties. AT&T had alleged only its own understanding of the agreement and the contractual language. In that context, the Court concluded that AT&T had not stated a claim for reformation, as Atos had proposed an alternative understanding of the agreement that would not render its language absurd or meaningless. As a theoretical matter, it was not

49

implausible that the "thru month 40" language incentivized Atos to front-load its MTRC-Eligible spending by offering a free extension term if Atos did so.  The facts alleged by AT&T were thus not of the type that would allow a contractual party to delve into discovery of its counterparty's understanding of an agreement that the two parties had recorded on paper.

This motion presents a fundamentally different question in a fundamentally different context.  AT&T has now alleged a proper claim for reformation based on a mutual mistake between the parties.  And, following discovery, the issue is not whether Atos's "stretch and reward" theory gives some kind of meaning to the contractual language.  It is instead whether the meaning that in theory could be imputed to the contractual language reflects the actual agreement that the parties reached at the time.  In answering that question, parol evidence is properly considered.  *See Chimart*, 489 N.E.2d at 234.

Based on the evidence before the Court, there is no genuine issue of material fact regarding whether the parties intended to incentivize Atos to front-load its spending by offering a penalty-free extension as a reward.  For the reasons already provided, the evidence is clear that the parties agreed that the penalty for failing to reach the MARC in the extension term would be the difference between the amount committed and the amount attained in that same term.  There is no evidence that, when McKinney added the "thru month 40" language while changing the years to months throughout the agreement, she did so in order to further incentivize Atos's spending through month 40.  No such incentive was mentioned in the BAFO.  And to reiterate, while there is evidence of the parties discussing a *penalty* for Atos's failure to meet the required monitoring-period amount, there is no evidence—none—of anyone at any time ever discussing

an *incentive* in the form of a free extension term if Atos exceeded the monitoring-period amount.[8]

### 4. *Atos Cannot Rely on Speculation to Defeat Summary Judgment*

Atos objects to relying on the absence of evidence supporting its "stretch and reward" theory to find in AT&T's favor. Dkt. No. 205 at 12, 23. Atos argues that because it is AT&T's burden to establish a mutual mistake, Atos need not come forward with any evidence affirmatively supporting its theory beyond the text of the agreement itself. *Id.* But Atos misstates the Rule 56 standard. The burden is of course on AT&T to put forward undisputed evidence that would require a jury to find that the document as written differed from the agreement reached. *See Anderson*, 477 U.S. at 254–56 (explaining that the movant bears the burden of showing that there is no genuine issue of material fact and that, in making this determination, courts "must view the evidence presented through the prism of the substantive evidentiary burden," which here is the clear-and-convincing evidence standard). AT&T has discharged its burden by providing positive and unequivocal evidence of mutual mistake,

---

[8] Atos makes an argument in its spoliation sanctions reply brief that it does not in its summary judgment papers—namely, that in one internal AT&T draft of the Restated Pricing Schedule, which was not shared with Atos, Section 3.2 separated the extension term's shortfall penalty from the monitoring period MARC with "OR," which Atos argues indicates that these two paragraphs were both intended as alternative carrot-and-stick provisions to incentivize Atos to spend a higher amount in the monitoring period. *See* Dkt. No. 163 at 5–6. Atos cannot rely on an argument at the summary-judgment stage made only in the context of a reply brief involving a separate motion. *See In re MSR Resort Golf Course LLC*, 515 B.R. 36, 46 n.12 (Bankr. S.D.N.Y. 2014) ("[S]uch arguments are improper where the issue was not raised in the summary judgment papers."); *KAH Ins. Brokerage Inc. v. McGowan*, 2023 WL 5435997, at *7 (E.D.N.Y. Aug. 4, 2023) ("The Court will not address arguments made for the first time in a reply brief."), *report and recommendation adopted*, 2023 WL 5436134 (E.D.N.Y. Aug. 23, 2023). In any event, the document does not create a genuine issue of material fact, as there is no evidence from the AT&T negotiators—both of whom were deposed—of such an incentive ever being discussed, nor is there evidence of Atos ever requesting or suggesting such an incentive (not to mention the fact that the document was never even shared with Atos, so it plainly cannot establish Atos's understanding of the agreement).

including statements from both sides' negotiators and documents demonstrating the parties' shared understanding and course of performance over several years.

