USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 08/03/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AT&T ENTERPRISES, LLC,

Plaintiff,

-v-

ATOS IT SOLUTIONS AND SERVICES, INC.,

Defendant.

23-cv-1395 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff AT&T Enterprises, LLC ("Plaintiff" or "AT&T") moves, pursuant to Federal Rule of Civil Procedure 54(d), for an order granting it attorneys' fees and costs. Dkt. No. 243. For the following reasons, the motion is denied.

## BACKGROUND

Familiarity with the prior proceedings in this case is presumed.

### I. The Relationship Between the Parties

This case arises out of a contract dispute between AT&T and Defendant Atos IT Solutions and Services, Inc. ("Defendant" or "Atos"). AT&T is a telecommunications company that offers a number of broadband connectivity services. *See* Dkt. No. 241; *AT&T Enters., LLC v. Atos IT Sols. & Servs., Inc.*, 2026 WL 1090227, at *1 (S.D.N.Y. Apr. 22, 2026). Atos is a systems integrator that provides customers with a wide range of IT services, including digital consulting and cloud management solutions. *Atos*, 2026 WL 1090227, at *1.

The two companies enjoy a contractual relationship pursuant to which AT&T provides services to Atos in return for payment. One type of service that AT&T sells to Atos is voice and data services. As the Court found in granting summary judgment for AT&T, *see id.* at *1–2,

three layers of contracts govern AT&T's obligation to sell voice and data services to Atos. The first layer is the Master Services Agreement ("MSA") entered into, effective October 9, 2002, by Atos's predecessor-in-interest, Atos Origin, Inc., and AT&T's predecessor-in-interest, AT&T Corp. Dkt. No. 244-1. The MSA provides "General Terms and Conditions" applicable to AT&T's provision of products and services to Atos. *Id.* It also contemplates that the parties' obligations—including the precise services provided by AT&T and the rates and charges payable by Atos for those services—are to be further defined by specific service agreements entered into by the parties. *Id.* § 2.1.

The second layer comes from the Comprehensive Service Order Attachment (the "CSOA"), an attachment to the MSA executed on April 4, 2007. Dkt. No. 171-9. Under the CSOA, AT&T is obligated to provide the services to Atos identified in the applicable pricing schedules ("Pricing Schedules") at prices also set forth in the CSOA or Pricing Schedules. *Id.* § 1(A), (B).

The third and most specific contract governing the voice and data services provided by AT&T to Atos thus is a Pricing Schedule titled "AT&T SDN OneNet BTB Pricing Schedule" which was originally entered into in 2015, first amended and restated in 2018, again amended and restated in January 2019, *see* Dkt. No. 171-46 (the "2019 OneNet RPS"), and further amended in February 2021, *see* Dkt. No. 171-78 (the "2021 Amendment") (collectively, the "OneNet Pricing Schedules").

## II. The Underlying Dispute

AT&T filed this lawsuit after it invoiced Atos for $3,367,351, which it claimed it was owed under the 2021 Amendment, and Atos failed to pay that sum. *See Atos*, 2026 WL 1090227, at *8. The dispute grew out of the parties' competing views regarding the application of a concept called the Minimum Annual Revenue Commitment ("MARC"), which was first set

forth in the CSOA and then determined by each of the respective Pricing Schedules and amendments thereto. As defined in the CSOA, the MARC is "an annual revenue commitment set forth in an applicable Pricing Schedule that Customer agrees to satisfy during a Pricing Schedule Term." Dkt. No. 171-9 § 2. The CSOA provided that "[i]f, on any anniversary of a Pricing Schedule Term start date, [Atos] failed to satisfy the MARC for the preceding 12 month period, [Atos] will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred during the 12 month period." *Id.* § 4. The MARC-Eligible Charges were defined as the "charges . . . incurred by Customer for the Services identified in the applicable Pricing Schedule as MARC-contributing." *Id.* § 2. Each of the successive Pricing Schedules contained a MARC and a definition for MARC-Eligible Charges for the periods covered by such Pricing Schedule. *See, e.g.*, Dkt. No. 171-46 § 1.1.