In the face of that evidence, it is insufficient for Atos to argue that AT&T's evidence should not be credited or is not credible. "[T]he [non-movant] may not respond simply with general attacks upon the [movant's] credibility." *Roches-Bowman v. Evans*, 749 F. Supp. 3d 479, 486 (S.D.N.Y. 2024) (quoting *Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009)). Atos must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. It "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo*, 536 F.3d at 145. It "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks*, 593 F.3d at 166 (citation omitted).

Atos's argument that it intended Section 3.2 to read exactly as written relies on attorney speculation. It has offered no evidence to support that conclusion. It is of course possible that Atos and AT&T intended that the spending through Month 40 would satisfy both the monitoring period amount and a prospective extension term. "[A]nything is possible, but mere possibility is not enough to defeat a factual argument on summary judgment. On summary judgment, once a movant has put forward factual material in support of an argument, it must be countered with more than mere speculation." *Great Am. Ins. Co. v. USF Holland Inc.*, 937 F. Supp. 2d 376, 385 (S.D.N.Y. 2013).

It also is possible that Ritter is lying or misremembering. *See* Dkt. No. 174 at 22. But "'[b]road, conclusory attacks on the credibility of a witness' without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment." *Sec. &*

*Exch. Comm'n v. Airborne Wireless Network*, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023). And AT&T relies on far more than just Ritter's testimony. Thus, Atos cannot defeat summary judgment simply by arguing that Ritter's testimony is self-serving. It must offer evidence to create a genuine issue of fact with respect to that issue. And it has not.

## II. Atos's Motion for Spoliation Sanctions Does Not Alter the Calculus.

Atos suggests that summary judgment in AT&T's favor is especially unwarranted given that AT&T failed to preserve relevant evidence (in particular, Ritter's electronically stored information). Dkt. No. 205 at 17 n.3. The Court therefore addresses the issue of spoliation to assess whether, despite the fact that AT&T would otherwise be entitled to summary judgment, some sort of sanction is warranted which might alter the evidence on summary judgment. Because Atos's spoliation sanctions motion lacks merit, the Court's bottom-line conclusion regarding AT&T's reformation claim remains unaltered.

### A. Factual Background

As previously indicated, the parties executed the 2021 Amendment on April 20, 2021. JS ¶ 165. AT&T discovered the error in Section 3.2 one week later. *Id.* ¶ 170; JX81 (AT&T noting internally that "there is an error in the 2018 version of the agreement that was not caught or corrected which states the customer would pay the difference between the MARC and the total of eligible charges through month 40. This needs to be corrected to say through month 76."). Later that same day, AT&T flagged the issue for Atos: "We identified a minor correction that is needed for section 3.2 SHORTFALL CHARGES/PENALTIES of the OneNet Agreement. The correction once made, actually delivers what Atos specifically asked for in point number 3 of your email sent Wednesday, 11-11-20." JS ¶ 171. AT&T attached a proposed amendment changing the "thru month 40" language to "thru Months 65–76." *Id.* ¶ 172. Atos responded approximately one week later, stating: "[We] have reviewed your request for updating section

3.2 SHORTFALL CHARGES/PENALTIES of the OneNet Agreement and ATOS is fine with the current language in place.  Therefore, we will not need to execute the amendment to the mini OneNet agreement." *Id.* ¶ 176.

The parties exchanged additional messages over the next few days, with AT&T asserting, "The current shortfall section 3.2 doesn't memorialize what we agreed to.  We agreed to forgive the MTRC shortfall through month 64 in the Release & Settlement, set a new $6.2 million MARC for months 65–76, and that AT&T in return would extend rates for the new MARC period and charge for any shortfall at the end of the new period.  In fact, you even sent an email noting that we would need to change the months on Section 3.2 (attached).  Leaving the shortfall language at month 40 was an unintended oversight by both parties and needs to be corrected to document the agreement we reached," to which Atos responded, "ATOS has decided to keep the original shortfall language in Section 3.2." *Id.* ¶¶ 176–78.