The 2019 OneNet RPS provided that, if at the end of an extension term that covered months 65–77 of the Pricing Schedule Term, Atos had failed to satisfy the MARC for that period, it would be charged "the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred thru month 40" of the parties' relationship. Dkt. No. 171-46 § 3.2. AT&T claimed that the charges incurred by Atos under the 2021 Amendment fell short of the MARC for the 2021 Amendment—set at $6.2 million for months 65–76—and that Atos owed AT&T an amount equal to the shortfall. *Atos*, 2026 WL 1090227, at *8. For its part, Atos relied on language that defined the period over which MARC-Eligible Charges were to be calculated to include prior years and that so measured, there was no shortfall. *Id.* at *7–8. In fact, calculated as Atos did, the MARC-Eligible Charges exceeded the MARC even before the

2021 Amendment was signed, rendering illusory the agreement that the parties subsequently reached in the 2021 Amendment for a $6.2 million MARC for the extension term. *Id.*

**PROCEDURAL HISTORY**

AT&T initiated this action by complaint on February 17, 2023, claiming that the language in the 2021 Amendment was a scrivener's error and seeking reformation, among other relief. Dkt. No. 1. On April 22, 2026, after lengthy litigation, the Court issued a 68-page Opinion and Order granting AT&T's motion for summary judgment and ruling in AT&T's favor on its claim for reformation. *Atos*, 2026 WL 1090227, at *11–24.

AT&T made this post-judgment motion[1] on May 6, 2026, seeking recovery from Atos of the attorneys' fees and costs it incurred in this litigation. Dkt. No. 243. AT&T also filed a memorandum of law in support of the motion and the declaration of Jonathan Pressment. Dkt. Nos. 244–45. On June 3, 2026, Atos filed a memorandum of law in opposition to the motion for attorneys' fees and the declaration of Leon Medzhibovsky. Dkt. Nos. 249–50. On June 17, 2026, AT&T filed a reply memorandum of law in further support of the motion for attorneys' fees. Dkt. No. 251. The Court subsequently directed AT&T to submit invoice records sufficient for the Court to evaluate the reasonableness of the hours billed by AT&T's counsel. Dkt. No. 255. On July 10, 2026, AT&T filed a second declaration of Jonathan Pressment together with invoices reflecting time entries and related expenses billed to the matter between February 2023 and February 2026. Dkt. No. 256. The Court held oral argument on July 29, 2026.

---

[1] Atos filed a notice of appeal on May 21, 2026 from this Court's decision granting summary judgment in AT&T's favor. Dkt. No. 248. The Court has jurisdiction over an application for attorneys' fees filed during the pendency of an appeal. *See* Fed. R. Civ. P. 54(d)(2); *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 2004 WL 856329, at *1 (S.D.N.Y. Apr. 20, 2004) ("Although a Notice of Appeal normally divests the district court of jurisdiction, a district court retains jurisdiction to decide the issue of attorneys' fees and other collateral matters notwithstanding a pending appeal."); *Adstra, LLC v. Kinesso, LLC*, 2025 WL 1070034, at *2 (S.D.N.Y. Apr. 9, 2025).

## DISCUSSION

In support of its fee application, AT&T relies on an agreement that was not previously mentioned in the pleadings or in the dispositive motions in this case: the System Integrator Unified Resale Addendum (the "2019 Resale Addendum") between the parties signed by Atos as Customer on February 26, 2019 and by AT&T on February 27, 2019. Dkt. No. 244-3. Section 4.4 of the 2019 Resale Addendum provides as follows:

> **Payments**. Payment is due within 45 days after the date of the invoice (unless another date is specified in an applicable Service Publication) and must refer to the invoice number. Charges must be paid in the currency specified in the invoice. Restrictive endorsements or other statements or checks are void. *Customer will reimburse AT&T for all costs associated with collecting undisputed overdue, delinquent or dishonored payments, including reasonable attorneys' fees*.

Dkt. No. 244-3 § 4.4 (emphasis added).