On May 25, 2021, roughly one month into the extension term, AT&T's in-house counsel sent Atos a letter (the "May 2021 Letter") again requesting that it sign the proposed amendment and reserving all rights if Atos refused to do so. *Id.* ¶ 179.  The letter states in relevant part:

> We look forward to receiving the executed enclosed Proposed Amendment back from you.  However, to the extent Atos refuses to execute the Proposed Amendment or otherwise correct the obvious Error contained in Section 3.2(c) of the Amended Pricing Schedule, please be advised that AT&T fully intends, and reserves all rights, to enforce the terms of the deal to which the Parties agreed—namely, Atos' agreement to: (1) a MARC in the amount of $6.2 million for Months 65–76 of the Pricing Schedule's Term; and (2) in the event Atos fails to satisfy such MARC, its related agreement to satisfy any shortfall charge in an amount equal to the difference between the MARC agreed on for Months 65 through 76 of the Pricing Schedule's Term and the total applicable MARC-Eligible Charges incurred between Months 65 and 76 of the Pricing Schedule's Term.
>
> In the interim, nothing contained herein shall be deemed a waiver of any and all rights to which AT&T may be entitled—all of which are expressly reserved.

54

Dkt. No. 141-6 at 6.  Atos did not respond to the May 2021 Letter at that time.  In its communications with AT&T around this period, Atos never advised AT&T that it had no intention of satisfying the 2021 Amendment's MARC, or that it would refuse to pay the shortfall charge if it failed to meet the MARC.  *See, e.g.*, Dkt. No. 141-5.

It appears the parties had no additional discussions regarding this issue until after the extension term ended on February 18, 2022.  JS ¶ 180.  On April 19, 2022, AT&T sent Atos a shortfall invoice of $3,367,351 for months 65 through 76 of the extension term.  *Id.* ¶ 181.  The parties then had "an open billing dispute" involving "ongoing direct business-to-business discussions[, which] were unsuccessful in resolving the business and legal issues" and which culminated in AT&T's denial of Atos's billing dispute claim on June 10, 2022.  Dkt. No. 153-3 at 2.  It was not until July 25, 2022, roughly one-and-a-half months later, that Atos first responded to AT&T's May 2021 Letter from over a year earlier.  *Id.*  In its response, Atos indicated that "[t]he shortfall issue was not ripe until February 2022," when the extension term ended and Atos officially failed to meet the MARC.  *Id.*  Atos also disputed that there was a scrivener's error in the Restated Pricing Schedule, concluding, "Atos does not owe and, consequently will not pay, AT&T any amount of the Shortfall Invoice."  *Id.*  AT&T filed this lawsuit on February 17, 2023.  Dkt. No. 1.

During the extension term, on December 1, 2021 (roughly halfway through the term and approximately six months after the May 2021 Letter), Ritter left his employment with AT&T.  Dkt. No. 153-6.  AT&T has submitted a declaration from its counsel, Edward J. Jacobs ("Jacobs"), who is familiar with AT&T's policies with respect to the retention of data for departed employees who are not subject to a litigation hold at the time of their departure.  Dkt. No. 153 ¶ 18.  According to Jacobs, "[a]bsent inclusion on a litigation hold, as a practice, AT&T

does not retain data for departed employees more than 30 days after their date of departure." *Id.*

Due to these document retention practices, AT&T no longer possesses Ritter's custodial data

and, to the best of Jacob's knowledge, information, and belief, AT&T did not retain Ritter's data

beyond approximately December 31, 2021—i.e., more than 30 days after he retired from AT&T.

*Id.* ¶ 20.

### B.    Legal Background

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025)

(quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *accord*

*Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 383 (S.D.N.Y. 2025) (Sullivan, J.).  "A

party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation

claim."  *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017) (citing

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001)).