The 2019 Resale Addendum requires AT&T to "either provide or arrange to have an AT&T Affiliate provide Services to [Atos] and its Users, subject to the availability and operational limitations of systems, facilities and equipment." *Id.* § 2.1. In exchange, Atos agrees "to pay for a Service Component . . . upon availability of the Service Component" to Atos. *Id.* § 4.3. "Services" is defined in the 2019 Resale Addendum as "all products and services AT&T provides [Atos] pursuant to this Agreement." *Id.* § 1.1. And "Agreement" is defined to "incorporate[] the terms of the [MSA] . . . together with the General Terms and Conditions [in the 2019 Resale Addendum]" and a series of "additional documents" including "Pricing Schedules." *Id.* The MSA contains the following language:

> This Agreement consists of the attached General Terms and Conditions and all service attachments ("Attachments"), attached hereto or subsequently signed by the parties and that reference this Agreement (collectively, this "Agreement").

Dkt. No. 244-1 at 1.

AT&T argues that the 2019 Resale Addendum applies to the services required to be supplied pursuant to the CSOA, as modified by the 2021 Amendment to the 2019 OneNet RPS, because each of the CSOA and the 2019 OneNet RPS was an attachment to the MSA and the 2019 Resale Addendum defines the "Agreement" to include the terms of the MSA. *See* Dkt. No. 245 at 13–14; Dkt. No. 251 at 3; Transcript of July 29, 2026 Oral Argument ("July 29, 2026 Hearing Tr.") at 5:24–7:1. It further argues that the reference to Pricing Schedules in the 2019 Resale Addendum picks up the 2021 Amendment to the 2019 OneNet RPS. Dkt. No. 251 at 3. On that reading, Section 4.4 of the 2019 Resale Addendum would apply to the costs, including attorneys' fees, incurred by AT&T in collecting on its invoice.

Atos counters that the 2019 Resale Addendum is inapplicable to the issue of attorneys' fees because the 2019 OneNet RPS cannot meet the 2019 Resale Addendum's definition of "Pricing Schedule" in Section 1.1(a): it was not "attached to" the 2019 Resale Addendum, it was executed prior to the 2019 Resale Addendum, and it makes no reference to the 2019 Resale Addendum. Dkt. No. 249 at 8–9. Though the 2021 Amendment was "later executed," it is also unattached and makes no reference to the 2019 Resale Addendum. *Id.* For those reasons, the 2019 Resale Addendum's "General Terms and Conditions, including the fee provision in Section 4.4, . . . do not apply to services provided and invoiced under" the 2019 OneNet RPS as amended by the 2021 Amendment. *Id.* at 9.

"Under New York law, 'when a contract provides that in the event of litigation the losing party will pay the attorney' [sic] fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable.'" *KLS Diversified Master Fund, L.P. v. McDevitt*, 532 F. Supp. 3d 126, 139–40 (S.D.N.Y. 2021), *aff'd*, 2022 WL 2759055 (2d Cir. July 13, 2022) (summary order)

(quoting *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992) (citation omitted)); *see Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 353 (S.D.N.Y. 2003) (where "a contract provides for shifting of the actual attorneys fees expended by the prevailing party, 'the court will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable'" (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263 (2d Cir. 1987))). "The intention that attorneys' fees be awarded to the prevailing party must be 'unmistakably clear.'" *Adstra, LLC v. Kinesso, LLC*, 2025 WL 1070034, at *3 (S.D.N.Y. Apr. 9, 2025) (quoting *OVES Enter., SRL v. NOWwith Ventures, Inc.*, 2024 WL 4635399, at *6 (S.D.N.Y. Oct. 31, 2024)); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."); *Zero Carbon Holdings, LLC v. Aspiration Partners, Inc.*, 2024 WL 3409278, at *2 (S.D.N.Y. July 15, 2024).