Federal Rule of Civil Procedure 37(e) governs claims of spoliation from the loss of

electronically stored information ("ESI").  Rule 37(e) states that "[i]f electronically stored

information that should have been preserved in the anticipation or conduct of litigation is lost

because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced

through additional discovery," a court may award sanctions in accordance with subsections (1) or

(2).  Fed. R. Civ. P. 37(e).  Those two subsections read as follows:

> (1) upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation[, the Court] may:
>
>> (A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

*Id.* Thus, Rule 37(e) requires a "three-part inquiry":

> The first is to decide if the rule applies at all—that is, if a party failed to take "reasonable steps" to preserve electronically stored information "that should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). If so, then the second step is to decide if there has been "prejudice to another party from loss of the information," in which case the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Lastly, the third step to consider—regardless of prejudice to any other party—is whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation," in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *13 (S.D.N.Y. June 20, 2019) (quoting *Coan v. Dunne*, 2019 WL 1620412, at *6 (D. Conn. Apr. 16, 2019)).

"[A] party's obligation to preserve evidence 'arises when the party has notice that the evidence is relevant to the litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Karlyg v. City of New York*, 2024 WL 4333858, at *5 (E.D.N.Y. Sept. 28, 2024) (quoting *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). "Once the duty to preserve evidence attaches, a party must save any evidence that it 'reasonably should know is relevant' to an anticipated action." *Taylor v. City of New York*, 293 F.R.D. 601, 611 (S.D.N.Y. 2013) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)). In addition, "once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 495 (S.D.N.Y. 2022) (quoting *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008)). "[T]he duty to preserve extends to those employees likely to

57

have relevant information—the 'key players' in the case." *Zubulake*, 220 F.R.D. at 218; *accord In re Keurig*, 341 F.R.D. at 502.

"[A]lthough a district court *may* reserve for the jury questions of fact related to adverse inference instructions under Rule 37(e)(2), it is also proper for a district court to make those factual determinations—including a finding of 'intent to deprive'—itself." *Hoffer v. Tellone*, 128 F.4th 433, 441 (2d Cir. 2025).

### C.    Analysis

Atos contends that spoliation sanctions are warranted under both 37(e)(1) and (e)(2) because AT&T deleted highly relevant ESI in the form of Ritter's emails and internal drafts after AT&T had a duty to preserve that information and in order to deprive Atos from using it in this litigation. *See generally* Dkt. No. 140.  Atos's motion fails for three reasons: First, litigation was not reasonably expected when Ritter left his job at AT&T, so AT&T had no affirmative duty to preserve his data at that time.  Second, Atos has failed to establish prejudice from the loss of this information because it is purely speculative that the lost data would support its defense.  And third, Atos has failed to establish that AT&T acted with any intent to deprive Atos of the use of the data in this litigation.

#### 1.    Duty to Preserve

With respect to the first issue of when AT&T's obligation to preserve Ritter's ESI arose, Atos argues that this duty kicked in, at the latest, when AT&T sent Atos the May 2021 Letter (which occurred roughly six months before Ritter left his job at AT&T and his ESI was deleted). *Id.* at 10–11.  Specifically, Atos contends that because this letter reserved AT&T's rights, it effectively threatened litigation, and AT&T therefore knew that litigation was reasonably foreseeable and had an obligation to preserve all relevant documents, which it failed to do.  *Id.* Atos's argument fails at the first step.  The letter did not threaten litigation, and Atos has

58

identified no other evidence that would support that litigation was reasonably anticipated.  The evidence suggests just the opposite.

Courts frequently pinpoint parties' ESI preservation duties as arising when litigation is filed, planned, or threatened.  *See In re Keurig*, 341 F.R.D. at 532 (collecting cases).  For example, the court in *Karsch* found, and neither party disputed, that the duty to preserve ESI was triggered when one party sent the other "a demand letter . . . threatening legal action" and outlining specific claims the party intended to bring if the situation was not resolved "on a fair and equitable basis."  2019 WL 2708125, at \*2, \*18.  The court explained that although the plaintiff did not file the lawsuit for another 23 months after the demand letter, that timing "was wholly within his control, and there is nothing in the record to suggest that his threat was not seriously intended when made."  *Id.* at \*18.  Likewise, in *Leidig*, the court found that preservation duties attached when the website Buzzfeed published an article, as the plaintiff's law firm had two days prior sent Buzzfeed a letter implicitly threatening a defamation claim if it went forward with publication.  2017 WL 6512353, at \*8; *see also Stonex Grp., Inc. v. Shipman*, 2024 WL 3356989, at \*3 (S.D.N.Y. July 10, 2024) (finding that the duty to preserve arose when one party sent the other a letter indicating that they "were considering filing claims"); *In re Frontier Commc'ns Corp.*, 666 B.R. 260, 285 (Bankr. S.D.N.Y. 2025) (explaining that, "in the copyright context, a cease-and-desist letter triggers a duty to preserve, especially when the content of that cease-and-desist clearly indicated that litigation was on the table," and collecting cases holding the same).