"Under familiar principles of New York contract law, a court 'interprets the agreement as a whole, applying plain meaning to all of its language, attempting to effectuate the commercial understanding of the parties, and avoiding interpretations that would render language surplusage or the promises contained in the agreement illusory.'" *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 392–93 (S.D.N.Y. 2022), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022), *and aff'd sub nom. In re Wade Park Land Holdings, LLC*, 2024 WL 3024648 (2d Cir. June 17, 2024) (summary order) (quoting *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 285 (S.D.N.Y. 2021)); *see also Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) ("In construing a contract,

one of the court's goals is to avoid an interpretation that would leave contractual clauses meaningless."); *Loctite VSI Inc. v. Chemfab New York Inc.*, 701 N.Y.S.2d 723, 725 (3d Dep't 2000) ("[C]ourts should adopt an interpretation of a contract which gives meaning to every provision of the contract, with no provision left without force and effect.").

These principles apply with equal force to contractual provisions governing entitlement to attorneys' fees. *See, e.g.*, *Katalyst Secs., LLC v. Marker Therapeutics, Inc.*, 2023 WL 22610, at *4 (S.D.N.Y. Jan. 3, 2023) (rejecting respondent's argument that a FINRA arbitration agreement's fee-shifting clause entitling "the prevailing party . . . in a legal proceeding" to attorneys' fees authorized fees incurred only within the arbitration itself, because that reading would render the phrase "in a legal proceeding" superfluous); *Trez Cap. (Florida) Corp. v. Noroton Heights & Co., LLC*, 2021 WL 3727352, at *3 (S.D.N.Y. Aug. 23, 2021) (denying leave to amend complaint to add claim for attorneys' fees against loan guarantors where guaranty automatically terminated upon repayment of "all other sums and payments which may be or become owing," and rejecting lender's argument that post-termination attorneys' fees fell within that surviving "sums and payments" language because doing so "would strip all meaning from the phrase 'shall terminate automatically'").[2]

AT&T's argument fails at the threshold. The services provided pursuant to the 2019 Resale Addendum do not include the services at issue in this litigation which were provided pursuant to the CSOA and the Pricing Schedules incorporated into that document.

Section 1.1 of the 2019 Resale Addendum, captioned "Overview of Documents," provides as follows:

> This Addendum incorporates the terms of the Master Agreement between AT&T and Customer referenced above and together with the General Terms and

[2] The 2019 Resale Addendum is governed by New York law. Dkt. No. 244-3 § 10.11.

> Conditions herein and the following additional documents (collectively "Agreement") shall apply to all products and services AT&T provides Customer pursuant to this Agreement ("Services") and shall continue in effect so long as Services are provided under this Agreement.

Dkt. No. 244-3 § 1.1.

"Customer" is defined as Atos and the Master Agreement is defined as the agreement bearing the Master Agreement number of the MSA (No. 120206). *Id.* at 1–3. The 2019 Resale Addendum then lists the "additional documents" deemed to be incorporated therein: Pricing Schedules, Tariffs, Acceptable Use Policy, and Service Guides; Guidebooks; Price Lists. *Id.* § 1.1(a)–(d). It states the following with respect to Pricing Schedules:

> **Pricing Schedules**. A "Pricing Schedule" means a pricing schedule (including related attachments) or other document that is attached to or is later executed by the parties and reference this Agreement. A Pricing Schedule includes the Services, the pricing (including discounts and commitments, if applicable, the pricing schedule term ("Pricing Schedule Term") and other Service specific terms and conditions.

*Id.* § 1.1(a).

AT&T's argument is premised on the notion that by incorporating "the terms of the Master Agreement," the 2019 Resale Addendum picks up and incorporates all of the attachments to the MSA, and thus that the 2019 Resale Addendum incorporates not only the terms in the Master Agreement but also all of the attachments that are deemed to be part of the MSA. *See* Dkt. No. 245 at 5–6; Dkt. No. 251 at 2. But that argument falters on the plain language of the agreement and the New York law that contracts are to be read to avoid surplusage. The 2019 Resale Addendum does not just incorporate "the terms of the Master Agreement." Section 1.1 of the 2019 Resale Addendum then goes on to specify the "additional documents" that are deemed to be incorporated into the 2019 Resale Addendum. *See* Dkt. No. 244-3 § 1.1(a)–(d). And those "additional documents" include Pricing Schedules that also, by virtue of the language of the MSA, are deemed to be part of the MSA. *See* Dkt. No. 244-1 at 1 (stating that the MSA