That said, not all letters involving disputes and which make reference to a reservation of rights establish a duty to preserve ESI.  Whether the substance of a letter can fairly be said to threaten litigation depends on the totality of the circumstances, including whether specific claims

59

are threatened, how explicitly litigation is mentioned, and the broader context of the parties'

dispute.  *See id.*; *Edwards v. Hearst Commc'ns, Inc.*, 2017 WL 6458612, at *3 (S.D.N.Y. Dec.

18, 2017) ("[D]etermining when the [preservation] duty arises 'calls for a fact-intensive inquiry'

. . . ." (quoting *Moran v. Manos*, 2009 WL 1059637, at *5 (S.D.N.Y. Apr. 15, 2009)); *Treppel v.*

*Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006) ("[T]he mere existence of a dispute . . . did

not mean that the parties should reasonably have anticipated litigation at that time and taken

steps to preserve evidence."); *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 2023

WL 2655111, at *12 (N.D.N.Y. Mar. 27, 2023) ("These developments, especially when viewed

in light of the lengthy history of known contamination, administrative involvement, and response

actions at the Site, made litigation among the parties reasonably foreseeable . . . ."), *aff'd*, 144

F.4th 360 (2d Cir. 2025); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020) ("There is

no single bright line that definitively marks when litigation reasonably should be anticipated.

Instead, courts consider a variety of factors, including the type and seriousness of the injury; how

often similar kinds of incidents lead to litigation; the 'course of conduct between the parties,

including past litigation or threatened litigation'; and what steps both parties took after the

incident and before the loss of the evidence, including whether the defendant initiated an

investigation into the incident." (citation omitted)).

Letters are often sent when litigation is not anticipated and precisely in order to *avoid* the

need for judicial intervention.  *See Iconic IP Holdings, L.L.C. v. Gerrit's Brands, Inc.*, 2021 WL

7543607, at *8 (E.D.N.Y. May 21, 2021) (finding that a cease-and-desist letter reflected nothing

more than "attempts to settle the dispute without the need for judicial intervention"); *see also*

*Emps. Ins. of Wausau v. Prudential Ins. Co. of Am.*, 763 F. Supp. 46, 49 (S.D.N.Y. 1991)

(holding that two letters which stated that the party intended to pursue all available remedies but

"hoped to avoid litigation" were "at best an attempt to initiate settlement negotiations" rather than notice of a lawsuit). It is also often prudent for parties to "reserve their rights" even when litigation is not anticipated. Under New York law, a party can be deemed to have acquiesced in its contractual counterparty's understanding of an agreement if, with knowledge that the counterparty has a different understanding, the party continues to perform. *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013) ("[A]ny written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." (citation omitted)). The failure to object can give rise to a claim that the party has waived or abandoned its rights, or that those rights should not be enforced under principles of estoppel. But a reservation of rights protects against such a possibility. *See Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006) (where a party "repeatedly and expressly reserve[s] its rights in its communications with" a counterparty, "[s]uch reservations preclude arguments both as to waiver and as to equitable estoppel"); *see also Hutton Const. Co. v. County of Rockland*, 52 F.3d 1191, 1193 (2d Cir. 1995) (noting that because a party reserved its rights under an agreement on four occasions, its counterparty could not argue waiver, reasonable reliance, or lack of notice regarding the possibility that the party might assert its rights).