"consists of the attached General Terms and Conditions and all service attachments . . . attached hereto or subsequently signed by the parties and that reference" the MSA). Moreover, the 2019 Resale Addendum does not incorporate all Pricing Schedules. It only incorporates specified Pricing Schedules: those that were executed at the time of or prior to the 2019 Resale Addendum and that are "attached to" the Addendum, as well as those Pricing Schedules that are "later executed by the parties and referenc[e] th[e] Agreement." Dkt. No. 244-3 § 1.1(a).[3]

AT&T's argument cannot be accepted without rendering significant parts of the 2019 Resale Addendum superfluous or illusory. If, in fact, the language incorporating the terms of the MSA in Section 1.1 was intended to bring with it all of the attachments that form part of the MSA, there would have been no reason for the parties to specify that the "additional documents" that are incorporated into the 2019 Resale Addendum include the Pricing Schedules. The language of Section 1.1 would have done all the necessary work without the need for subsections (a) through (d). And, if the Pricing Schedules that were executed by the parties and form part of the MSA are already deemed to be incorporated into the 2019 Resale Addendum, then the limitations of Section 1.1(a)—that the only Pricing Schedules whose terms are deemed to be part of the 2019 Resale Addendum are the subsisting Pricing Schedules attached to the 2019 Resale Addendum or the future Pricing Schedules that reference the 2019 Resale Addendum—would be illusory. All Pricing Schedules, whether or not they were attached to the 2019 Resale Addendum

[3] The "later executed" language in Section 1.1(a) could also be read to modify only the phrase "other document" as the last antecedent. *See Chachkes v. David*, 2021 WL 101130, at *7 (S.D.N.Y. Jan. 12, 2021) ("Under the 'rule of last antecedent,' a 'limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'") (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). But the parties agreed at oral argument that "later executed" modifies the full clause, including pricing schedules—and that is the most natural reading of the provision. *See* July 29, 2026 Hearing Tr. at 5:18–6:9, 35:9–36:9.

and whether or not they reference the 2019 Resale Addendum, would be incorporated into the 2019 Resale Addendum by virtue of the first sentence of Section 1.1.

There is a more straightforward interpretation of Section 1.1 and one that gives meaning to all of its language. The 2019 Resale Addendum incorporates the "terms" of the MSA and the General Terms and Conditions of the 2019 Resale Addendum. It also incorporates the specific "additional documents" that are referenced in Section 1.1(a)–(d). The 2019 Resale Addendum does not incorporate the MSA itself and all of the attachments that over time form that agreement. The MSA contains numerous "terms" itself—it is those and those alone that are incorporated into the 2019 Resale Addendum by the first sentence of Section 1.1. Under this reading, there is no problem of surplusage. The only Pricing Schedules deemed to be incorporated into the 2019 Resale Addendum would be those referenced in Section 1.1(a). Section 1.1 would not incorporate any Pricing Schedules of its own force. And no language is rendered illusory. The Pricing Schedules that are incorporated into the 2019 Resale Addendum are only those subsisting Pricing Schedules which are attached to the 2019 Resale Addendum or which are later executed and reference the 2019 Resale Addendum.

So interpreted, the rest of AT&T's argument falls away. The CSOA and the OneNet Pricing Schedules pursuant to which AT&T provided voice and data services to Atos are not incorporated into the 2019 Resale Addendum, and thus those services are not services provided to Atos "pursuant to" the 2019 Resale Addendum. Dkt. No. 244-3 § 1.1. In other words, the 2019 Resale Addendum does not cover those services. The CSOA is not incorporated into the 2019 Resale Addendum by operation of Section 1.1 because it is not referenced in Section 1.1. It is not a term of the MSA or one of the General Terms and Conditions of the 2019 Resale Addendum, and it is not listed in Section 1.1(a)–(d). It is also conspicuously absent from Section