Courts around the country have accordingly held that such letters do not necessarily establish ESI preservation duties. *See, e.g.*, *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 622 (D. Colo. 2007) (finding no preservation duty based on a letter which raised the possibility of trademark infringement but which also sought "to determine whether this situation can be resolved without litigation," as the letter implied that the sender "preferred and was willing to explore a negotiated resolution"); *Velocity Press, Inc. v. Key Bank, N.A.*, 2011 WL

61

1584720, at *3 (D. Utah Apr. 26, 2011) (same where a letter "hinted at potential claims" but "never directly threatened imminent litigation"); *Price v. Peerson*, 2014 WL 12558253, at *8 (C.D. Cal. Apr. 23, 2014) (same where letters included "[n]on-litigious statements" indicating the sender's desire to "settle" his administrative complaints), *aff'd*, 643 F. App'x 637 (9th Cir. 2016); *Bhattacharya v. Murray*, 2022 WL 875032, at *4 (W.D. Va. Mar. 23, 2022) (same where letter "clearly expressed a willingness to resolve or 'otherwise negotiate'" a dispute without hinting at "the possibility Plaintiff might later take the dispute to court"); *cf. Claude P. Bamberger Int'l, Inc. v. Rohm & Haas Co.*, 1997 WL 33768546, at *4 (D.N.J. Aug. 12, 1997) (litigation not reasonably anticipated for purposes of work-product doctrine where letter did not "threaten litigation, but appear[ed] to seek a business remedy to a perceived unfairness in a business matter"), *aff'd*, 1997 WL 33762249 (D.N.J. Dec. 29, 1997).

Several factors here lead the Court to conclude that AT&T's May 2021 Letter did not threaten litigation, and that litigation was not reasonably foreseeable at that time. First, the letter made no mention of litigation or any specific legal claims. Dkt. No. 141-6. The letter "reserves" AT&T's rights with respect to a question of contract interpretation and indicates that AT&T intends to enforce its rights as AT&T understands them. It does not reflect an understanding by AT&T that Atos will not satisfy its obligations or, more pertinently, that AT&T will have to institute litigation in order for those obligations to be satisfied. Atos asserts that the letter "did not invite a non-litigation resolution." Dkt. No. 163 at 2. But it plainly did. The letter requested that Atos execute a proposed amendment, and it indicated that AT&T "look[ed] forward" to receiving the signed amendment back from Atos. *Id.* at 5–6. The letter therefore reflected AT&T's expectation that Atos would agree to execute the amendment, not that Atos would stick to an interpretation contrary to the parties' prior understanding. At most, the letter "hinted at

62

potential claims," and it "never directly threatened imminent litigation." *See Velocity Press*, 2011 WL 1584720, at *3; *see also Cache*, 244 F.R.D. at 622 (stating that for a demand letter alone to be sufficient to trigger preservation obligations, it "must be more explicit and less equivocal" regarding the likelihood of litigation).

Of course, litigation can be threatened implicitly and without express reference to an impending suit. *See Leidig*, 2017 WL 6512353, at *8. But the May 2021 Letter also cannot reasonably be understood to implicitly threaten litigation. Crucially, AT&T sent the letter only one month into the twelve-month extension term, and it was far from clear at that point that there would even be a dispute, let alone litigation, regarding payment at the end of the extension term. For one, it was possible that Atos might meet the extension term's MARC, obviating the need to consider the appropriate shortfall penalty. Furthermore, Atos never indicated that if it failed to meet the MARC, it would refuse to pay a shortfall penalty. It only responded to AT&T's letter after the extension term ended, as it believed that "[t]he shortfall issue was *not ripe*" until then. Dkt. No. 153-3 at 2 (emphasis added). That admission all but resolves the issue of whether AT&T had a duty to preserve ESI when it sent its letter. Atos cannot seriously contend, on the one hand, that it had no reason to respond to AT&T's letter until after the extension term concluded because the issue of payment was not ripe, while also suggesting, on the other hand, that litigation was reasonably foreseeable with the extension term barely underway. If it was not foreseeable that there would be a dispute regarding payment, it was not foreseeable that there would be litigation over payment.