1.2 of the 2019 Resale Addendum, which sets forth the "order of priority of the documents that form this Agreement." *Id.* § 1.2. The 2019 OneNet RPS is not incorporated into the 2019 Resale Addendum because it precedes the 2019 Resale Addendum but is not attached to it. It therefore is not one of the "additional documents" whose terms are incorporated into the 2019 Resale Addendum. *Id.* § 1.1. And the 2021 Amendment, though "later executed," is not incorporated into the 2019 Resale Addendum because it does not reference it. It references the MSA. *See* Dkt. No. 171-78 at 1 (listing "Master Agreement No. 120206" in header). But the MSA is not "this Agreement." "[T]his Agreement," by the terms of the 2019 Resale Addendum, is the 2019 Resale Addendum which incorporates the terms of the MSA. And those terms do not include the attachments to the MSA.

Thus, AT&T has not met its burden to show that the 2019 Resale Addendum clearly conveys a right to attorneys' fees for an action to collect undisputed overdue, delinquent, or dishonored payments for services provided under the OneNet Pricing Schedules. Section 4.4 entitles AT&T to reimbursement for all costs associated with collecting amounts due for services provided under the 2019 Resale Addendum. But the voice and data services provided pursuant to the CSOA and OneNet Pricing Schedules were not provided pursuant to the 2019 Resale Addendum. Rather, they were provided pursuant to a separate set of documents that also incorporated the general terms of the MSA. The mere incorporation of shared general terms into documents governing two sets of services—voice and data on the one hand, and resale services and equipment on the other—does not mean that every contractual arrangement covering one set of services necessarily extends to the other. *Cf. Aioi Nissay Dowa Ins. Co. Ltd. v ProSight Specialty Mgmt. Co., Inc.*, 2013 WL 3111349, at *7 (S.D.N.Y. June 20, 2013), *aff'd*, 563 F. App'x 68 (2d Cir. 2014) (summary order) ("[E]ven if the contracts are interrelated, as a matter of

law, this 'does not mean that any provision contained in [one] document must be applied to all other documents that are part of the same transaction,' as '[p]arties are free to enter into multiple contracts as part of a single transaction without the provisions in one contract governing another contract.'" (quoting *Rosen v. Mega Bloks, Inc.,* 2007 WL 1958968, at *5 (S.D.N.Y. July 6, 2007))).

That conclusion is reinforced by examination of each of the separate sets of agreements as a whole. The OneNet Pricing Schedules for voice and data services were designed so as to incent Atos itself to consume large amounts of the services offered by AT&T. That was the point of the MARC, as established in the summary judgment record. *See Atos*, 2026 WL 1090227, at *16 (finding that "the parties understood that MARCs . . . represented real and binding spending 'commitments' with real consequences for failing to satisfy them"). AT&T offered discounted rates to Atos to encourage it to use AT&T's voice and data services for the services it in turn provided to its customers and not the services of one of AT&T's competitors. *See id.* at *22 (restating the Court's own prior finding that "AT&T had an interest in incentivizing Atos to use more AT&T services, and thus to accrue more charges" toward its revenue commitments). Because Atos committed to consume a certain amount of services, AT&T discounted those services. *Id.* at *16 (finding that the extension term "carried with it the Pricing Schedule's steeply discounted custom list rates," the loss of which could cause the cost of services to a single client for a single month to "balloon from approximately $2,000 to over $15 million"). To that end, the CSOA strictly prohibited the resale by Atos of the voice and data services it was receiving from AT&T. Dkt. No. 171-9 § 11 ("Unless applicable local law or regulation mandates otherwise, Customer may not resell any portion of a Service to third parties."). That provision was not an immaterial part of the CSOA. It performed a central

function within that agreement. Absent a provision against resale, Atos would be able to take AT&T's discounted services and peddle those discounted services to others, while leaving itself the freedom to take as much or as little of those services for itself as it wanted.