Atos's reliance on *Leidig*, a case involving a letter which implicitly threatened litigation, only proves the point. Contrary to Atos's suggestion, *see* Dkt. No. 163 at 1, the court in that case did not find that the parties' ESI preservation duties arose when the relevant letter was sent, *see*

63

2017 WL 6512353, at *8.  Instead, the court explained that the preservation duties arose when the article mentioned in the letter was published, as the letter implicitly threatened legal action "in the event the Article were published."  *Id.*  In other words, the letter threatened litigation in the event of some future contingency, and the parties' preservation duties kicked in only when that contingency arose, not when the letter was sent.  *See id.* ("[A]s soon as the Article was published on April 24, 2015, in defiance of the Carter-Ruck letter, the plaintiffs knew that there was a realistic potential for litigation against Buzzfeed, thereby triggering plaintiffs' obligation to preserve.").  So too here.  Even assuming that the May 2021 Letter could reasonably be viewed as threatening litigation—which is not the case—that does not mean that preservation duties arose at that point.  *Leidig* suggests that those duties would have instead arisen if and when non-payment occurred—several months after Ritter left AT&T and his data was deleted.

Atos observes that AT&T could have brought its reformation claim when it sent its letter, as reformation claims accrue for purposes of the statute of limitations "when the alleged mistake or actionable wrong occurred—in this case, when the agreement was formed."  Dkt. No. 163 at 4 (quoting *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 249 (S.D.N.Y. 2006)).  However, even if the clock on AT&T's reformation claim had begun ticking, in order for a court to issue a declaratory judgment, there must be an "actual controversy" between the parties, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 104 (1983), and it was not clear that there was one when AT&T sent its letter considering that Atos never informed AT&T of its position until after the extension term concluded.  And again, Atos itself stated that the dispute was not ripe when AT&T sent its letter.

The parties' prior working relationship further underscores that litigation was not reasonably foreseeable when AT&T sent its letter.  In the years leading up to the extension term,

Atos at least twice failed to meet required spending commitments, and in neither instance did litigation ensue. Rather, the parties addressed those shortfalls through additional business negotiations refining their contractual relationship. Atos's Courtois testified that it was common practice in the industry that if there was a shortfall, "most of the time we are negotiating how to find a way to, I would say, solve the problem." Dkt. No. 153-4 at 75:25–76:3. This course of conduct strongly suggests that when Atos indicated that it was "fine" with the language in Section 3.2, the most likely and reasonably anticipated outcome was further negotiations, not a lawsuit. Atos's then-CFO Crandall, who signed the 2021 Amendment, expressed this understanding in an internal email at the time: "Atos will not sign an amendment and *will use it as leverage in further discussions*." Dkt. No. 194-87 at 2 (emphasis added).

Atos's sanctions motion therefore fails at the threshold: AT&T did not have a legal duty to preserve the ESI in question when that data was discarded.

### 2. Prejudice and Intent to Deprive

Atos's motion fails for other reasons as well.

Sanctions are unwarranted under Rule 37(e)(1) because Atos's assertions of prejudice are entirely speculative and unsupported. "Courts within the Second Circuit generally require that the lost evidence was not only probative, but also would affirmatively support the movant's claim to find prejudice." *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (citing *Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018)); *accord Health & Happiness (H&H) US LLC v. Nutramax Lab's, Inc.*, 2026 WL 836132, at *11 (S.D.N.Y. Mar. 26, 2026).[9] A movant seeking spoliation sanctions may rely on "circumstantial evidence that

---

[9] Courts have recognized that prejudice may also be found "where a party destroys the only evidence that might vindicate their opponent's claims and thereby assures victory for themselves," on the theory that in such a case, "the deterrent purposes of the spoliation doctrine may well be served by an appropriate sanction, even without affirmative proof as to whether the

gives rise to an inference the spoliated evidence would help the movant's case," but "mere speculation alone is insufficient to show that the loss of ESI is prejudicial to [the movant]." *Cooper Foods Int'l, LLC v. Yourd*, 2025 WL 2663977, at \*5 (E.D.N.Y. Sept. 17, 2025) (cleaned up) (quoting *Karlyg v. City of New York*, 2024 WL 4333858, at \*7–8 (E.D.N.Y. Sept. 28, 2024)); *see also Ungar v. City of New York*, 2022 WL 10219749, at \*3 (2d Cir. Oct. 18, 2022) (summary order) ("Given the broad discretion afforded to the district court, and the permissive nature of Rule 37(e)(1), we find that the district court did not clearly err in concluding that [movant] failed to offer proof that the video would have corroborated [movant's] claims, and thus sanctions were unwarranted.").