The 2019 Resale Addendum has a very different architecture. Under that agreement, AT&T agreed to "provide or arrange to have an AT&T Affiliate provide Services to Customer and its Users." Dkt. No. 244-3 § 2.1. "Users" is defined to mean "anyone who uses or accesses any Service provided to [Atos], including End User Customers." *Id.* § 3.3. And "End User Customer" is defined broadly to mean "any entity that is a customer of [Atos] and to whom [Atos] may provide access to Services for its own use (which use may not include resale or redistribution)." *Id.* Thus, the 2019 Resale Addendum contemplated circumstances in which Atos operated as a pure pass-through. Atos was responsible for "selecting the Users to whom [it] ma[de] the Service available for use" as well as for implementing the appropriate terms, conditions, and measures to ensure that such End User Customers complied with AT&T's terms and conditions. *Id.* § 3.4(a). For its part, AT&T was responsible for "providing the Service to [Atos] or any [Atos] Affiliate for resale to an End User Customer in a timely manner, and in accordance with any purchase order entered into between the End User Customer and [Atos]." *Id*. The agreement makes explicit that Atos "may make the Hardware, Software, and Services available for the use by End User Customers or resell [t]he Hardware, Software, and Services for use by or otherwise for resale to third parties without AT&T's written consent." *Id.* § 3.4. It also provides that "AT&T may not interfere or attempt to sell (directly or indirectly) to an End User Customer AT&T knows, or has reason to know, [Atos] has begun directed negotiations with." *Id.* § 3.4(f).[4]

---

[4] Under the 2019 Resale Addendum, AT&T's obligation to provide Services to Atos or an End

Indeed, the very fact that the agreement itself is titled "System Integrator Unified *Resale* Addendum" lends further weight to the notion that the agreement's scope differs from that of the OneNet Pricing Schedules. *See Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 162 (S.D.N.Y. 2014) (where the relevant contract "contained no language suggesting that the captions or section headings should be disregarded in interpreting the contract . . . the heading must be considered and given effect in contractual construction"); *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002) ("Captions are relevant to contract interpretation.").

AT&T cannot pick and choose which provisions of the 2019 Resale Addendum are applicable to the Services provided pursuant to that agreement. If the voice and data services addressed by the 2019 OneNet RPS are Services provided pursuant to the 2019 Resale Addendum for the purposes of Section 4.4 (the attorneys' fee provision), then they necessarily also are Services under Sections 2.1 and 3.4 (the resale provision). But just one month before the parties executed the 2019 Resale Addendum, they negotiated and executed the 2019 OneNet RPS which set aggressive purchase goals for Atos to satisfy and, in turn, provided Atos generous rates for agreeing to satisfy those goals without revising the prohibition against resale in the CSOA. *See generally* Dkt. No. 171-46. The absence of any evidence that the parties intended in 2019 pursuant to the 2019 Resale Addendum to so fundamentally change the economic structure of the OneNet Pricing Schedules provides further confirmation that they did not intend through the 2019 Resale Addendum to give AT&T the right to attorneys' fees that it did not have with respect to services provided under the OneNet Pricing Schedules.

---

User Customer is qualified by "the availability and operational limitations of systems, facilities and equipment." Dkt. No. 244-3 § 2.1. Under the CSOA, AT&T's obligation to deliver the Services identified in the Pricing Schedules is unqualified. Dkt. No. 171-9 § 1(A).

Finally, the Court pauses to note only that there is substantial question whether AT&T has satisfied the prerequisites to attorneys' fees under the 2019 Resale Addendum, even assuming that that agreement was applicable. Section 4.4 entitles AT&T to attorneys' fees for actions to collect "undisputed overdue, delinquent or dishonored payments." Dkt. No. 244-3 § 4.4. Meaning must be given to each of those words. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[U]nder New York law . . . the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 121 (2d Cir. 2003))); *Zero Carbon Holdings, LLC v. Aspiration Partners, Inc.*, 732 F. Supp. 3d 326, 349 (S.D.N.Y. 2024) (when interpreting a contract, "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby" (internal quotation marks and citation omitted)).