Atos asserts that it is prejudiced by the loss of Ritter's ESI because Ritter was AT&T's lead drafter, and it is at least plausible that Ritter's communications support Atos's interpretation of the parties' agreement. Dkt. No. 140 at 14–15. The Court has already found that AT&T has demonstrated by clear and convincing evidence that the "thru month 40" language was a scrivener's error and that Atos's alternative theories are implausible and unsupported. *See supra* § I. For all the reasons that AT&T is entitled to summary judgment on its reformation claim, Atos is not entitled to a finding of prejudice with respect to the issue of spoliation. Atos's arguments for prejudice rely solely on speculation. Atos has access both to documents regarding its own state of mind at the time Section 3.2 was adopted and also contemporaneous materials from Ritter, McKinney, and other relevant individuals at AT&T. If there was something in Ritter's missing emails that would have supported Atos's position, one might have expected to

---

evidence would have been advantageous to the movant." *Ungar*, 329 F.R.D. at 15. That basis for finding prejudice is inapplicable here. The burden of proof with respect to the underlying claim is on AT&T, and Atos is the party which has the best access to evidence regarding what its own state of mind was regarding Section 3.2 when that provision was adopted. The only evidence of the intent and understanding of the parties does not lie in the Ritter emails.

see a reference to it in one of those documents or somewhere else. But nothing in any of these documents suggests that Ritter's missing emails would support Atos's position.

Sanctions are also unwarranted under Rule 37(e)(2). Although that subsection does not require a finding of prejudice, it requires something that is typically even more difficult to establish: that the opposing party acted with the intent to deprive the movant of the information's use in litigation. Fed. R. Civ. P. 37(e)(2); *Amimon Inc. v. Shenzhen Hollyland Tech Co.*, 2025 WL 66633, at *16 (S.D.N.Y. Jan. 10, 2025) ("Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information." (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment)). This means that the opposing party must not only have intentionally spoliated evidence, but have done so for "the specific reason" of preventing the movant from benefiting from that evidence in litigation. *See Barbera v. Grailed, LLC*, 2025 WL 2098635, at *8 (S.D.N.Y. July 25, 2025); *Hoffer*, 128 F.4th at 440 ("[T]he 'intent to deprive' standard is 'both stringent and specific,' and contemplates 'not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence.'" (citation omitted)).

Given that litigation was not reasonably foreseeable when the ESI here was deleted, Atos cannot establish that AT&T deleted the documents specifically to prevent them from being used in this litigation. And even if litigation *were* reasonably expected at the time, AT&T has come forward with a perfectly credible and non-nefarious reason for the documents' deletion—normal document retention policies for employees who leave the company. *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) (finding of intent to deprive turns in part on whether "the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator"). Atos has failed to offer evidence,

67

circumstantial or otherwise, calling this explanation into question.  Thus, it has failed to establish

the propriety of sanctions under subsection (e)(2).

Atos's motion for spoliation sanctions is denied.  The Court therefore reaffirms its

holding that AT&T is entitled to summary judgment on the issue of contract reformation.[10]

## CONCLUSION

AT&T's motion for summary judgment is GRANTED.  Atos's cross-motion for

summary judgment and its motion for spoliation sanctions are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 139, 170, and 173.


SO ORDERED.


Dated: April 22, 2026
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[10] AT&T argues that because Atos's motion for spoliation sanctions is baseless, the Court should instead sanction Atos and award AT&T costs and fees for opposing the motion under 28 U.S.C. § 1927 and the Court's inherent authority.  Dkt. No. 152 at 24–25.  The Court declines to do so, finding that Atos's motion is not so utterly meritless as to raise an inference of bad faith.  *See Charles v. City of New York*, 2015 WL 756886, at *3 (S.D.N.Y. Feb. 20, 2015) ("Section 1927 sanctions require a showing of bad faith." (citing *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 180 (2d Cir. 2004)); *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (noting that the Second Circuit, "in recognizing the need for restraint, has always required a particularized showing of bad faith to justify the use of the court's inherent power").