Atos claims that "undisputed" means that Atos has agreed that it owes AT&T the invoiced amount. *See* Dkt. No. 249 at 9–10 (arguing that the MARC shortfall was "by definition, disputed" as "Atos contested the very existence of the obligation AT&T sought to collect," as opposed to "delinquent bills that the customer refuses to pay despite acknowledging the obligation"). But that cannot be the case. Under that reading, the only attorneys' fees to which AT&T would be entitled would be those that it incurred in obtaining a default or uncontested judgment. *See* July 29, 2026 Hearing Tr. at 46:1–47:2. The clause would be rendered illusory.[5] Meaning must be given to "undisputed," and "overdue" payments must be

[5] Under Atos's preferred construction, "AT&T would never be able to recover its reasonable attorneys' fees and costs so long as Atos 'disputed' the charges—regardless of whether it had any legitimate basis to do so." Dkt. No. 251 at 7. In the same vein, AT&T's response that this Court has already determined that there is no genuine dispute as to Atos's obligation to pay the MARC shortfall must fail. Dkt. No. 251 at 6–7. If AT&T were right, the term "undisputed"

distinguished from "delinquent" payments. The answer to that interpretative question comes from the very next provision in the 2019 Resale Addendum—the provision that addresses "Disputed Charges." Dkt. No. 244-3 § 4.5. Under that provision, if Atos as Customer disputes a charge, it is entitled to provide notice to AT&T of the dispute, at which point Atos's obligation to pay is suspended and it may withhold "[t]he portion of charges in dispute." *Id.* Such amounts are not considered "overdue" until AT&T conducts and completes an investigation and provides notice of the results of the investigation to Atos. Only then does the clock for payment start to run. Atos must pay the disputed amounts within 45 business days. *Id.* Giving each word of the contract meaning then, the interpretation becomes apparent. "[U]ndisputed overdue" amounts refer to those amounts that were the subject of a dispute under Section 4.5 but that, following the completion of the investigation and notice to Atos, have become overdue. "Delinquent" payments are those that were not disputed under Section 4.5, and that have not been made when due.[6] Finally, "dishonored" is given its plain meaning to refer to a check payment that a bank refuses to accept for insufficient funds, for example. *See Dishonor*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/direct ("refusal on the part of the issuer (as a bank) to pay or accept commercial paper (as a check) when it is presented").

In this case, however, while the parties do not contest that Atos disputed AT&T's invoice, *see* July 29, 2026 Hearing Tr. at 23:23–25:5, AT&T has not proffered evidence that it conducted the investigation required by Section 4.5 or that it provided the "notice" to Atos of the

---

would also be stripped of meaning. AT&T would be entitled to recover its attorneys' fees and costs in every case where it incurred such costs on the theory that, at the time it requested such fees, Atos's obligation to pay the underlying charge could no longer be disputed.

[6] If, as Atos argues, "undisputed" modified both "overdue" and "delinquent" in Section 4.4, the term "delinquent" would be devoid of meaning, as "delinquent payments are, by definition, overdue." Dkt. No. 251 at 5.

results of investigation necessary to trigger the Section 4.5 obligation and the Section 4.4 right to collect attorneys' fees if Atos did not pay the now undisputed amount when due. It points only to a letter from counsel to Atos referencing that the parties had a billing dispute and that in June 2022 AT&T denied the billing dispute claim. Dkt. No. 153-3.[7] But nowhere in that letter does Atos reference the 2019 Resale Addendum, and AT&T has pointed to no other evidence that it conducted the formalities required by Section 4.5. *See JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 2024 WL 4880075, at *2 (S.D.N.Y. Nov. 25, 2024) ("A fee applicant 'must . . . submit appropriate documentation to meet the burden of establishing entitlement to an award.'" (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011))). For that reason as well, AT&T has not proven its entitlement to attorneys' fees for this litigation.

**CONCLUSION**

AT&T's motion for attorneys' fees and costs is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 243.

SO ORDERED.

Dated: August 3, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge

[7] The CSOA provides a separate mechanism for Atos to submit a billing dispute to AT&T. Under Section 5.5 of that agreement, Atos must provide written notice to AT&T of a disputed charge at the cost—if it does not do so—that the dispute is waived. Dkt. No. 171-9 § 5.5.